1

2

3

4

5

6                    UNITED STATES DISTRICT COURT

7                    EASTERN DISTRICT OF CALIFORNIA

8

9  THADDAEUS LOUIS TURNER,              )   Case No. 1:91-cv-00153-LJO
                                        )
10            Petitioner,               )   <u>DEATH</u> <u>PENALTY</u> <u>CASE</u>
                                        )
11     vs.                              )   MEMORANDUM DECISION AND ORDER
                                        )   FOLLOWING EVIDENTIARY HEARING
12  ROBERT K. WONG, as Acting Warden    )   GRANTING PETITION FOR WRIT OF
    of San Quentin State Prison,*       )   HABEAS CORPUS
13                                      )
              Respondent.               )
14  _____    )

15

16

17

18

19

20

21

22

23

24

25  * Robert K. Wong is substituted for his predecessor Warden pursuant to Federal Rule of Civil Procedure
26  25(d).

27

28

91dp153.OFollEvidHrg.Tur.wpd

1

2                                    Table of Contents

3

4   I.      Factual Background and Trial Proceedings . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   1

5   II.     Post-Trial Procedural History . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   3

6   III.    Standard of Review . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   5

7   IV.     Alleged Ineffective Assistance of Counsel During Penalty Proceedings (Claim 5) . . . . . . .   6

8           A.      Summary of the Relevant Facts . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   6

9                   1.      Guilt Phase Trial Proceedings . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   6

10                          a.      Mr. Hallford's Guilt Phase Opening Statement . . . . . . . . . . . . . . . . .   6

11                          b.      Mr. Ellery's Guilt Phase Opening Statement . . . . . . . . . . . . . . . . . .   7

12                          c.      Guilt Phase Testimony of Gregory Mayo . . . . . . . . . . . . . . . . . . . .   8

13                          d.      Guilt Phase Testimony of Augusti Albritton . . . . . . . . . . . . . . . . . .   9

14                          e.      Guilt Phase Testimony of Detective Craig Wright . . . . . . . . . . . . . .   9

15                          f.      Guilt Phase Testimony of Detective Henry Strength . . . . . . . . . . .   10

16                          g.      Guilt Phase Testimony of Detective John Harris . . . . . . . . . . . . . .   11

17                          h.      Guilt Phase Testimony of Pathologist Malcolm Murdoch, M.D. . .   11

18                          i.      Guilt Phase Testimony of Rita Dienst . . . . . . . . . . . . . . . . . . . . . . .   12

19                          j.      Guilt Phase Testimony of Turner . . . . . . . . . . . . . . . . . . . . . . . . . .   12

20                          k.      Guilt Phase Testimony of Bartender Jay Bradshaw . . . . . . . . . . . .   17

21                          l.      Guilt Phase Testimony of Phillip M. Hamm, Jr., Ph.D. . . . . . . . . .   17

22                          m.      Guilt Phase Testimony of Lee Stewart Coleman, M.D. . . . . . . . . . .   21

23                          n.      Mr. Hallford's Guilt Phase Summation . . . . . . . . . . . . . . . . . . . . . .   21

24                          o.      Mr. Ellery's Guilt Phase Summation . . . . . . . . . . . . . . . . . . . . . . .   22

25                          p.      Mr. Hallford's Guilt Phase Rebuttal . . . . . . . . . . . . . . . . . . . . . . . .   23

26                          q.      Guilt Phase Deliberations . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   24

27                  2.      Penalty Phase Trial Proceedings . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   24

28                          a.      Penalty Phase Testimony of Dr. Murdoch . . . . . . . . . . . . . . . . . . . .   24

b.    Penalty Phase Testimony of Detective Strength . . . . . . . . . . . . . . 25

c.    Penalty Phase Testimony of Ruth Turner . . . . . . . . . . . . . . . . . . . 25

d.    Penalty Phase Testimony of Lisa Haynes . . . . . . . . . . . . . . . . . . . 25

e.    Penalty Phase Testimony of Elijah Barber . . . . . . . . . . . . . . . . . . . 25

f.    Penalty Phase Testimony of Lewis Coleman . . . . . . . . . . . . . . . . . 26

g.    Penalty Phase Testimony of Kathryn Carter . . . . . . . . . . . . . . . . . 26

h.    Penalty Phase Jury Instructions . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

i.    Mr. Hallford's Penalty Phase Summation . . . . . . . . . . . . . . . . . . . 27

j.    Mr. Ellery's Penalty Phase Summation . . . . . . . . . . . . . . . . . . . . . 28

k.    Mr. Hallford's Penalty Phase Rebuttal . . . . . . . . . . . . . . . . . . . . . 29

l.    Penalty Phase Deliberations . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

3.    Turner's motion for modification of the death verdict . . . . . . . . . . . . . . . 30

4.    Evidence Presented at the Evidentiary Hearing . . . . . . . . . . . . . . . . . . . . . 31

a.    Turner Family and Friend Witnesses . . . . . . . . . . . . . . . . . . . . . . . 32

(1)    Evelyn Turner . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

(2)    Elizabeth Turner . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

(3)    Oweida Doxey . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42

(4)    Ruth Evelyn Turner . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45

(5)    Yvonne Turner Haynes . . . . . . . . . . . . . . . . . . . . . . . . . . 53

(6)    Thaddaeus Jefferson Turner . . . . . . . . . . . . . . . . . . . . . . . 54

(7)    Pam Butler . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 55

(8)    Kathryn Carter Senegal-Price . . . . . . . . . . . . . . . . . . . . . 56

(9)    Lewis Coleman . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 59

(10)    Sandra Goodman . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 60

(11)    March 31, 1980 Probation Report . . . . . . . . . . . . . . . . . . . 60

b.    School and Academic Records. . . . . . . . . . . . . . . . . . . . . . . . . . . . 61

c.    Witnesses Acquainted with Mr. Savage . . . . . . . . . . . . . . . . . . . . 62

(1) Betty Means Tavares . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 62

(2) Joyce Slaton . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 63

d. Investigating Officers . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 64

(1) Detective Strength . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 64

(2) Detective Jill Mayer . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 65

e. Expert Witnesses . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 65

(1) Trevor D. Glenn, M.D. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 66

(2) Ernest D. Lykissa, Ph.D. . . . . . . . . . . . . . . . . . . . . . . . . . . 66

(3) Dean Warden . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 67

(4) Stephen M. Pittel, Ph.D. . . . . . . . . . . . . . . . . . . . . . . . . . . . 67

(5) Phillip M. Hamm Jr., Ph.D. . . . . . . . . . . . . . . . . . . . . . . . . 70

(6) Howard B. Terrell, M.D. . . . . . . . . . . . . . . . . . . . . . . . . . . 78

(7) Reese T. Jones, M.D. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 90

f. Trial Defense Team Witnesses . . . . . . . . . . . . . . . . . . . . . . . . . . . . 96

(1) John W. Ellery . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 96

(2) William Ray Brown . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 104

(3) Kenneth Roberts . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 106

g. State Appellate and Post-Conviction Attorney Witnesses . . . . . . . 107

(1) Dennis A. Fischer . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 107

(2) John M. Bishop . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 107

(3) Douglas W. Otto . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 107

h. (Former) District Attorney Patrick Hallford . . . . . . . . . . . . . . . . 108

B. Analysis . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 110

1. Performance . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 110

a. Childhood Abuse and Dysfunctional Family Dynamics . . . . . . . . 111

b. Borderline Intellectual Capabilities . . . . . . . . . . . . . . . . . . . . . . 122

c. Drug Abuse and Drug Abuse History . . . . . . . . . . . . . . . . . . . . 123

d. Mr. Savage's Sexual Practices . . . . . . . . . . . . . . . . . . . . . . . . . 127

       2.     Prejudice  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 130

V.     Order  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 144

Appendix

## I.      Factual Background and Trial Proceedings

This case involves the stabbing murder of Roy Savage on April 14, 1984.  Mr. Savage was stabbed 40 to 50 times in a gruesomely bloody attack at his Merced home.  Numerous household items, including a television, together with Mr. Savage's late model Cadillac, were missing from the house when sheriff's deputies commenced their investigation.  In addition, two telephone cords in the house had been cut.[1]  Petitioner Thaddaeus L. Turner ("Turner"), 22 years old at the time,[2] admitted the act of stabbing Mr. Savage, taking a television from Mr. Savage's home, and driving away in Mr. Savage's car.  He denied harboring the intent to steal the television or car prior to the fatal attack, and denied cutting telephone cords or taking any other possessions. He claimed the stabbing followed Mr. Savage's unwanted sexual advances. When Turner was apprehended by a California Highway Patrol officer in Fresno, two days after Mr. Savage was killed (April 16, 1984), he was driving Mr. Savage's car.  The missing television set was in the trunk and Mr. Savage's wallet was on the console of the car.  None of the other household items said to have been missing from Mr. Savage's house was recovered.

Besides claiming to have been sexually attacked by Mr. Savage, Turner maintains he was an habitual PCP and marijuana user, and that he used both drugs, plus methamphetamine and alcohol, on the day of the offense.  In offers of proof supporting his motion for an evidentiary hearing, and at the evidentiary hearing the Court ultimately conducted, he also presented considerable evidence of his miserable and sad childhood during which he was persistently physically abused and verbally ridiculed by his alcoholic father, while virtually neglected by his depressed, despondent mother. From the time Turner was in grade school, his father whipped him with a leather razor strap kept in the garage,[3] "thumped" him on all parts of his head,[4] and socked him in the stomach with karate punches. Turner's

---

[1] A third telephone cord, in the kitchen, had not been cut.

[2] Turner was born on October 3, 1961.

[3] The Ninth Circuit opinion remanding this case incorrectly reports that Turner's father used razors to beat him. *Turner v. Calderon*, 281 F.3d 851, 894 (9th Cir. 2002).

[4] "Thumping" was described by sister Evelyn Turner as the thumb pressing down on the third finger and the third finger flicking away from the hand.  EHT-1: 17-18.  Sister Elizabeth Turner additionally described "thumping" as striking with a fist where the middle knuckle was raised above the other knuckles. *Id.*: 110.

crying during these discipline sessions did not induce his father to relent, but to "discipline" more vigorously.  The parents, who fought bitterly, violently, and physically with one another eventually separated and terminated their marriage, but even after the separation, the father continued thumping Turner until he was in junior high school.

Turner suffered two prior felony convictions, for robbery and for receiving stolen property, both of which he admitted.  (Only the October 6, 1982 conviction for receiving stolen property was charged and admitted as an enhancement to the indictment. RT-5: 998-99.)  His trial attorney was Merced County Public Defender John Ellery.  The prosecutor was Merced District Attorney Patrick Hallford.  The trial evidence gave conflicting portraits of Mr. Savage.  On one hand, he was a highly respected administrator and mathematics instructor at Merced Community College, who also served as director of the College Educational Opportunity Programs and Services.  In that capacity, he helped many young people pursue an education and obtain jobs.  He also owned several rental houses.  Accordingly, it was not unusual for him to hire young people to help with landscaping and clean up tasks for these rental houses.  On the other hand, as Mr. Ellery tried to bring out, he engaged in homosexual activities and cultivated homosexual relations.  This inference was supported by testimony that Mr. Savage sometimes went to San Francisco for week-end stays and did not talk about what he did.  Mr. Ellery also called a former bartender who worked at a known "gay" bar in Fresno.  The bartender informed police that Mr. Savage was a frequent customer at the bar.  Turner testified that he met Mr. Savage at a bus stop just outside this gay bar while he (Turner) was on his way home from his construction job.  Mr. Savage offered Turner work performing landscaping tasks on his (Mr. Savage's) house (residence).  Turner accepted and Mr. Savage arranged to drive to Fresno to pick Turner up and return to Merced, a distance of approximately 60 miles, each way, the ensuing weekend.  Also pertinent to the case is the difference in relative size between Mr. Savage, a large man said to be six feet, three inches, weighing between 200 and 300 pounds, and Turner, who was 5 feet 9 inches tall and weighed 140 to150 pounds.

The facts leading up to the fatal stabbing of Mr. Savage were provided during guilt phase proceedings by Turner's testimony.  Defense retained psychologist, Phillip M.  Hamm, Jr., Ph.D, also testified about the story Turner recounted to him for purposes of revealing Turner's mental state at the time of the killing.  Mr. Hallford countered by painting  a picture of Turner as an opportunistic, cold-

blooded killer motivated by the desire to steal from his victim.  While Mr. Hallford argued Turner's story of Mr. Savage's unwanted sexual overtures was simply unbelievable, he maintained that to the extent Mr. Savage did express a sexual interest, Turner exploited the situation to gain access to Mr. Savage's home and cultivate Mr. Savage's trust.  Under the prosecution theory, Turner formulated a premeditated plan to kill Mr. Savage so he could realize his goal of acquiring Mr. Savage's property.

Trial commenced on November 6, 1984, with jury selection complete by November 13, 1984.  Opening statements and presentation of evidence at the guilt phase proceeded on November 14, 1984.  Both sides rested on November 20, 1984, with jury deliberations commencing the same day.[5]  Deliberations continued for 35 minutes on Wednesday, November 21, 1984, until the jurors notified the trial court they had reached a verdict.  They returned a guilty verdict on the first degree murder change and found true the robbery-murder special circumstances.  Although Turner also was charged with a second felony count of robbery, the jurors failed to complete the verdict form or return a verdict on this charge until the following Tuesday, November 27, 1984.  RT-8: 1712-15; 1758-67.

Penalty proceedings commenced and were completed on the same day (November 27, 1984).  For the People, Mr. Hallford called the pathologist who conducted the autopsy on Mr. Savage to describe the depth of the knife wounds Turner inflicted as part of the jury's consideration of the circumstances of the crime sentencing factor.  Mr. Ellery called one of the investigating detectives to bring a sense of uncertainty to bear on the jurors that Turner in fact harbored the requisite intent to steal prior to the fatal stabbing because he didn't take the television remote control device for the stolen television.  He also called Turner's mother, a half-sister, a family friend, a cousin, and a "job developer" to describe Turner's caring, kind, non-violent nature, and reliability as an employee.

## II.    Post-Trial Procedural History

Following the death verdict on November 27, 1984, Turner moved the trial court for modification of that verdict, which was heard and denied on December 21, 1984.  His direct appeal affirming the conviction and death sentence was filed April 26, 1990.  *People v. Turner*, 50 Cal. 3d 668 (1990).  He commenced this federal proceeding on April 1, 1991, by filing a pro se petition, requesting a stay of

---

[5] Testimony at the guilt phase of Turner's trial was taken on Wednesday, November 14, 1984, Thursday, November 15, 1984, Friday, November 16, 1984, and Tuesday, November 20, 1984.

1    execution, and applying for appointment of counsel.  Following the appointment of federal counsel, he

2    filed an amended petition containing a number of unexhausted claims on March 8, 1993.  The Court

3    ordered Turner to exhaust his state remedies by order entered May 25, 1993.  His subsequently filed state

4    petition for habeas corpus was denied on March 25, 1996.  He thereafter filed his amended federal

5    petition on April 29, 1996.  This is the operative petition in the case (hereafter the "Petition").

6         In 1996 and 1997, the Court addressed the arguments of Respondent Robert K. Wong, as Acting

7    Warden of San Quentin State Prison (the "Warden"),[6] that a number of claims in the Petition were

8    procedurally defaulted.  Following a series of orders on the subject, the Court issued an order on June

9    27, 1997, denying three claims on the merits and dismissing eleven claims as procedurally barred.

10   *Turner v. Calderon*, 970 F. Supp. 781 (E.D.Cal. 1997).  On September 23, 1997, following the issuance

11   of *Fields v. Calderon*, 125 F.3d. 757, 760 (9th Cir. 1997), in which the Ninth Circuit held that California

12   state procedural defaults of the kind at issue in Turner's case were inadequate to bar federal review, the

13   Court denied on the merits all fourteen of the previously resolved claims.

14        After further merits briefing of the Petition, on April 27, 1999, the Court issued a Memorandum

15   Decision and Order denying Turner's request for an evidentiary hearing as to four claims, including

16   Claim 5, alleging ineffective assistance of counsel at Turner's penalty phase.  The April 27, 1999 Order

17   additionally denied each of the four claims on the merits.  On May 18, 1999, the Court denied the

18   remaining, record-based claims on the merits and judgment was issued forthwith.  Turner appealed to

19   the United States Court of Appeals for the Ninth Circuit and the appellate court reversed this Court with

20   respect to the denial of an evidentiary hearing as to Claim 5.  *Turner v. Calderon*, 281 F.3d 851 (9th Cir.

21   2002).  Following the remand, this Court, by the Honorable Robert E. Coyle, conducted an evidentiary

22   hearing as to Claim 5 on July 22, 23, 24, 25, and 29, 2003, focusing on the limited issues of whether Mr.

23   Ellery had a reasonable strategy justifying *not* presenting the mitigation evidence Turner identified as

24   available at the time of trial and whether that evidence would have been compelling enough to have

25   altered the outcome of the penalty verdict.

26

27   _____

28        [6] Acting Warden Wong follows a number of interim predecessors in the public office he now
     occupies.  In 1996 and 1997, the Warden was Arthur Calderon.

1    **III.    Standard of Review**

2          Under controlling United States Supreme Court precedent, it is the filing of "an application for

3    habeas relief seeking adjudication on the merits of petitioner's claims" that triggers applicability of the

4    Anti-terrorism and Effective Death Penalty Act of April 24, 1996 ("AEDPA").  *Woodford v. Garceau*,

5    538 U.S. 202, 207 (2003).  Since Turner's March 8, 1993 petition, which constitutes a substantive

6    pleading seeking adjudication on the merits, was filed before the enactment of AEDPA, pre-AEDPA

7    law, under former 28 U.S.C. § 2254, is controlling.  *Id.*

8          Former 28 U.S.C. § 2254(d) directs that *written* state findings are presumed correct:

9          In any proceeding instituted in a Federal court by an application for a writ of habeas
           corpus by a person in custody pursuant to the judgment of a State court, a determination
10         after a hearing on the merits of a factual issue, made by a State court of competent
           jurisdiction in a proceeding to which the applicant for the writ and the State or an officer
11         or agent thereof were parties, evidenced by a written finding, written opinion, or other
           reliable and adequate written indicia, shall be presumed to be correct, unless the
12         applicant shall establish or it shall otherwise appear, or the respondent shall admit –

13              (1)   that the merits of the factual dispute were not resolved in the State court
           hearing;
14
                (2)   that the factfinding procedure employed by the State court was not adequate
15         to afford a full and fair hearing;

16              (3)    that the material facts were not adequately developed at the State court
           hearing;
17
                (4)   that the State court lacked jurisdiction of the subject matter or over the
18         person of the applicant in the State court proceeding;

19              (5)   that the applicant was an indigent and the State court, in deprivation of his
           constitutional right, failed to appoint counsel to represent him in the State court
20         proceeding;

21              (6)    that the applicant did not receive a full, fair, and adequate hearing in the
           State court proceedings; or
22
                (7)   that the applicant was otherwise denied due process of law in the State court
23         proceeding;

24              (8)   or unless that part of the record of the State court proceeding in which the
           determination of such factual issue was made, pertinent to a determination of the
25         sufficiency of the evidence to support such factual determination, is produced as
           provided for hereinafter, and the Federal court on a consideration of such part of the
26         record as a whole concludes that such factual determination is not fairly supported by the
           record.

27

28

1  Both mixed questions of law and fact and pure questions of law are reviewed *de novo*.  *See Thompson*

2  *v. Borg*, 74 F.3d 1571, 1573 (9th Cir. 1996).  Under pre-AEDPA law, a claim alleging ineffective

3  assistance of counsel is considered a mixed question of law and fact, subject to *de novo* review.  *Correll*

4  *v. Ryan*, 539 F.3d 938, 942 (9th Cir. 2008).

5  **IV.    Alleged Ineffective Assistance of Counsel During Penalty Proceedings (Claim 5)**

6      In reaching the ultimate determination as to Mr. Ellery's alleged constitutionally incompetent

7  representation, the Court must review the evidence adduced at the evidentiary hearing as well as

8  pertinent trial evidence (guilt and penalty), and the argument of counsel (guilt and penalty) to assess the

9  relative impact between what was presented during Turner's penalty proceedings and what Turner

10  alleges could have been presented.  Evidence submitted by the Warden also must be factored into the

11  mix.  *See Wiggins v. Smith*, 539 U.S. 510, 534 (2003) (holding that assessing prejudice requires re-

12  evaluating the prosecution evidence against the totality of available defense evidence).

13      **A.    Summary of the Relevant Facts**

14      Although the Court previously has set out a comprehensive summary of trial proceedings and

15  post-conviction declarations presented on federal habeas in prior orders, *see* June 27, 1997 Order at pp.

16  1-4; April 27, 1999 Order at pp. 8-36, selected trial proceedings (including some not previously

17  summarized) are summarized (and in some cases re-summarized) to give context to the evidentiary

18  hearing testimony and relevant documentary evidence.

19      **1.    Guilt Phase Trial Proceedings**

20      The relevant guilt phase trial proceedings include Mr. Ellery's opening and closing arguments,

21  Mr. Hallford's opening, closing, and rebuttal arguments, selected guilt phase testimony, and guilt phase

22  deliberations.   Guilt phase proceedings commenced with Mr. Hallford's opening statement on

23  Wednesday, November 14, 1984, continuing through November 15, 16, and 20, 1984.  Guilt phase

24  deliberations commenced at 3:04 p.m. on Tuesday, November 20, 1984, and were complete the next day

25  on Wednesday, November 21, 1984 at 10:34 a.m.  RT-8: 1704, 1712.

26      **a.    Mr. Hallford's Guilt Phase Opening Statement**

27      Mr. Hallford identified Mr. Savage's professional responsibilities at Merced College and the last

28  two people to have seen him alive on Saturday April 14, 1984, in the company of Turner.  RT-5: 999-

1000.  He described what Greg Mayo observed when he came to Mr. Savage's home on the following

Monday.  The body was "bloody," the scene at the house was "gory."  There was blood on the couch,

the ceiling, the curtains, the sliding glass doors, and the enclosed back porch all the way to the back

door.  *Id*.: 1001-02.  There was blood on the back screen door and there were drag marks where the body

had been dragged back away from the door.  The body was covered with towels.  Sheriff's investigators

also observed blood "going down the street, indicating that the Defendant, after he had done this gory

deed, had dropped blood when he had left."  Mr. Savage's Cadillac, television , a stereo and some other

items were missing from the home.  When Turner was arrested, he was driving the missing Cadillac.

*Id*.: 1002.  The television was in the car and both the car and the television had blood on them which

matched Mr. Savage's blood.  The buck knife in Turner's possession when he was arrested also had

blood on it which matched Mr. Savage's blood type.  Turner's shoes matched a bloody print left in the

house.  Mr. Hallford explained that two telephone cords in the house had been cut, and neither was

bloody, "indicating the Defendant had planned this violence, indicating the premeditation."  *Id*.: 1003.

### b.    Mr. Ellery's Guilt Phase Opening Statement

After successfully resisting a prosecution *in limine* motion to preclude evidence of Mr. Savage's

homosexuality, Mr. Ellery explained the circumstances of the initial interactions between Mr. Savage

and Turner in terms that would suggest Mr. Savage's sexual interest in Turner.  Mr. Savage initiated the

contact with Turner in front of a "homosexual" bar in Fresno about a week previous to the homicide.

He placed several calls to Turner "with the stated purpose of inviting the Defendant to come to Merced

and work in Mr. Savage's yard."  RT-5: 1004-05.  In order to accomplish this, Mr. Savage had to make

a one hour drive from Merced to Fresno to collect Turner and then drive back again for another hour.

The work to be done in the yard was overwhelming and Turner made a mild protest.  "Mr. Savage was

not really terribly concerned about getting work done."  *Id*.: 1005.  After less than an hour in the yard,

Mr. Savage and Turner spent the day "going to various friends of Mr. Savage, or seeing people that Mr.

Savage knew . . . they arranged a barter system as to how the Defendant was to be paid for his labors.

. . . They spent the good part of the day also admiring Mr. Savage's home, influential area, listening to

the sound machine – the sound equipment, the stereo equipment, maybe the television."  *Id*.: 1005-06.

After carrying out the barter agreement (purchasing clothes for Turner) they returned to Mr. Savage's

1    home rather than driving back to Fresno to take Turner home. "[T]he evidence will show that some time

2    during the evening the Defendant did indeed kill Mr. Savage." *Id*.: 1006. As to whether the killing was

3    or was not a crime, the jurors were told to question why Mr. Savage did all these things. Also, Mr.

4    Ellery asked the jury to take note of the fact that Mr. Savage's head was placed upon a pillow; his "body

5    was covered with a variety of pillow cases and towels and things like that," and that there may have been

6    an attempt to clean some of the blood off, and that there was blood "spread throughout may portions of

7    the house." He concluded by suggesting these erratic acts had a bearing on "the mental elements of this

8    event." *Id*.: 1006-07.

9                              **c.    Guilt Phase Testimony of Gregory Mayo**

10          Greg Mayo, Mr. Savage's second cousin, discovered the bloody crime scene in the mid-afternoon

11   on Monday, April 16, 1984. He came to the house to help Mr. Savage perform maintenance work on

12   his rental homes, as he often did. Occasionally Mr. Savage also hired students to perform maintenance

13   work. RT-5: 1009. Mr. Mayo had arranged to stop by Mr. Savage's house on this day (April 16, 1984)

14   the preceding Friday, April 13, 1984, when he and Mr. Savage ate dinner together. *Id*.: 1011, 1039-40.

15   He approached the house from the backyard and observed that the screen door to the enclosed patio was

16   swung wide open and full of blood. *Id*.: 1012. On cross examination he further described the screen

17   door as having been cut. *Id*.: 1047. Upon discovery of the crime scene, rather than use a neighbor's

18   telephone, Mr. Mayo drove across town and called authorities from a friend's house. *Id*.: 1013. This was

19   after he tried to use the telephone in Mr. Savage's family room, but found it was dead. *Id*.: 1049. He

20   identified the items missing from Mr. Savage's house, including a television set removed from the

21   upstairs master bedroom, a full-size stereo receiver, two 10-by-12-by-25 inch speakers, a tape cassette,

22   miniature speakers, a second stereo system, two glass end tables with two foot-high bases, several

23   statutes in the one to one and a half foot high range, and most of the clothes from Mr. Savage's closet,

24   including three full suits Mr. Mayo specifically described. *Id*.: 1014-16, 1065-70, 1079. When Mr.

25   Mayo visited Mr. Savage on Friday, the closet was really compacted with suits, but, "[a]lmost empty"

26   when he came to inventory missing items with authorities. *Id*.: 1070. Mr. Mayo also initially reported

27   that two rings and a watch Mr. Savage customarily wore were missing. *Id*.: 1051.

28

1    Mr. Mayo was aware that sometimes Mr. Savage went out of town on weekends. He understood

2    that Mr. Savage went to the Bay Area on these occasions. Mr. Savage did not explain exactly where he

3    was going, who he was visiting, or what he was doing during these trips. This was in contrast to his trips

4    to visit family members, when Mr. Savage did specifically tell Mr. Mayo where he was going and who

5    he was visiting. *Id.*: 1045-47. Mr. Mayo testified that his cousin was approximately six feet, three

6    inches tall and weighed approximately 200 pounds.[7] *Id.*: 1071.

7    At some point when Mr. Mayo was in the house after the homicide, he found a telephone index

8    in the family room, which he turned over to investigating officers. RT-7: 1458-59.

9    **d.    Guilt Phase Testimony of Augusti Albritton**

10    In April of 1984, Mr. Albritton was the Assistant Director of Educational Opportunity Programs

11    and Services at Merced Community College. RT-5: 1087. Roy Savage was the director. Mr. Savage

12    also taught a math class and was a counselor. Mr. Albritton and Mr. Savage were friends. Mr. Savage

13    was, "Very, very well thought of." *Id.*: 1088. Mr. Savage came to Mr. Albritton's house on Saturday,

14    April 14, 1984 to exchange Mr. Albritton's truck, which Mr. Savage had borrowed, for his (Mr.

15    Savage's) Cadillac, which Mr. Albritton was using while Mr. Savage had the truck. Mr. Savage often

16    borrowed Mr. Albritton's truck to haul materials used in his (Mr. Savage's) rentals. *Id.*: 1091. Turner

17    was with Mr. Savage during this visit/vehicle exchange. Mr. Albritton believed Turner was one of the

18    many young people Mr. Savage was helping with getting an education. He described Mr. Savage as a

19    man who loved to eat and suffered from a "weight problem." *Id.*: 1092.

20    **e.    Guilt Phase Testimony of Detective Craig Wright**

21    Merced County Sheriff Detective Wright described the blood stains and splatters throughout Mr.

22    Savage's house onto the covered patio to the backyard, all captured on a video tape that was introduced

23    in evidence. RT-5: 1103, 1106. Everything was splattered with blood. There was blood in the front

24    lobby (foyer) and blood on the front door knob. *Id.*; 1106. Blood stains were seen on the furniture,

25    walls, drapes, floor, house plants, doors, and on the linens covering the Mr. Savage's body. *Id.*: 1162-

26    1165. Detective Wright described the scene as the pathologist, Dr. Malcolm Murdoch, and various

27

28    _____

[7] Mr. Mayo adopted Mr. Ellery's question, "And close to 200 pounds." RT-5: 1071.

deputies inspected the body, front and back. There were "large gaping open wounds to the check [sic] and neck area" as well as to the chest. *Id.*: 1166-1167. His head was resting partially on a pillow. RT-6: 1210-11. The part of his head resting on this pillow did not appear to have been bleeding. *Id.*: 1221.

The canvass of the living room indicated that some furniture, which made indentations in the carpet, had been recently moved. RT-5: 1168-1169. Mr. Savage's body was lying in the covered patio "under some towels." *Id.*: 1107. A cabinet on the patio appeared to have been forced open by bending the door. There was a pool of blood below the door. The blood on the floor appeared to have drag marks. *Id.*: 1109. Mr. Savage's body appeared to have been dragged over the carpet remnants on the patio floor. RT-6: 1287.

Detective Wright observed three telephones in the house, one in the family room downstairs, one in the master bedroom upstairs, and one in the kitchen downstairs. The cords on the family room and master bedroom telephones had been cut. RT-6: 1185-86. Later in the prosecution case, Detective Wright testified that two vials of blood were taken from Turner on April 20, 1984. RT-6: 1204. Later still, Mr. Savage's rings and watch were found under carpet remnants that were beneath his body. *Id.*: 1283.

**f.   Guilt Phase Testimony of Detective Henry Strength**

Lead Detective Henry Strength testified that the kitchen telephone cord had not been cut. Officers realized the kitchen telephone existed when it rang during the investigation. RT-6: 1278. He observed a pillow partially under Mr. Savage's head. The pillow did not have blood on it; it was not under a part of Mr. Savage's head that had been bleeding. *Id.*: 1279. Mr. Savage's rings and watch were found under Mr. Savage's body when the investigation began. *Id.*: 1281. On the patio, the blood stains appeared to have been wiped up or partially wiped up. He testified to having observed drag marks which were partially wiped up. *Id.*: 1293.

After Turner's arrest, when Detective Strength took Turner's clothes, he observed no defense wounds on his body. He did observe "some small scratches" on one of Turner's arms. *Id.*: 1281.[8] Regarding the recovery of the items from Mr. Savage's house other than the Cadillac and the television,

---

[8] In Detective Strength's report, he noted "minor scratches on [Turner's] right forearm." EHT Exhibit 106: EH0066.

1    Detective Strength testified that a search of Turner's house came up empty. *Id.*: 1292. Detective

2    Strength also seized items from the bar at Mr. Savage's house from which finger prints other than Mr.

3    Savage's and Turner's were discovered. *Id.*: 1307, 1309; RT-7: 1461. In addition, he authenticated Mr.

4    Savage's telephone index which Mr. Mayo turned over to authorities so it could be admitted into

5    evidence. RT-6: 1303.

6       At the very end of his rebuttal case, Mr. Hallford elicited from Detective Strength the substance

7    of Turner's statements to the Merced authorities (Detective Strength and Detective Jill Mayer). He told

8    the detectives he did not know Roy Savage and that he had not been to Merced. RT-8: 1624. Turner

9    further stated he couldn't remember where he obtained Mr. Savage's Cadillac and he didn't know where

10    he was going when he initially was stopped in Fresno by a California Highway Patrol officer. *Id.*: 1625.

11            **g.**     **Guilt Phase Testimony of Detective John Harris**

12       After the family of Mr. Savage changed the locks on the door of the house, they found and

13    reported to Detective Harris a broken key found in one of the doors. RT-7: 1467. This report, however,

14    was made a week or more after the investigation. *Id.*: 1468.

15            **h.**     **Guilt Phase Testimony of Pathologist Malcolm Murdoch, M.D.**

16       Dr. Murdoch conducted the autopsy on Mr. Savage's body. He also examined Mr. Savage's

17    body at the scene. RT-5: 1130. Mr. Savage's body was lying face down on the back patio. The body

18    was clothed in a shirt and Levis which were closed and belted. *Id.*: 1131-32. Multiple stab wounds were

19    inflicted on his body, including defensive wounds on his hands, cuts to his arms, back, chest, and face.

20    *Id.*: 1132-34. Some cuts were slashing wounds and some were penetrating wounds. *Id.*: 1138. Dr.

21    Murdoch testified he counted a total of 44 wounds, but because two of those were V-shaped, which may

22    been caused by two separate stabs (each), there may have been 46 wounds. There was a deep slashing

23    wound down across the jaw, a single wound on the left neck, were nine wounds on the anterior portion

24    of the chest, four wounds on the abdomen, three on the anterior leg, seven on the left arm, one superficial

25    wound on the left hand, a large deep cut in the right thumb, almost removing it, a deep wound in the

26    palm of left hand, a deep laceration on the right middle finder, three in the right hand, one on the left

27    hand, four on the right arm, and seven on the back, all below the shoulder blades, for a total of 44 stab

28    wounds, 46 if the V-shaped wounds counted as two rather than one. *Id.*: 1140-42. At the culmination

of cross examination, he clarified that his earlier testimony about the number of wounds overlooked four additional wounds, two on each of Mr. Savage's sides. *Id*.: 1150-51. This brought the total number of stab wounds to 50 (counting the two V-shaped wounds as two wounds each).

The autopsy revealed semen at the tip of Mr. Savage's penis indicating he ejaculated either shortly before he was killed or at the time he died. Dr. Murdoch explained that ejaculation at the time of death could occur. *Id*.: 1146. On cross examination, Mr. Ellery elicited that the occurrence of semen in this case could have been consistent with sexual activity. He also elicited that Mr. Savage's sphincter was looser than normal. *Id*.: 1147.[9]

Dr. Murdoch identified a stab wound to the upper abdomen, which passed through the diaphragm and cut a hole in the right ventricle of the heart as being the cause of death. *Id*.: 1148 (cross examination), 1155 (re-direct examination). Mr. Ellery also elicited that four of the wounds to Mr. Savage's back went through the chest wall into the lungs and that these wounds likely preceded the wounds to the lower abdomen, because chest wall wounds bled more. *Id*.: 1148-49. Finally, Mr. Hallford clarified from Dr. Murdoch that Mr. Savage would have able to move after having been stabbed, even with the fatal blow that cut into his heart: "None of these, none of these stab wounds would prevent him from moving." *Id*.: 1155-56.

### i.      Guilt Phase Testimony of Rita Dienst

Ms. Dienst was the office manager of Cross Construction, where Turner worked. She testified he didn't have transportation, so he took the bus to work. RT-7: 1361. Turner had a good reputation at work and was well liked. He worked on Monday, the day of his arrest. *Id*.: 1362.

### j.      Guilt Phase Testimony of Turner

Turner testified at the guilt phase proceedings during the defense case in chief. At the time of the crime, he lived with his mother and younger teenage sister, Oweida, in Fresno. Mr. Ellery elicited from Turner that he was incarcerated from June 1982 through September 1983 for receiving stolen property. Prior to that, Turner spent time at the California Youth Authority (hereafter "CYA") for robbery. He explained that both convictions were obtained without trial on his pleas of guilty. RT-6:

---

[9] That this condition was consistent with homosexual activity was not further explored.

1313-14. No questions were asked to explain Turner's limited role in the prior robbery conviction.[10]

Upon his release from prison in September 1983, he began working for Cross Construction, starting out

as a carpenter helper and moving up to a laborer. *Id.*: 1315. Turner had no car and usually rode to work

with a friend or used the bus.[11]  *Id.*: 1316. Turner met Mr. Savage at a bus stop in Fresno near a

homosexual bar. *Id.*: 1317. Mr. Savage introduced himself to Turner and offered Turner a ride. Turner

accepted and Mr. Savage drove Turner to his (Turner's) bank so he could cash his paycheck. *Id.*: 1319-

20. Mr. Savage also offered Turner a job working around his (Mr. Savage's) house. *Id.*: 1322. The

compensation was to be $20 to $30 depending upon how much work Turner completed. RT-7: 1411

(cross examination). Turner explained that he didn't have a car, so Mr. Savage offered to come to

Fresno to collect him. RT-6: 1323-25. Mr. Savage later called Turner and made arrangements to pick

him up near his home in Fresno. *Id.* 1329-30. Turner had never been to Merced before and was not

familiar with the area. *Id.*: 1331-32. Turner let Mr. Savage know he used drugs, notably, "sherm"

(meaning marijuana and PCP) and speed. Turner used both drugs the morning Mr. Savage collected

him. *Id.*: 1334. During cross examination, he clarified that he smoked half a sherm before Mr. Savage

came to collect him in Fresno. RT-7: 1410. Upon arrival in Merced, Turner started working in the

backyard. Mr. Savage interrupted him and offered him some yard shoes and a work shirt. Turner went

upstairs to Mr. Savage's bedroom to obtain these items. RT-6: 1335-38. Turner found that the work

needed in the yards was overwhelming. He didn't work long in the backyard before he walked around

to the front yard to do something else. *Id.*: 1338. *See also* RT-7: 1413 (Turner figured there was too

much work for him to complete alone.) He took a break while working and smoked some PCP. There

was a lot to do in the front yard as well. RT-6: 1339. On cross examination, he clarified that at this

point he smoked the other half of the sherm he started before Mr. Savage came to pick him up. RT-7:

1415. Mr. Savage offered Turner some orange juice. After that, Turner did no more yard work. Mr.

---

[10] Turner alleged in his Petition, and the Court previously accepted as true his contention that he he served only as the "look-out" in the prior robbery, did not use a weapon (although his co-defendant did brandish a gun), and was not involved in the actual taking of money at the subject liquor store. Petition, ¶ 38. Turner is said to have only gone along with a plan conceived by an accomplice, playing a minor role in the actual execution of the plan. Petition ¶ 111(2).

[11] During the evidentiary hearing, Turner's sisters, mother, and cousin testified that Turner's father occasionally drove him to work.

Savage didn't seem to mind.  Turner told him there was too much work for one person to complete.  RT-6: 1340-41.  Turner and Mr. Savage talked about Turner – his drug use and his prison time.  Then, at about noon time, Mr. Savage decided to go to Gottschalks (department store) to take a television in for repairs.  *Id.*: 1342-46.  After that, they drove to the home of a friend of Mr. Savage, Mr. Augusti Albritton.  Mr. Savage talked with Mrs. Albritton and then Mr. Albritton for about 30 minutes.  While there, Mr. Savage traded Mr. Albritton's pick up truck (which Mr. Savage had borrowed) for his (Mr. Savage's) Cadillac.  *Id.*: 1346-50.  Mr. Savage and Turner stopped at a Burger King, where Mr. Savage purchased Turner some lunch, and then returned to Mr. Savage's house.  *Id.* 1350-51.  They listened to music and Mr. Savage gave Turner a complete tour of his spacious house.  *Id.*: 1351-56.  Prior to that, Turner replaced all the garden tools he had taken out of the garage and cleaned up the work he had done.  RT-7: 1364-65.  While they were talking, they consumed a fifth of brandy.  Turner consumed three or four glasses.  *Id.*: 1366.  They discussed compensation for Turner's work.  Mr. Savage told him he would buy Turner a pair of pants and shirt at Gottschalks rather than given him money so he (Turner) wouldn't use the money to purchase drugs.  *Id.*: 1367.  At Gottschalks, Mr. Savage conversed with a woman customer, who had two little girls with her, as well as with the sales clerk.[12]  *Id.*: 1370-73.

After completing the purchase, Mr. Savage and Turner returned to Mr. Savage's home.  Instead of driving to Fresno, Mr. Savage then placed a telephone call in the kitchen and prepared dinner for himself.  Turner declined dinner. *Id.*: 1373, 1375.  At one point, the telephone rang, but Mr. Savage, who was right next to the ringing kitchen telephone did not answer it.  *Id.*: 1376.  After Mr. Savage finished eating, he went upstairs and Turner waited to go back to Fresno.  Mr. Savage came downstairs in a T-shirt and shorts,[13] put his hand on Turner's shoulder and said, "'Let's go to bed.'"  *Id.*: 1378.  Turner pushed him.  Then Mr. Savage "came at" Turner, chased him (Turner) around the house, and hit him with something wooden on the back of the head.  Turner kicked Mr. Savage and ran out of the house.  *Id.*: 1378-79.

---

[12] The sales clerk, Amir Falahi, also testified.  He was a parttime employee and student at Merced Community College.  As an employee at the college, Mr. Falahi was supervised by Mr. Savage.  RT-6: 1262.

[13] According to testifying psychologist Dr. Hamm, Turner recounted that Mr. Savage first came downstairs in his underwear.  *See* RT-7: 1493.

From this point, Turner walked to a local store, smoking another "stick" of PCP on the way, and once at the store, purchased a pack of cigarettes. *Id.*: 1379-81.  He clarified on cross examination that he smoked the entire sherm. *Id.*: 1416.  After making his purchase of cigarettes, Turner proceeded to light one when he saw Mr. Savage driving up in his car.  Mr. Savage apologized; Turner asked to go back to Mr. Savage's house to retrieve his belongings and then go home.  Mr. Savage agreed. *Id.*: 1381. By this time, Turner was pretty high. *Id.*: 1416 (cross examination).  When Turner and Mr. Savage arrived back at Mr. Savage's house, Mr. Savage went upstairs.  Turner waited downstairs.  When Mr. Savage came down, he asked Turner if he wanted a drink and if he would tell anyone about the sexual proposition.[14] *Id.*: 1382.  Turner responded he was going to tell somebody: "'You brung me down here, you going to try something like this.'"  Mr. Savage became upset and expressed that he didn't want Turner to tell anyone, and then reiterated that he wanted Turner to go to bed with him.  Turner repeatedly refused.  He explained to the jury that although he had been in prison where homosexual activities had taken place, he had no sexual taste for men. *Id.*: 1383.  He testified he did not engage in any homosexual activities while in prison.  Returning to the events leading to the homicide, Turner continued that the discussion about sex between Mr. Savage and Turner persisted.  Turner offered Mr. Savage a "Spanish fly" so he (Mr. Savage) could have sex at "some girl's house."  Mr. Savage replied he didn't want sex with a girl; he wanted sex with Turner. *Id.*; 1384.  The arguing continued.  Turner was sitting at the end of the table in the family room; Mr. Savage came up behind him and grabbed him by his "breast, and arm and neck," choking him.  They struggled and fell over the back of the couch with Mr. Savage "leaning on top" of Turner. *Id.*: 1386.  Mr. Savage had his arm across Turner's neck; Turner removed his knife from his back pocket and tried to stab Mr. Savage in the shoulder, but missed and stabbed him in the neck instead.  Mr. Savage was in front and on top of Turner at this point.  Turner "flipped" Mr. Savage on the couch and dropped his knife in the process.  Mr. Savage grabbed a fireplace tool and swung it at Turner.  Mr. Savage missed, dropped the tool and Turner picked it up.  Turner then picked up his knife and Mr. Savage came from behind him again. *Id.*: 1387.  At some point in the struggle, Mr. Savage fell on the knife; blood started "gushing out."  Turner was scared and started hollering at Mr.

---

[14] Turner's testimony was: "I told him I wanted a ride home. . . . We was sitting there.  He asked me if I tell anybody."

Savage.  Turner had the fireplace tool in one hand, and the knife in the other.  Mr. Savage was coming

at him; Turner was "poking" at Mr. Savage, telling Mr. Savage to get back.  Mr. Savage knocked the

knife out of Turner's hands; Turner picked it up.   Mr. Savage grabbed Turner by the wrist; Turner

stabbed him some more and ran out the patio door.  *Id*.: 1388.[15]  On cross examination, Mr. Hallford

tried to elicit that while Mr. Savage was running away from Turner, Turner was stabbing Mr. Savage

in the back.  Turner vehemently denied this, insisting that he was "poking" Mr. Savage with the knife

as Mr. Savage was coming at him (Turner).  He did not recall stabbing Mr. Savage in the neck, back,

and thigh.  *Id*.: 1421-23.  Then Turner testified that Mr. Savage ran out to the enclosed patio and that

he (Turner) ran up the stairs, threw the fireplace "stick" in one of the rooms, grabbed his coat from the

master bedroom, and took the television from the master bedroom to throw at Mr. Savage in case he

came upstairs.  When Turner went downstairs, he observed Mr. Savage lying on the patio.  While he was

lying there, Turner removed his watch and rings, and checked his pulse.  *Id*.: 1389.  Turner went to get

a drink from the bar, came back and checked Mr. Savage's pulse again.  Turner realized Mr. Savage was

dead.  *Id*.: 1390.  Turner went to the daughter's bedroom and retrieved a white blanket to cover Mr.

Savage's body.  Turner covered Mr. Savage because that's what he had seen on television  *Id*.: 1390-91.

On cross examination he stated that he covered the body with a blanket, not towels as authorities

described it when they came onto the scene.  *Id*.: 1449.  Turner denied cutting the telephone cords.  He

thought he would take the rings and watch at first, but decided not to because he wouldn't want anybody

to "rob" him if he were dead, so he didn't.  *Id*.: 1392-93.  Turner did take the television and Mr.

Savage's car keys.  The car was in front of the walkway in the front yard.  Turner did nothing to clean

up the blood.  He just left.  *Id*. 1394.  On cross examination he confirmed that he left Mr. Savage's body

where it was when he came downstairs, that is, he did not move it or drag it across the enclosed patio.

*Id*.: 1420.  On re-cross examination, he explained that when he left the house, Mr. Savage's body was

near the door to the back yard, not where the video taken by Sheriff's detectives depicted it.  He also

confirmed that when he covered the body, he used a blanket, not multiple towels.  *Id*.: 1447.

---

[15] From the testimony it would seem that both Turner and Mr. Savage ran out the patio door.  On cross examination, it appears that only Mr. Savage went out on the patio, where, he collapsed while Turner was running upstairs.  RT-7: 1420, 1438.

Back in Fresno, Turner parked the car in front of some apartments near his house. At that time, he put the television in the trunk of the car. *Id*.: 1396. Then Turner went home. No one was home. Turner removed his clothes to wash them and took a shower to remove the blood "all over" his hair and face. *Id*.: 1396-97. He moved the car near to the Fresno Baptist Church so no one would steal the hubcaps. *Id*.: 1397. On Monday after work, he moved the car again. *Id*: 1398. He made no attempt to sell the television because it wasn't his. Turner did not know Mr. Savage's wallet was on the console of the car. He didn't even look. *Id*.: 1399. After work on Monday, Turner took the car to have it washed. He vacuumed the inside, but didn't clean it further because it wasn't dirty. *Id*.: 1400.

Turner denied having the intent to steal from Mr. Savage when they were fighting. He testified stealing from Mr. Savage was the "last thing" on his mind because Mr. Savage had offered him a job. He decided to take Mr. Savage's car after Mr. Savage was dead because he had no other way home. He picked up the television with the idea of using it as a weapon and took it with him to the car in case somebody tried to stop him. *Id*.: 1402. Turner remembered stabbing Mr. Savage multiple times. Turner told Mr. Savage to get back and Mr. Savage was "just talking about 'Baby, I love you.'" *Id*.: 1403. Turner didn't recall stabbing Mr. Savage in the thigh as the pathologist testified. *Id*.: 1404. He thought about wiping finger prints from the cabinets and electronic equipment, but decided not to do so. *Id*.: 1405-06.

### k.      Guilt Phase Testimony of Bartender Jay Bradshaw

Mr. Bradshaw was employed as a bartender at the Fresno Express/ Back Door Bar. This was a homosexual bar, the same one Turner described being in front of when he first met Mr. Savage. Mr. Bradshaw recognized Mr. Savage as a frequent customer at this bar. RT-7: 1451.

### l.      Guilt Phase Testimony of Phillip M. Hamm, Jr., Ph.D.

Dr. Hamm, a licensed psychologist practicing in Merced and who had prior testimonial experience in court, personally interviewed and conducted testing on Turner on three separate days. RT-7: 1475.[16] When Turner described the events leading up to the stabbing of Mr. Savage, Dr. Hamm understood it was a "stressful situation" for him. Dr. Hamm opined that Turner had a mental disorder

---

[16] Dr. Hamm's assistant administered two of the psychological tests and Dr. Hamm administered the other, plus conducted the interview. RT-7: 1476.

1   based on his interviews with and testing of Turner, the transcript of the preliminary hearing, various

2   police reports, and material from Turner's prison records.  *Id.*: 1477.  Based on the results of the

3   Wechsler Adult Intelligence Scale ("WAIS"), Dr. Hamm described Turner as a person with "slightly

4   below average intellectual abilities" who had "a lesser capacity than the average person or people who

5   we would consider to be in the average range to solve problems, to handle unique and novel problems,

6   situations."  No actual IQ (intelligence quotient) was elicited from Dr. Hamm.  *Id.*: 1478-80.  Turner

7   scored in the 30th percentile for intelligence.  *Id.*: 1481.  Testing also showed that Turner was

8   submissive, mentally dull, and "would have a tendency to become disorganized under stress," meaning

9   he "would tend to decompose or he would tend to lose control" when called upon to cope or solve

10  problems.  *Id.*: 1482.  The next test, the Minnesota Multiphasic Personality Inventory ("MMPI")

11  included a validity scale.  Accordingly, the test results demonstrated to Dr. Hamm that Turner's

12  responses accurately reflected his personality and the various symptoms he was experiencing.  *Id.*: 1483-

13  84.  Turner's responses on the Rorschach (ink blot) Test also confirmed his passive and submissive

14  qualities as well as his lack of intelligence and lack of creativity.  *Id.*: 1458-86.

15          During Dr. Hamm's interview with Turner, the events leading up to the crime were explained,

16  including the initial meeting between Mr. Savage and Turner, arrangements for Turner to work at Mr.

17  Savage's Merced house, and Turner's consumption of PCP cigarettes before being picked up by Mr.

18  Savage and during a break from what little work Turner performed in Mr. Savage's yard.  Turner

19  described a situation where Mr. Savage basically did not require him to perform very much work at all.

20  He (Mr. Savage) essentially began "to entertain" Turner.  *Id.*: 1488-89.  Turner and Mr. Savage

21  discussed compensation for the work Turner performed with Turner saying "he would prefer perhaps

22  for Mr. Savage to perhaps buy him some clothing."  Dr. Hamm commented on how Turner was

23  impressed with the fact that Mr. Savage commanded so much respect from those with whom he came

24  into contact – particularly referring to the store clerk at Gottschalks.  *Id.*: 1490.  When Turner was trying

25  on the clothes at Gottschalks, he noticed Mr. Savage looking at him in a way that made him feel

26  uncomfortable.  Mr. Savage was very solicitous.  *Id.*: 1491.  Turner told Dr. Hamm that when they came

27  back to Mr. Savage's home, Mr. Savage touched Turner and asked him if he were ready to go to bed.

28  Turner reported being surprised and repulsed by the invitation.  *Id.*: 1492.  At the time, Mr. Savage was

dressed in his underwear. He became angry at Turner's refusal, proceeding to swear at him and hit him with a stick. Turner left the house, smoked a stick of PCP, was approached by an apologetic Mr. Savage, and returned to Mr. Savage's house to collect his (Turner's) coat and then go home. Mr. Savage "became solicitous and offered him [Turner] a drink," but then they began to argue about whether Turner would or would not have sex with him (Mr. Savage). *Id*.: 1493-94. Mr. Savage tried to talk Turner into having sex with him – offering to buy him anything. Dr. Hamm recounted that Turner reported it was at this point when his head was "pounding, spinning, music sounded like it was loud, he was getting more confused, more disorganized." Then Mr. Savage became furious not only at Turner's refusal but that Turner might disclose the fact of Mr. Savage's overtures. Turner kept telling Mr. Savage he wanted to go home. Mr. Savage reportedly told Turner to "shut up and reminded him that nobody knew where he was," all the while continuing his argument and fury. Turner then recounted that he went upstairs to get his coat and then just sat in the family room "trying to sort things out." Then Mr. Savage came up behind him and began to choke him. *Id*.: 1494. At this point, Turner grabbed his knife and began to stick Mr. Savage with it; Mr. Savage hit Turner with a fire place poker. Turner picked up the knife and stabbed Mr. Savage as Mr. Savage approached. The stab went into Mr. Savage's chest and there was a lot of blood "spurting out all over the place." Prior to this, the PCP was making Turner feel spaced out; "intentions came to his mind to beat Mr. Savage up and leave. But he was fighting it." He reported to Dr. Hamm that when Mr. Savage came up behind him, he "went off," meaning he lost control. *Id*.: 1495. He heard voices telling him to get the knife and stab Mr. Savage. Dr. Hamm continued that Turner went upstairs to get his coat. While there, he was frantic; he couldn't find his coat.[17] He threw the fireplace poker at a dresser, grabbed the television to throw at Mr. Savage, and came back downstairs. When he came down, Mr. Savage was lying on the ground. He took off Mr. Savage's watch and rings and determined Mr. Savage didn't have a pulse. When Turner was recounting this part of the story, he was becoming more and more frantic, as he was reliving what had transpired. After he initially found no pulse on Mr. Savage, Turner went to the bar, drank some liquor, and splashed

---

[17] If Dr. Hamm's testimony about Turner's account accurately reflects what really happened, then Turner's effort to locate his coat at this juncture would have failed because he already retrieved it before the knifing attack occurred. The two trips upstairs to get the coat, as explained by Dr. Hamm conflicts with Turner's own account that he went upstairs to retrieve his coat *only* after the fatal attack.

some liquor on his face, then went back to Mr. Savage's body to check for a pulse again. *Id.*: 1496. After Turner realized Mr. Savage was dead, he contemplated whether he should "rob" Mr. Savage. Mr. Savage's dog was howling.  Turner thought he saw one of Mr. Savage's eyes open and then close. Turner then went upstairs to get something to cover Mr. Savage's body, put the television in the car, and drove to Fresno.  The next thing he remembered was waking up at his home with blood all over himself. *Id.*: 1497.  Although Turner was not a person who was psychotic or crazy normally, the effects of PCP mixed with alcohol exacerbated his ability to maintain mental organization, being a man of low native intelligence in a drug-free state. *Id.*: 1498-99.  "His ability to think things through [was] highly impaired at that time.  From an emotional standpoint, he was confused.  He was being bombarded with conflicting passionate behavior on the part of Mr. Savage." *Id.*: 1499.  On the one hand, Mr. Savage was a high-powered person being solicitous and kindly, treating Turner like a child.  On the other, he was becoming demanding and abusive, including sexually abusive.  Turner was having auditory hallucinations, hearing voices telling him what to do. *Id.*: 1500.  He was in the grips of hysteria and eventually began to dissociate himself from the situation and from his own conduct of stabbing Mr. Savage. *Id.*: 1501-02. At the time of the struggle with Mr. Savage, Turner was borderline psychotic, that is, "out of touch with [the] reality of the situation." *Id.*: 1503.

On cross examination, Mr. Hallford attempted to undermine Dr. Hamm's conclusions by suggesting that Turner had lied to him, including about having used PCP, drinking alcohol with Mr. Savage on the day of the crime, and Mr. Savage's sexual advances.  Mr. Hallford emphasized that the story Dr. Hamm recounted was not what really happened, but, rather, what Turner said happened. Included in this argument was the suggestion that Turner in fact had not used PCP on the day of the crime. *Id.*: 1504.  Dr. Hamm testified that although Turner told officers he didn't know Roy Savage, this misstatement could have been based on defensiveness or amnesia.  Dr. Hamm felt that Turner's story during their interview was consistent with the result of the psychological tests. *Id.*: 1506.  He admitted, however, that the tests administered to Turner did not indicate whether he (Turner) committed a crime or intended to commit a crime.  He commented that the presence of a low IQ score would be more consistent with murder because people with lower intelligence would tend to utilize more of a physical than a mental approach to problems. *Id.*: 1507-08.  Mr. Hallford suggested that since Turner

1  lied to investigating officers about whether he knew Mr. Savage, he would also lie to the jury. *Id.*: 1509.

2  Dr. Hamm did not believe a defendant would lie to a jury because he would be counseled against it;

3  lying would be very detrimental to the defense case. *Id.*: 1510. Dr. Hamm believed his "interview

4  methodology, coupled with the psychological testing, and review of the records, [wa]s a lot more

5  scientific in terms of determining a man's mental state at the time of the commission of the offense than

6  what the police officers did." *Id.*: 1513. He explained that psychological testing is a scientific tool used

7  to infer certain information. *Id.*: 1513-14. In fact, Dr. Hamm's purpose in examining Turner was not

8  to accept Turner's word for everything, but rather to determine "the factual basis for the issues in

9  question." The tests administered to Turner originally were developed to make diagnostic assessments

10  and to provide treatment, but after much work and research, they had been properly applied to legal

11  issues. *Id.*: 1517-18.

**m.      Guilt Phase Testimony of Lee Stewart Coleman, M.D.**

13        In rebuttal to the defense presentation of Dr. Hamm, Mr. Hallford called psychiatrist Lee Stewart

14  Coleman, M.D. As a practicing, clinical psychiatrist, Dr. Coleman told the jurors that psychiatry cannot

15  help a court or jury decide questions of a defendant's mental state. RT-7: 1522. He further discounted

16  the value of psychological tests as providing independent reliable information because they rely on the

17  personal opinion of the tester. *Id.*: 1524. With respect to Dr. Hamm's testimony, specifically, Dr.

18  Coleman found it "extremely misleading" and the tests administered irrelevant as well as unreliable.

19  *Id.*: 1528-29. A primary basis for Dr. Coleman's opinion was that subjects in the criminal justice system

20  have a reason to misrepresent the facts. *Id.*: 1528.

**n.      Mr. Hallford's Guilt Phase Summation**

22        Mr. Hallford emphasized Turner's lack of credibility on account of untruthfulness to officers at

23  his arrest and interrogation that he hadn't been to Merced and didn't know Mr. Savage. RT-8: 1664.

24  He further discounted the theory that Mr. Savage was gay and was looking to Turner for sex. The only

25  basis for that theory was Turner's testimony, which Mr. Hallford urged was not credible, and evidence

26  that Mr. Savage had been seen at a gay bar. *Id.*: 1666-67. Referring to the cut telephone cords, he

27  stressed they were cut for a purpose and that Mr. Savage certainly didn't cut them. *Id.*: 1667-68. With

28  respect to the television Turner took from the master bedroom, Mr. Hallford argued it was both unlikely

and unreasonable to suppose Turner thought of using it as a defensive weapon. *Id*.: 1668-69.  He discounted the notion that a phantom person came into the house after Mr. Savage was killed, clipped the telephone cords, took the missing items which were never found, re-covered Mr. Savage with towels rather than the blanket from upstairs (Turner testified about), and moved the body. *Id*.: 1669-70.

He argued that Turner only admitted to the jurors what he had to admit, that is taking the car, taking the television, and stabbing Mr. Savage. *Id*.: 1670.  Then, Turner concocted a story about warding off a sexual attack to show self-defense or homicide in the heat of passion. *Id*.: 1671.  Mr. Hallford maintained that Turner intended to kill Mr. Savage when he repeatedly stabbed him (Mr. Savage) and had robbery in mind when he cut the telephone cords. *Id*.: 1674-75.

### o.   Mr. Ellery's Guilt Phase Summation

Mr. Ellery started with Dr. Hamm's perception of Turner, as a person of low-average intelligence, who was by nature ill-equipped to handle stressful situations, and the events preceding the homicide were stressful. RT-8: 1679-80.  Mr. Savage presented a conflicting personae.  On one hand, he was authoritative, wealthy, and sexually demanding.  On the other, he was kind, solicitous, and generous.  Turner was not only naturally unable to cope with stress, but he also was isolated and wanting to go home.  He was getting frustrated.  Ultimately, he boiled over and regressed to act in a physical manner, delivering 40 ineffectual wounds and three to four effectual blows. *Id*.: 1680.  The delivery of 40 ineffectual blows did not speak of a planned attack. *Id*.: 1681.

To discount the robbery theory, Mr. Ellery stressed that the kitchen telephone cord had not been cut, even though Turner heard Mr. Savage talking on that telephone. *Id*.  Referring to Turner's removal of Mr. Savage's rings and watch after concluding he was dead, Mr. Ellery asserted that the intention to steal did not arise until after the struggle. *Id*.: 1683.  The police suspected Mr. Savage had a gay life-style as indicated by their investigation at the Back Door bar.  The officers suspected Mr. Savage may have been a customer at that establishment and they confirmed this suspicion by interviewing a bartender.  Mr. Ellery also stressed that Turner did not take any of the missing items, other than the television and car, since there was no trace of them at his (Turner's) house. *Id*.; 1685.  Giving substance to the theory that someone broke into the house after the homicide, Mr. Ellery referred to the 30 to 40 "liftable" prints investigators found at the home, which belonged neither to Turner nor to Mr. Savage,

which authorities never pursued.  Some time after the investigation and after the family had changed the locks to Mr. Savage's house, a broken key was found in the front door.  Mr. Ellery argued this showed that a second theft crime was committed.  *Id*.: 1686.

Mr. Ellery portrayed Turner as a person susceptible to influence by the authority figure Mr. Savage presented on the street corner in Fresno.  Turner was submissive; Mr. Savage may have picked up on that.  When Mr. Savage brought Turner to his house, he gave Turner no instructions on what to do with the yard.  *Id*.: 1688.  Turner was impressed by Mr. Savage's interactions with others during the day, particularly with the Gottschalks clerk.  *Id*.: 1689.  Mr. Ellery also questioned Mr. Savage's motives after it was clear no more yard work was going to be performed.  He pondered what other reason for the delay in taking Turner home could there have been other than that Mr. Savage was "courting" Turner. *Id*.: 1689-90.  He argued that Mr. Savage definitely had an interest in men, as seen by entries in his telephone index, particularly a note next to a man's name that "This man is cute."[18]  Mr. Ellery stated:

> At least I ask you to consider there is the possibility that the Defendant's version of this, of this event is so accurate, that it is likely that this – he reacted either to the overtures made by Mr. Savage, of a homosexual nature, or that he referred to the fact that Mr. Savage became upset, when he refused initially to acknowledge that he promised that he would not say anything to anybody.  A sudden passion; a quarrel between the two.

*Id*.: 1692.  This scenario, Mr. Ellery argued, negated pre-homicide malice, an element the prosecution needed to prove.  *Id*.: 1693.

### p.   Mr. Hallford's Guilt Phase Rebuttal

On rebuttal, Mr. Hallford again stressed Turner's unreliability and lack of credibility as a witness.  He further pointed out to the jurors that Mr. Savage was not on trial.  RT-8: 1694.  He argued that the interim burglary of Mr. Savage's house between the Saturday homicide and Monday afternoon discovery was something Mr. Ellery imagined.  *Id*.: 1694-95.  The broken key in the door was a red herring.  It was found weeks later.[19]  *Id*.: 1695.  Finally, Mr. Hallford argued that many of the stab wounds inflicted on

---

[18]  The telephone index was introduced during the testimony of Detective Strength, as summarized above.  Part IV.A.1.f., *supra*.

[19]  The testimony from Detective Harris was that the broken key incident was reported a week or a little more than a week later, not that no one could have entered the house prior to the commencement of the investigation by Merced Sheriff's detectives.  *See* Part IV.A.1.g., *supra*.

1    Mr. Savage hit vital organs.  Mr. Savage was stabbed in the back trying to get away while Turner

2    pursued him.  *Id*.: 1698.

3                              **q.      Guilt Phase Deliberations**

4        The jurors retired at 3:04 p.m. on Tuesday, November 20, 1984 and returned at 4:17 p.m. for a

5    read back of Dr. Hamm's and Turner's testimony, were sent back and deliberated until 5:25 p.m.  They

6    returned the next day, Wednesday, November 21, 1984 at 10:00 a.m. and 34 minutes later announced

7    a verdict finding Turner guilty of first degree murder and the robbery-murder special circumstance true.

8    RT-8: 1704-12.  After the jurors were polled, counsel and the trial judge discussed starting the penalty

9    phase.  Mr. Ellery stated he was not prepared to proceed at that time and requested a continuance of the

10   proceedings until the following Tuesday, November 27, 1984 (after Thanksgiving).  *Id*.: 1715.  The

11   jurors were then dismissed until November 27, 1984.[20]

12                         **2.      Penalty Phase Trial Proceedings**

13       The relevant penalty phase trial proceedings include penalty phase testimony, Mr. Hallford's

14   closing, and rebuttal arguments, Mr. Ellery's closing arguments,[21] penalty phase instructions, and

15   deliberations.  The penalty proceedings commenced and were completed with a death verdict in a single

16   day, November 27, 1984.  *Id*.: 1757.

17                         **a.      Penalty Phase Testimony of Dr. Murdoch**

18       Over Mr. Ellery's objection, Mr. Hallford recalled Dr. Murdoch, his only penalty phase witness,

19   to address the circumstances of the crime.  Based on his examination of the stab wounds, Dr. Murdoch

20   concluded they were inflicted in many different directions, "indicating that the deceased had been mobile

21   and moving at the time he was stabbed."  RT-8: 1779.  Even though many of the wounds were shallow

22   because they hit and terminated at a bone, or were inflicted at an angle, most of the wounds appeared

23   to have been delivered by "considerable force."  *Id*.: 1780.  The depth of the wounds was about three

24   _____

25       [20] There was some controversy at the trial because the jurors did not actually return a verdict on
     the robbery count on that day, but did eventually prior to commencement of penalty proceedings.
26   Challenges to Turner's conviction and sentence the robbery count and the robbery-murder special
     circumstances on account of this irregularity were previously resolved against Turner and are not
27   presently before the Court.

28       [21] Neither Mr. Hallford nor Mr. Ellery gave an opening statement prior to the elicitation of
     testimony at the penalty phase.

or four inches, generally.  *Id.*: 1782-83.  On cross examination, Mr. Ellery elicited that Dr. Murdoch only probed (measured) the wounds that appeared to have struck an organ.  *Id.*: 1784-85.

### b.    Penalty Phase Testimony of Detective Strength

Mr. Ellery elicited from Detective Strength that the remote control for the television Turner took from the master bedroom was left behind.  RT-8: 1792.

### c.    Penalty Phase Testimony of Ruth Turner

Ruth Turner, Turner's mother, briefly and superficially described Turner's family life.  She testified she had four children, three daughters and Turner.  RT-8: 1794.  None of Turner's sisters had trouble with the law.  *Id.*: 1795.  In the tenth grade, Turner's English teacher suggested that Turner be placed in a remedial reading class because of some misbehavior in class.  After completion of this remedial class for a year, Turner he returned to grade level performance and was a good student making C's and B's.  His school progress thereafter was good and he had no further behavioral problems.  *Id.*: 1796-97.  Turner did not fight with or hit his sisters.  Before his arrest, he gave Mrs. Turner $50 a week and his 15 year old sister, Oweida, $20 a week.  *Id.*: 1798.  Mr. Hallford elicited from Mrs. Turner that she didn't know how he spent the rest of his money, but that she knew he was using drugs at the time and believed he might be using PCP.  *Id.*: 1800-01.

### d.    Penalty Phase Testimony of Lisa Haynes

Ms. Haynes was Turner's half-sister.  They had the same father and Ms. Haynes' mother was related to Turner's mother.  She learned Turner was her half-brother when she was in the fifth grade and he was in the sixth grade.  In school Turner was shy and quiet, not known for violent behavior.  *Id.*: 1802-04.  Mr. Hallford elicited that Ms. Haynes didn't live with Turner during high school and was not aware of the circumstances of this prior convictions.  *Id.*: 1806-07.

### e.    Penalty Phase Testimony of Elijah Barber

Mr. Barber, was a neighbor of Turner when Turner was growing up.  His son, Dexter, was Turner's age.  The boys had been close since they were two years old, attending grade school through high school together.  RT-8: 1808.  When Turner came to the Barber home to spend time with Dexter, Mr. Barber heard Turner express his wish that he had a father like Mr. Barber.  *Id.*: 1809.  When Turner's father separated from Turner's mother and moved out of the family home, he moved down the

1   block with another woman.  Mr. Turner purchased nice clothes and shoes for the children of his

2   girlfriend but not for his own children.[22]  When Mr. Barber had a heart attack in 1979 (five years before

3   the trial), Turner came over to help him with the lawn. *Id*.: 1810.  Mr. Barber was not aware of and never

4   observed fighting or arguing between Turner and Dexter.[23]  *Id*.: 1811.  Mr. Barber was not aware of the

5   details of Turner's conviction, but was aware Turner had been in prison. *Id*.: 1812.

6                    **f.       Penalty Phase Testimony of Lewis Coleman**

7        Mr. Coleman was a "job developer" who placed Turner in three different jobs, including his last

8   job for Cross Construction in 1983.[24]  RT-8: 1814-15.  Mr. Coleman received reports on Turner's

9   performance at Cross Construction every 30 days.  They were highly favorable. *Id*.: 1816.

10                   **g.       Penalty Phase Testimony of Kathryn Carter**

11       Ms. Carter, Turner's cousin, was close contact with Turner as he grew up.  She lived with Turner

12  and his mother in 1979 and 1980.  She testified she had four young sons and Turner treated them all very

13  well.  He showed no signs of aggression.  RT-8: 1818.  Mr. Hallford elicited that she knew he had been

14  incarcerated for robbery and receiving stolen property, but no further details. *Id*.: 1819.

15                   **h.       Penalty Phase Jury Instructions**

16       The jurors were given complete copies of the instructions to read along with the judge.  They

17  were told that in determining which penalty to impose they were to "consider all of the evidence . . .

18  received during any part of the trial."  RT-8: 1841.  Specifically the jurors were told to consider the

19  following sentencing factors:[25] the circumstances of the crime of which Turner was convicted and the

20  existence of any special circumstances found to be true (factor (a)), the presence or absence of any prior

21  felony conviction (factor (c)), whether the offense was committed while Turner was under the influence

22

23       [22] This was in the early 1970s. *See* summaries of evidentiary testimony from Turner's sisters at Part IV.A.4.a.(1), (2), and (3).

24       [23] Evidence of fighting between Turner and Dexter Barber was elicited at the evidentiary hearing
25  from Evelyn Turner, Part IV.A.4.a.(1), Elizabeth Turner, Part IV.A.4.a.(2), Oweida Turner, Part IV.A.4.a.(3), and Ruth Turner, Part IV.A.4.a.(4).

26       [24] Although Mr. Coleman's first name appears as L-O-U-I-S in the trial transcript, he spelled his
27  name L-E-W-I-S at his pre-trial interview with investigators.  EHT Exhibit 101; Part IV.A.4.a.(9), *infra*.

28       [25] The sentencing factors were labeled (a) through (k), after the same sub-sections in Penal Code § 190.3.

of extreme mental or emotional disturbance (factor (d)), whether the victim was a participant in Turner's homicidal act or the victim consented to the acts which led to the homicide (factor (e)), whether the offense was committed under circumstances which Turner reasonably believed to be a moral justification or extenuation for his conduct (factor (f)), whether Turner acted under extreme duress or under the substantial domination of another person (factor (g)), whether at the time of the offense Turner's capacity to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was impaired as a result of mental disease or defect or the effects of intoxication (factor (h)), Turner's age at the time of the crime (factor (i)), and any other circumstances which extenuated the gravity of the crime even though not a legal excuse for the crime and any other aspect of Turner's character or record that Turner offered as a basis for a sentence less than death (factor (k)). *Id*.: 1841-42.[26]   The jury was given legal definitions for his two prior crimes, robbery and receiving stolen property. *Id*.: 1844.

### i.      Mr. Hallford's Penalty Phase Summation

Mr. Hallford outlined the aggravating circumstances, beginning with Turner's admitted prior robbery conviction.  RT-8: 1848.  He continued that Mr. Savage had not been a participant in the homicidal conduct; he was running and was stabbed in the back.   Turner's story about having a reasonable belief that his act of stabbing Mr. Savage was morally justified or that the circumstances presented might have extenuated the nature of his conduct was "just unbelievable."  *Id*.: 1849.  Mr. Savage was fully clothed, belt buckled, shoes on.  Mr. Hallford emphasized Turner cutting of the telephone cords showed "he had the factor of robbery in his mind before the stabbing."  He noted Turner did not act under extreme duress of domination of another.[27]  *Id*.: 1850.  He further argued that blood tests taken of Turner days after the killing "wouldn't reveal whether or not he was under the influence

---

[26] No instructions for factor (b), the presence or absence of prior criminal activity that did not result in a felony conviction, or for factor (j), whether defendant was an accomplice to the offense, were read to the jurors.

[27] Neither duress nor domination have been factors in this case, from trial to habeas corpus.

1    . . . at the time of the killing."[28]  However, he conceded that if Turner had been under the influence of

2    drugs or alcohol, that would have been a mitigating factor.  Mr. Hallford's primary emphasis was the

3    fact that Turner repeatedly stabbed Mr. Savage, "over and over, again and again."  *Id.*: 1851.  He closed

4    with the statement that Turner should be given no more sympathy or mercy than he gave his victim.  *Id.*:

5    1852.

6                              **j.    Mr. Ellery's Penalty Phase Summation**

7           On summation, Mr. Ellery[29] presented a lingering doubt argument.  He began by explaining that

8    the reasonable doubt standard referred to something about which the jurors were morally certain and

9    then urging them to be more certain when considering the death penalty.  He stressed that there were

10   uncertainties in the case.  RT-8: 1853.  First, he pointed to the fact that Turner took the upstairs

11   television without the companion remote control, indicating he didn't intend to use the television "in the

12   normal fashion or offer it for use in the normal fashion" and consequent uncertainty as to whether he

13   intended to commit a robbery before the fatal altercation with Mr. Savage.  *Id.*: 1853-54.  There was the

14   uncertainty about activities that "almost surely" occurred after Mr. Savage's death.  The numerous

15   coverings found over Mr. Savage's body when he was found by authorities were different than the single

16   blanket Turner described.  The pillow found under Mr. Savage's head by authorities was placed so long

17   after the crime that there was no blood on it, suggesting that someone other than Turner placed it there.

18   Mr. Ellery argued that while there was evidence someone tried to mop or clean up some of the blood,

19   there was no rag found used for that purpose.  *Id.*: 1854.  Mr. Ellery also questioned why Turner would

20   have gone all the way upstairs to retrieve a television to steal when there was one readily available

21   downstairs.  Since these events suggested someone came into the house after the crime, Mr. Ellery

22   argued it also was uncertain that Turner cut the telephone cords or that he took the other property said

23

24

25   _____

26          [28] Blood testing for the presence of drugs was not conducted until federal habeas proceedings
     were commenced.

27          [29] Mr. Ellery's summation and Mr. Hallford's rebuttal have been offered as an exhibit to the
     evidentiary hearing.  *See* EHT Exhibit 19.  The proffer was accepted by the Warden and admitted by the
28   Court.

to have been missing from Mr. Savage's house.[30]  *Id*.: 1855.  Mr. Ellery urged that Turner's testimony was believable because he made so many damaging admissions to Dr. Hamm as well as in his own testimony.  *Id*.: 1855-56.  He also urged the jurors to consider Mr. Savage's role in the events leading up to the crime, especially the "mysteries of his weekends before this particular weekend."  *Id*.: 1856.  He noted that Turner's mother testified Turner had been "using some kind of intoxicant," and conceded that Turner had twice been convicted of a crime and sent to prison.  He stressed that Turner was well-loved by his family and liked by his employer.  *Id*.: 1857.

Transitioning to the deliberative process, Mr. Ellery discussed the critical term of the instructions about whether the aggravating circumstances outweighed the mitigating circumstances explaining that the way the law was drafted left much of what must be decided up to the jurors.  *Id*.: 1858.  He then referred to the Bible passage about not judging others.[31]  Mr. Ellery concluded by summing up Turner's life prior to the crime and the crime itself:

> He's lived, the drug thing is wrong, the prior robbery is wrong, the prior receiving charge is wrong, this Defendant was wrong.  Four item [sic] wrongness.
> We've attempted to show you his day-to-day life prior to these events. Awfully well regarded by his family, by his neighbors, by his school, by his employers.  Thank you very much.

*Id*.: 1859.

### k.   Mr. Hallford's Penalty Phase Rebuttal

Respecting the uncertainties, which he discounted, Mr. Hallford first addressed the television remote control, stating there was no reason for Turner to have known it existed.  He emphasized that the cut telephone cords had no blood on them, so Turner must have cut them before the homicidal assault began.  After the stabbing, Turner was dripping with blood, his hands were bloody, the doorknob was bloody.  RT-8: 1861.  Mr. Hallford argued that Turner's theory about someone else coming into the house and replacing the coverings Turner put over Mr. Savage's body was a "red herring."  The fact that

---

[30] Mr. Ellery's rhetorical question about Turner's theft of the upstairs television did not fit into the chronicle of events which indicated someone other than Turner had been in the house after Mr. Savage was killed.  Turner, in fact, took the upstairs television with him when he left Mr. Savage's house.  Mr. Ellery's summation at this point was somewhat desultory in this portion of the transcript.

[31] In fact what he said was "Judge not or reasons that may apply to yourself . . ." without completing the thought.

the pillow under Mr. Savage's head had no blood on it was insignificant since it was resting under a part of his head that wasn't bleeding.  Mr. Hallford also reminded the jurors that when Turner was first apprehended by authorities, he was not honest about having been in Merced or knowing Mr. Savage. Turner only admitted the events which authorities had proved.  *Id.*: 1862.

### l.   Penalty Phase Deliberations

Following the examination of witnesses, instructions, and summation, the jury retired to deliberate at 2:53 p.m. and returned with a death verdict at 4:04 p.m..  RT-8: 1865, 1867-68.

### 3.   Turner's motion for modification of the death verdict

After the verdict of death, the court set December 21, 1984 for the actual sentence and Mr. Ellery's motion for modification of the verdict pursuant to Penal Code § 190.4.  RT-8: 1870.  Relevant to the present proceedings, during oral argument on the § 190.4 motion, Mr. Ellery stressed that Turner ordinarily was a caring, gentle person and that the number of wounds showed the homicide to be a crime of passion, even taking into account the jury's finding of intent to kill.  CT: 323-24.  Mr. Hallford responded that although Turner's family members and friends knew him as a caring and gentle person, they knew very little about his past criminal record.  *Id.*: 327.  He again emphasized that at least 20 to 30 of the stab wounds inflicted demonstrated a distinct intent to kill Mr. Savage.  *Id.*: 328.[32]  The gruesome circumstances of the crime were the most influential sentencing factor.  But the planning (apparently alluding to the cut telephone cords) also showed premeditation.  *Id,*: 329.  Mr. Ellery responded that cutting telephone cords did not show intent to kill, but intent to prevent a live person from calling authorities about a theft.  *Id.*; 331.

The trial court then reviewed the evidence, noting that Mr. Savage evidently made the first contact with Turner and there was telephonic contact between the two during the ensuing week until the day of the crime.  *Id.*: 333.  Mr. Savage treated Turner nicely and Turner was impressed by the deference shown by various people to Mr. Savage.  *Id.*: 333-34.  The court acknowledged Turner's theory of the case, that he had no intention of harming Mr. Savage when he came to Merced, but was provoked by Mr. Savage's sexual advances.  There was, however, contrary evidence supporting the jury verdict.  *Id.*:

---

[32] The number of stab wounds described and reiterated during trial was "over 40."

1    334.  The court was convinced by the cut telephone cords that Turner did form the intent before the

2    stabbing attack "to commit some kind of act."  Further, the number of stab wounds demonstrated an

3    intent to attain the objective of killing Mr. Savage, a man much larger than Turner.  *Id*.: 335.  Cutting

4    the telephone cords evidenced planning.   The court suggested that Turner may have disliked

5    homosexuals, as he perceived Mr. Savage to be, and he determined that killing Mr. Savage "was one

6    way he could do something about it."  *Id*.: 336.  With respect to Turner himself, the court found his

7    recent release from prison to be a factor worthy of consideration.  As to the crime, Turner's role was not

8    minor, his act was not a mistake or induced by others, and the jury didn't believe his story that Mr.

9    Savage's conduct precipitated the stabbing.  Agreeing with the jury verdict, the court commented that

10   under the circumstances presented, there was every reason to believe that Turner committed first degree

11   murder in the commission of a robbery *and* aggravating factors outweighed mitigating factors.  *Id*.: 337.

12   There was no indication that the jury was inflamed in arriving at its verdict.  *Id*.: 337-38.  The court

13   denied the motion to modify the sentence.  *Id*.: 338.

### 4.       Evidence Presented at the Evidentiary Hearing

15          Turner proffered evidence focused on his early childhood abuse, his borderline intellectual

16   capabilities, his drug abuse history, as well as Mr. Savage's predatory sexual practices.  His theory is that

17   Mr. Ellery's failure to develop this evidence constituted deficient performance because had Mr. Ellery

18   presented this evidence, the jury would not have returned a death sentence verdict.  The Warden offered

19   evidence to suggest that Mr. Ellery's alleged failure to conduct a reasonable investigation was not

20   capable of being determined because his trial file was lost.  Alternatively, the Warden's evidence was

21   intended to show that Mr. Ellery's defense representation was not objectively unreasonable, largely

22   because a body of evidence existed demonstrating a violent side to Turner's character.[33]  The evidence

23   admitted includes live, declaration, and deposition testimony, as well as interview statements and letters

24   appended to a probation report.  The following evidentiary summaries are divided by witness category.

25

26       [33]  The Warden also elicited evidence to show that a Merced County jury impaneled in 1984
     would not have been persuaded that evidence of Turner's PCP abuse and intoxication, together with
27   evidence of his abusive childhood and intellectual impairments, was sufficiently mitigating to have
     avoided the death penalty in light of the circumstances of the crime.  Turner objected, and the objection
     was reserved subject to later resolution after the evidence was received.  By order issued September 20,
28   2004 (doc. 276), the Court sustained Turner's objection.

1

**a.     Turner Family and Friend Witnesses**

2     Turner called his sisters Evelyn Turner, Elizabeth Turner, and Oweida Doxey, his mother Ruth

3 Ann Turner, and his paternal aunt Yvonne Turner Hayes.  Prior declarations of these witnesses also were

4 considered by the Court.  He offered (and the Court received) declarations of his late father, Thaddaeus

5 J. Turner, his late former girlfriend, Pam Butler, and a Fresno County Probation Report, filed with the

6 Fresno Superior Court on March 31, 1980, which included many favorable letters from family members

7 and friends.  The Warden called Turner's cousin, Kathryn Carter Senegal-Price and offered interview

8 transcripts (as well as cassette tapes) of Lewis Coleman and Sandra Goodman.

9

**(1)     Evelyn Turner**

10     Evelyn Turner, Turner's older sister by one year, testified she worked as a human resources

11 manager for Pitney Bowes, having received her bachelor of science degree in business from Pepperdine

12 University.  EHT-1:13.  When Evelyn was six or seven years old and Turner was five or six years old,

13 she remembered that their father abused Turner.  He drank and in his drunken state, his whole demeanor

14 changed.  *Id*.: 15.  The abuse took three forms: "thumping" Turner on the head, "whooping" him with

15 a razor strap in the garage, and giving him karate punches in the stomach.  *Id*.  On cross examination,

16 the Warden attempted to elicit that the father was trying to teach Turner karate moves, but Evelyn

17 persisted that when Turner failed to learn certain moves, the father would punch Turner (as a young

18 child) in the stomach.  The blows were hard and delivered with vigor when the father was drunk.  *Id*.:

19 81-82.  If Turner wouldn't spar with the father, the father would then start "thumping" Turner to induce

20 cooperation in the karate training effort. *Id*.: 83.  The abuse occurred when the mother was not at home

21 and happened often – during the weekdays, and on weekends.  At times, the mother's absence was due

22 to her going to school at night.  *Id*.: 16.  The father thumped Turner all over his head, ears, and neck.

23 *Id*.: 17-18.  The thumping was very hard.  The father also thumped Turner when he did not repeat foreign

24 words properly.[34]  When the father would thump Turner, he (Turner) cried or had a traumatic look,

25

26

27

28     [34] Mr. Turner spoke Spanish and some Japanese.

meaning his eyes became wide and his arms trembled. *Id*.: 23-24. If Turner cried, the father would sock him in the stomach. *Id*.: 19-20. The abuse continued until the father moved out of the home.[35]

The father used the razor strap on Turner often – not as frequently as once a day. The razor strap "whoopings" were inflicted arbitrarily, not necessarily when Turner did something wrong. *Id*.: 21-22. Evelyn and her sister Elizabeth would stand at the door and watch when their father whipped Turner with the razor strap. *Id*.: 66. On cross examination, she admitted that the whippings were punishment for something Turner did that he knew he wasn't supposed to have done. *Id*.; 66-67. The father also used a belt on all the children, but a razor strap only on Turner. He never thumped the girls and very rarely gave them whoopings or disciplined them. *Id*.: 22-23. The mother occasionally was present during the karate "training" sessions, but she was not present when the father beat Turner with the razor strap. *Id*.: 84. The father also didn't "thump" Turner when the mother was present. *Id*.: 85. Eventually the mother stopped going to classes at night. *Id*.: 23.

The father also was verbally abusive. The verbal abuse tracked the physical abuse, from the time Evelyn was six until she was eleven or twelve. *Id*.: 25, 26. The father berated Turner, calling him "stupid" and "dumb" when he (the father) was drunk. *Id*.: 26. During this approximately six-year period, Evelyn never observed the father give Turner any positive words of encouragement or show affection, with the exception of one fishing trip. *Id*.: 27. Those positive words had to do with Turner putting a worm on the end of a fishing hook. *Id*.: 80. Once Turner helped his father extend the sprinkler system in the front yard of the family home. *Id*.: 77-78. She never heard her father compliment Turner respecting his assistance on the sprinkler system, or anything else. *Id*.: 100.

The following colloquy summarizes Evelyn Turner's testimony about her brother's upbringing:

> Q.   Was there something different about the quality of the punishment that your father administered to Thad and the quality of punishment that your father administered to you?
>
> A.   Yes.

[35] When Turner was about ten or eleven, his mother took the children and moved in with her mother (the children's maternal grandmother). Evelyn moved back to the family home with the father. Eventually Mrs. Turner and the other children moved back into the family home, and Mr. Turner moved out to the home of a girlfriend (with her own children) down the street. Even during the separation between Mr. and Mrs. Turner, the thumping abuse of Turner continued until he was in the ninth grade. EHT-1: 45-46.

Q.     And what was different about it?

A      My father did not – like I said, rarely did he give us [Evelyn and Elizabeth] whoopings. And he was always doing something to my brother.

Q.     And when you say he was always doing something to your brother, was that because your brother was always acting out and doing something wrong?

A.     No, we were all acting out, but he chose to – he was the person that took the brunt of the punishment.

Q.     Did your father ever thump you in the head?

A.     Never.

Q.     Did your father ever use a razor strap on you?

A.     Never.

Q.     Did your father ever do a karate sock in the stomach to you?

A.     Never.

Q.     How about to your sisters?

A.     No.

Q.     Did your father ever call you stupid?

A.     No.

Q.     Did your father ever thump Thad in the head when your brother had done nothing wrong?

A.     Yes.

Q.     Did he ever use a razor strap on your brother when he had done nothing wrong?

A.     Yes.

Q.     Did he ever sock – your father ever sock your brother in the stomach when your brother had done nothing wrong?

A.     Yes.

*Id.*: 95-96.

Turner had other problems.  He suffered from asthma as a child and he also had academic problems.  In elementary school, he was in a tutoring program to help him with math and English.  In junior high and high school, Evelyn was certain he was enrolled in special education classes.  *Id.*: 28. The mother helped Turner with his academics, but the father did not.  *Id.*: 29.  Their cousin, Phillip

Haynes, who was six years older than Turner and five years older than Evelyn, tutored Turner a bit in reading and math. *Id*.: 74. Turner was in a remedial reading class when he was a junior in high school. Evelyn did not dispute her mother's testimony that Turner progressed to a regular reading class in his senior year. She was not living at home when Turner was a high school senior. *Id*. 75-76.

Evelyn recalled the parents fighting in the presence of the children when she was eight or nine years old. *Id*.: 30, 63. On one occasion, Evelyn observed her father giving her mother karate chops and socking her in the stomach. The mother hit him in the head with a skillet, and the fighting continued outside. While her father continued to strike the mother with karate chops, the mother used the skillet to knock out the windows in the house and the father's station wagon. *Id*.: 30-31. All four children were present for that fight. *Id*.: 31, 63. On cross examination, the Warden brought out that Evelyn previously averred, in her June 15, 1994 declaration (Exhibit 19 to the Petition),[36] that Turner kept to himself, spending a lot of time alone in his room or outside in a special spot behind the bushes.[37] She explained that when the parents began fighting, Turner came out to find out what was going on. "So he was still present." *Id*.: 63-64. The parents argued and fought "quite often." The father was drunk during these fights. After the fights, the mother came away with bruises on her arms. *Id*.: 31. During one fight, the mother pulled telephone cords out of the living room wall. *Id*.: 41.

The father would sometimes take the children out for rides in his car or pick-up truck when he was drunk. *Id*.: 32. There were other occasions when the father would drive up and down the circular driveway of a parking structure downtown very fast, to give the children a thrill. At the top of the structure, the children had to get out of the car and stand at the ledge and look over the city. This was frightening for Evelyn and Elizabeth because they were afraid of heights. *Id*.: 69; 98. These excursions were frequent over a period of approximately three years when Evelyn was seven to nine years old. *Id*.: 69. None of the three children, Evelyn, Turner, or Elizabeth, wanted to get out of the car to look over the bannister, but the father "made" them. *Id*.: 98. When Evelyn was eight or nine, the father provided

---

[36] Evelyn Turner's June 15, 1994 declaration was not offered by either party as part of the evidentiary hearing. Its contents, however, were fully explored and summarized in the April 27, 1999 Order. *See* Part II.C.1.c.

[37] This testimony was offered to show that Turner was not or may not have been present during this physical altercation between the parents.

alcohol to her and Turner (who would have been seven or eight).  When he gave the children alcohol to drink, the father was driving very fast.  *Id*. 34.  During the same time frame, the father took the children to an irrigation ditch two or three times.  The children walked out on a ledge and sat down on the dirt with their legs hanging over the edge where water was gushing out of the pumps.  The children were frightened because they could not swim.  *Id*.: 35, 37.  These irrigation ditch excursions did not include Oweida, who was a baby at this time, just Evelyn, Turner, and Elizabeth.  The father had been drinking.  *Id*.: 36.  Evelyn did not describe these excursions as forms of punishment.[38]

The mother administered corporal punishment to the children until they were in junior high school.  She did not hit them as hard as the father hit, but she did use switches, extension cords, and Hot Wheels race tracks.  *Id*.: 40.  The mother was depressed and suffered headaches.  She was sad, moody, and "fussed" at the children.  *Id*.: 43-44.  When the father first moved out of the home, he lived in a motel, and then moved in with a woman down the street.  *Id*.: 45.  This woman, Faye Hill, had a daughter named Patsy Roebuck, and several sons.  *Id*.: 85-86.  The father seldom visited his own children and he seldom provided financial support.  When he did visit, he continued to thump Turner on the head, but discontinued use of the razor strap.  *Id*.: 45-46.  The thumping continued until Turner was in the ninth grade.  *Id*.: 47.  After the father moved out, neighbor Elijah Barber, whose son Dexter, was Turner's age, often would include Turner in father-son activities.  *Id*.: 80-81.  There was rivalry, animosity, and threats between the Turner children and Ms. Hill's children on account of the father's living arrangements.  But Evelyn did not recall that Turner was involved in beating up one of the sons.  *Id*.: 86-87.  Evelyn did recall, however, that her cousin Phillip and Dexter Barber got into a fight, that Turner interceded, that Dexter than called Turner a "faggot," and that Turner then fought with Dexter.  The Warden attorney asked if Turner "kicked Dexter's butt."  Evelyn responded, "Yeah, they had a fight."[39]  Evelyn considered Turner to be non-violent despite the animosity with Ms. Hill's children and the fight with Dexter Barber.  *Id*.: 87.  Dexter may have called Turner a "punk."  *Id*.: 102.  Dexter was

---

[38] The Ninth Circuit opinion recites that Mr. Turner forced *Turner* "to sit on a dangerous embankment as a form of punishment."  281 F.3d at 893.

[39] On re-cross examination, the Warden suggested that Phillip Haynes was gay and asked whether Evelyn knew Phillip died of AIDS.  Evelyn responded, "No, I did not know that he died of AIDS."  *Id*.: 102.

1   not injured in the fight. It "was just standard rough house, hitting each other and then breaking it up."

2   There were no bruises, no black eyes. *Id.*: 100.   On re-cross examination, Evelyn did not agree with the

3   Warden's question that Turner "won" the fight with Dexter. *Id.*: 104.

4          When Evelyn was in high school she observed that Turner was under the influence of something.

5   She recognized this because his eyes were red and his behavior was despondent.  She saw him smoke

6   marijuana often. *Id.*: 47.  He was 14 or 15 years old.  He obtained the marijuana from their cousin

7   Phillip, who lived in the house at that time. *Id.*: 48.  A little later, Turner began using PCP, in the form

8   of "Sherm sticks" which he smoked.    His demeanor and reaction to people changed when he started

9   using PCP.  He was in his late teens to early 20s. *Id.*: 49.  The PCP use might have started after Turner

10  was committed to CYA (when he was 17 and had graduated from high school).  When Turner was 19,

11  she saw him in an altered mental state. *Id.*: 50.  He had red eyes and was despondent until Evelyn

12  challenged him by asking him why he was using drugs (PCP).  With this challenge, Turner became very

13  angry with Evelyn, which was uncharacteristic. *Id.*: 51.  He raised his voice and told Evelyn to mind

14  her own business. *Id.*: 88.  Evelyn brought the fact of Turner's drug use to her mother's attention. *Id.*:

15  52.  The family was very unhappy Turner was using drugs. *Id.*: 88.

16         From the time Turner was paroled from Soledad State Prison in September 1983, until his arrest

17  in April 1984, Turner had contact with his father.  The father gave Turner rides to work during that

18  period.   From 1982, on, Evelyn lived in Southern California, although she came up to Fresno on

19  holidays. *Id.*: 91-92.  Generally, however, she was not in Fresno during the Mr. Ellery's investigation

20  for Turner's defense.  She was never contacted by telephone. *Id.*: 92-93.  She attended three days of

21  Turner's trial and was introduced to Mr. Ellery, but Mr. Ellery never suggested that she be called as a

22  witness.   She was available to testify and would have been willing to testify about the family

23  background. *Id.*: 53.

24                      **(2)    Elizabeth Turner**

25         Elizabeth Turner, one year younger than Turner,  testified she worked as a teacher in the Fresno

26  County Headstart Program, having received her bachelors degree in human development.  EHT-1: 105-

27  06.  She attended every day of Turner's 1984 trial with her mother and sisters (Elizabeth and Oweida).

28  *Id.*: 106-07.  She was never interviewed by Mr. Ellery, either before or during the trial.  She was never

interviewed by defense investigator Ray Brown, or present at her mother's home when Mr. Brown was interviewing her mother. She did not testify at trial or think of asking Mr. Ellery if she should testify. *Id.*: 107-08. She didn't think of asking because Mr. Ellery was the lawyer. She would have been willing to testify about family background, including parental abuse and alcoholism. *Id.*: 108. On cross examination, she clarified that she was never involved in a family meeting with defense personnel to talk about Turner's case. *Id.*: 144. Elizabeth did not live in Fresno at the time; she lived in the Bay Area. *Id.*: 144-45. She was attending California State College at Hayward at the time. *Id.*: 177.

She remembered that when she was five or six (and Turner was six or seven), her father disciplined Turner by spanking, "thumping," and possibly striking him with a razor strap, although the razor strap might have started a little later. *Id.*: 108-09. When the father thumped Turner, he (Turner) would cry. The father would thump Turner for a variety of reasons, including when Turner was crying about something – to induce him to stop crying, as well as for punishment for a minor transgression. *Id.*: 110-11. Turner was the only recipient of thumping. Elizabeth was in the fifth grade when her parents separated. She was ten years old. *Id.*: 111. The father thumped Turner three or four times a week. He did not thump Turner when the mother was present. *Id.*: 112, 122. When the father "hit" or "beat" Turner with the razor strap, he took Turner out in the garage to do so, for a period of two to three minutes. Turner would cry. *Id.*: 113. Elizabeth actually saw her father strike Turner, but she didn't stay for the entire duration of the beating. *Id.*: 148. Even while she was not watching, she could still hear the sound of the razor strap striking Turner's body and she could hear Turner crying. *Id.*: 182. After the beating, Turner would come into the house and continue weeping in his room. *Id.*: 183. Turner was disciplined because he had done something he knew he wasn't supposed to do, or he didn't do something he was supposed to do, or he didn't do something the way the father wanted him to do it. *Id.*: 149. Elizabeth believed that thumping Turner was overkill for doing things that boys do, which she characterized a minute transgressions the father could have talked to Turner about rather than thumping or "knuckling" him. Examples included running in the house, throwing rocks outside, or hitting someone. *Id.*: 164. Elizabeth believed that the abuse inflicted on Turner was more severe than the abuse that was inflicted on her. *Id.*: 180-81. She did not feel that Turner's conduct warranted physical

discipline, like the thumping or razor strap treatment.   The punishment inflicted on him was disproportionate to the punishment doled out to the sisters.  *Id.*: 183.

The three girls were never beaten. Elizabeth may have been spanked, but she didn't recall having been spanked by her father.  *Id.*: 114.  Elizabeth testified that although she was difficult to manage and misbehaved as a child, Turner was the one who was punished.  *Id.*: 122.  Elizabeth had frequent and violent encounters with her mother.  She and her mother did not get along well.  Once her mother came at her after Elizabeth called her a "bitch."  Her mother choked her.  *Id.*: 178.  But the mother's choking of Elizabeth was in response to Elizabeth fighting with her mother.  *Id.* 184.   Unlike Elizabeth, Turner was not often disciplined by the mother.  He obeyed her.  *Id.*: 185.  While in high school, Elizabeth moved in with her grandmother until she moved away from Fresno.   After she lived with her grandmother, while Turner was still at home, she saw him when he would come to the grandmother's house to visit.  *Id.*: 179.

Before the parents separated, the father berated Turner, telling him to "stop crying" because he was "acting like a sissy."  She could not recall any positive interactions between her father and her brother.  *Id.*: 115.  The "sissy" admonitions some times came in the context of the father trying to teach Turner karate as well as other times.  The karate "training" only took place when the father was intoxicated.  Elizabeth agreed with the Warden's counsel that this could have been to toughen Turner up.  *Id.*: 168.   The father would wake the children at night when they were sleeping up to have them walk over his back.  *Id.*: 122-23.  She remembered having to walk on the father's back about every other month.  *Id.*: 123.

The father was not often sober.  When he was sober, he was quiet, bright, intelligent, and to himself.  He abused alcohol for as long as Elizabeth could remember.  When he drank, he was verbally abusive, violent, and careless.  She recalled having conversations with her father.  She did not recall ever seeing her father and Turner have a conversation.  *Id.*: 116.  When the children were small, the father provided little cans of Coors beer for them to drink when they went on outings in the family station wagon.  After giving the children beer, he would drive them to the country and drive very fast.  The children felt it was exciting because they didn't realize the danger.  *Id.* 126-28.  He had been drinking

also. *Id*.: 166. As Elizabeth stated in her November 27, 1994 declaration, EHT Exhibit 16,[40] when the father drove the children out to the country and they would pick fruit off of trees without permission of the owners, she believed they were stealing. *See* EHT Exhibit 16, ¶ 14. She clarified at the evidentiary hearing that she held her belief about stealing the fruit when she was a child, not just in retrospect. *Id*.: 165.

Elizabeth was aware that Turner and their cousin Phillip smoked marijuana. When he was a sophomore or a junior in high school, Turner told her that he also had used PCP, although she never saw him use it. *Id*.: 129-30. She was familiar with the smell of marijuana, and she smelled it on Turner's clothes. Also, Turner's eyes were bloodshot. This was a frequent occurrence. *Id*.: 132-33. Turner's marijuana use preceded his detention at CYA. *Id*.: 135. She didn't actually see Turner smoking, but she knew he did so because of the smell. *Id*.: 175-76.

She remembered the occasion where the father took the children (Evelyn, Turner, and Elizabeth) to an irrigation ditch embankment with their legs dangling over the edge. The father sat with the children, but did not hold on to them. Elizabeth was frightened of falling into the rough waters below. No one else was around except the three children and the father. He did not explain why they were there. It was not a form of recreation to Elizabeth. *Id*.: 123-25. There were other irrigation ditch occasions, but Elizabeth did not remember them in detail. *Id*.: 169. Elizabeth testified she had no positive memories of her father relative to her siblings and herself. *Id*.: 137.

Elizabeth recalled fights between her father and mother as early as when she was six years old. *Id*.: 116. The parents verbally argued every week and had physical confrontations every three or four months. *Id*.: 118. After physical fights, the mother would have "knots on her head, . . . visible in the back and the front." She also had black eyes. Elizabeth did not believe her mother ever sought medical attention for her injuries. The father did not appear injured. *Id*.: 119. The children could hear and see the physical fights. *Id*.: 120. As a child, Turner spent time alone in the backyard of the house or in his room. He did not interact with the family. *Id*.: 146. Because the fights lasted for a significant duration,

---

[40] Elizabeth Turner's November 27, 1994 declaration previously was offered as Exhibit 31 to the Petition, and summarized in the Court's April 27, 1999 Order. *See* Part II.C.1.d. The Warden objected to its proffer as part of the evidentiary hearing and the objection was overruled in the June 19, 2003 order (doc. 231).

Turner was present when the parents fought; he didn't stay in the backyard when the parents were fighting. *Id.*: 147. There was one memorable fight after the parents were separated – with the mother and children living with relatives and the father in the family home. The mother wanted him to move out so she could move back in with the children and he refused to leave. She then proceeded to break out the front windows with a frying pan and break out the windows of his car. At that point, "he came at her and they just started fighting." Elizabeth believed the police were called. *Id.*: 121. The parents actually were divorced "much after" this event. *Id.*: 145. After the father moved in with another woman and her children down the street, he did not come back to visit with the children or take them on outings. *Id.*: 134. Elizabeth also did not recall any further physical confrontations between her parents when the father moved in with the other woman. *Id.*: 145-46.

Turner had a stuttering problem when he was in school, through junior high. *Id.*: 125. Turner also had a low comprehension level for learning. *Id.*: 126. On cross examination, she agreed that he eventually received help for his learning problems, and further that their cousin Phillip helped tutor Turner. *Id.*: 170. Turner was put in remedial classes. *Id.*: 171.

As Elizabeth stated in her declaration, Turner was a gentle person and "willing to let anything go." *See* EHT Exhibit 16, ¶ 6. Elizabeth denied that Turner "beat up a bicycle with a hammer or a baseball bat." She denied that she and Patsy Roebuck, the daughter of Faye Hill, were ever good friends. *Id.*: 172. Elizabeth also denied that she had been good friends with Patsy's sister, Juanita. She denied being aware of an incident where Turner and "some of his cousins jumped one of Patsy's brothers." She admitted, however, that there was rivalry between the Turner children and the children of Faye Hill. *Id.*: 173. She also recalled the incident when Turner and Dexter Barber fought over Dexter calling their cousin Phillip a "faggot" or a "punk" and then calling Turner a "faggot." *Id.*: 174. To the question, "he [meaning Turner] kicked Dexter's butt; didn't he?" Elizabeth responded, "I guess yes." She further explained that this confrontation with Dexter had been building up for some time and finally escalated. *Id.*: 175. This fight occurred long after the father had imparted his knowledge of fighting on Turner. *Id.*: 184.

### (3)   Oweida Doxey

Oweida Doxey was Turner's youngest sister, seven years younger than Turner. EHT-2: 419. She attended every day of her brother's trial. She was 15 or 16 at the time. Prior to the trial, she was interviewed by an investigator (Ray Brown) hired by the defense attorney and a Merced County Sheriff detective. *Id*.: 420-21. She did not talk to anyone about her (and Turner's) family background, either before the guilt phase or between the guilt phase and the penalty phase. She would have been willing to testify about the father's alcoholism and abuse. *Id*.: 421-22. She recalled that when the detective came to interview her, she was asked whether Turner was gay. *Id*.: 423. She responded that the family was anti-gay because homosexuality was contrary to their Christian beliefs. *Id*. 423.

Oweida remembered family interaction when she was as young as three or four years old. She recalled that her father was very mean to Turner and that he would thump Turner, all the time, everyday. The mother was not present when this happened. *Id*.: 424. The father also would make Turner stay in his room, away from his sisters, for long periods of time. Her father was drinking when he inflicted these punishments. She didn't recall her father ever being sober, or at least not using alcohol. *Id*.: 425-26. The father never imposed corporal punishment on Oweida. The father also verbally belittled Turner, calling him "dumb and stupid and idiot" everyday. She was not aware at the time that Turner had difficulties with school. *Id*.: 426. The parents fought in front of the children. She specifically remembered the fight where the mother was knocking out the windows in the house with a frying pan and also using a knife to slash the father's car tires. The mother's attempts at breaking the car windows with the frying pan were unsuccessful. *Id*: 427-28. After the parents separated, the mother was sad and depressed. Although she worked, she slept quite a bit; she didn't cook and she didn't clean. *Id*.: 428-29.

Oweida never actually observed Turner using drugs. *Id*.: 429. She did, however, observe behavior that she associated with drug use, that is, he was "spacey" and couldn't remember or understand simple directions (like going to the store). *Id*.: 430. She also smelled marijuana on Turner when he was in high school. *Id*.: 431. He never came home drunk on alcohol and as far as she knew, he didn't drink alcohol. *Id*.: 444.

1   The Warden's counsel contrasted this testimony with what he said was her statement to Detective

2   Strength shortly after the crime, that she believed he (Turner) "didn't take any type of drugs at all."   The

3   transcript of the interview states as follows:

4       Q. (by Detective Strength) "Do you know if he [Turner] takes any type of drugs at all?"

5       A. (by Oweida) "I don't know; (Laugh)I don't know. (Laugh)."

6       Q. "Do you know if he takes any type of drugs at all?"

7       A. "I don't know.  I'm not saying he does it, ah you know --"

8   EHT Exhibit 109: EH 146.[41]

9       At the evidentiary hearing, Oweida testified that she "had no idea why he [Detective Strength]

10  was asking the questions."  She "didn't know what to tell him, so [she] said [she] did not know."  EHT-

11  2: 444.  In fact, Oweida did know that her brother used drugs.  She just didn't admit that to Detective

12  Strength because she didn't know who he was or even if he was a law enforcement officer.  *Id.*: 445-46.

13  She remembered that when the mother asked Turner if he wanted help for his drug use that he said yes.

14  *Id.*: 452.  On redirect, Oweida was asked about the laughter recorded in the interview with Detective

15  Strength when she was asked about Turner's use of drugs.  Oweida affirmed that she was 15 years old

16  at the time of the interview and had a tendency to giggle when she was nervous.

17      On cross examination, the Warden's counsel asked Oweida about the defense investigator's

18  interview.  She only recalled the investigator interviewing her mother and her.  *Id.*: 435.  Oweida also

19  recalled Turner spending time in the backyard.  *Id.*: 436.  Focusing on one particular incident when the

20  father thumped Turner, reference was made to Oweida's November 27, 1994 declaration, EHT Exhibit

21  17, at paragraph 10,[42] which provides:

22      Another memory of my father is at our house at the dinner table.  He was yelling an
        cursing at Brother [Turner's nickname].  He got up from the table and "thumped"
23      Brother in the head.  Thumping was something my father did with his knuckles that hurt
        much more than a regular slap.  Brother ran into his bedroom and my father followed him

24

25      [41]  In Detective Strength's stipulated offer of proof, he authenticated the interview transcript.
26  June 5, 2003 Stip. re: Henry Strength, ¶¶ 4-7.

27      [42]  Oweida Doxey's November 27, 1994 declaration originally was presented to the Court as
    Exhibit 32 to the Petition and previously summarized by the Court in the April 27, 1999 Order.  *See* Part
28  II.C.1.e.  The Warden objected to the proffer of this declaration as part of the evidentiary hearing.  The
    Court overruled this objection in its June 19, 2003 order (doc. 231).

1  into his room. I don't remember what my father did to him in there, I only remember
2  hearing Brother cry hysterically. I didn't realize how very painful thumping was until
   a classmate of min[e] did it to me in high school.

3  Oweida didn't know why the father punished Turner in this manner on this occasion. He thumped

4  Turner other times as well. EHT-2: 438.

5          After Turner was paroled from prison in September 1983 and had a job with Cross Construction,

6  the father sometimes took Turner to work. She denied that Mr. Turner came by the house every day to

7  take Turner to work. She did not concede that the relationship between Turner and the father was

8  "better" at this time, although she did state that the father was no longer hitting or thumping Turner. *Id.*:

9  450.

10          At some point, Turner had a job and was contributing to the household, including giving Oweida

11  an allowance. *Id.*: 439. In her 1994 declaration, she averred that Turner was the most gentle and even

12  tempered person she knew. EHT Exhibit 17, ¶ 16. The Warden's counsel brought up incidents to

13  impeach this description of Turner. She was not aware that Turner had on one occasion "tore up a

14  bicycle" of one of her sister's boyfriends. She was aware of the rivalry between the children of Faye Hill

15  (who were then being taken care of by her father) and her siblings.[43] She denied knowing or ever hearing

16  that Turner and cousins "jumped one of the Hill boys, beat him up." EHT-2: 440. The feeling between

17  the Turner children and the children of Faye Hill was one of dislike and hatred because their father "was

18  taking care of somebody else's kids and not taking care of his own. . . . [W]hat intensified those feelings

19  is that he [the father] had to pass [Oweida's] house every day and saw that [his own children] were in

20  lack and yet still did not provide." *Id.*: 457.

21          Oweida recalled Turner telling about his incarceration at CYA. He told her that a person had

22  to protect himself or he would be a "punk," meaning "wimp." *Id.*: 440. On re-direct, Oweida confirmed

23  that "punk" did *not* mean homosexual." What she meant was that Turner could not be bullied. *Id.*: 456.

24  In her November 27, 1994 declaration she stated Turner told her he a person had to fight or else he

25  would "be a woman." EHT Exhibit 17, ¶ 19. She recalled that statement as well. *Id.*: 440. Oweida

26

27          [43] In the declaration, Oweida recounted how her mother and siblings lived in poverty after the
28  father left, but the father's new family (Faye Hill's children) had nice clothes and "material possessions
   beyond anything [the Turner children] hoped for." EHT Exhibit 17, ¶¶ 3-4.

1   recalled a fight between Turner and Dexter Barber.  She did not know what it was about.  *Id*.  During

2   an interview with an investigator hired by Turner's habeas counsel, she said that Turner was obliging

3   and complacent only with his mother and father.  If the father hit him, he didn't strike back.  But, Turner

4   "wasn't a punk, and nobody else could run over him."  EHT Exhibit 124.  Oweida affirmed this

5   statement on cross examination.  EHT-2: 443.

6                                    **(4)    Ruth Evelyn Turner**

7          The post-conviction testimony of Mrs. Turner before the Court is derived from a transcription

8   of a tape-recorded interview Detectives Henry Strength and Jill Mayer conducted of Mrs. Turner on

9   April 18, 1984, and offered by the Warden, two declarations executed by Mrs. Turner, offered by Turner,

10  and Mrs. Turner's evidentiary hearing testimony.  The interview transcript was admitted without

11  objection as EHT Exhibit 108.  *See also* EHT Exhibit 106: EH078 (giving the date for Detective

12  Strength's interview with Mrs. Turner).[44]

13         Mrs. Turner executed the first of the two declarations on July 20, 1993.  EHT Exhibit 8.  This

14  declaration originally was considered by the Court as Exhibit 8 to the Petition and summarized in the

15  April 27, 1999 Order, at Part II.C.3.b. and 4.g.  The Warden interposed a general objection to the entire

16  declaration to the extent it contained hearsay.  The Court sustained the hearsay objection as to statements

17  attributable to Mrs. Turner's friends concerning their observations of Turner's behavior (in ¶¶ 4,5) and

18  also statements attributable to her cousin about Turner's behavior (in ¶ 8).  With respect to Mr. Ellery's

19  statement about finding witnesses to corroborate Mr. Savage's homosexuality (in ¶ 14), the objection

20  was reserved to ascertain if his statement could be admissible as a prior inconsistent statement

21  (Fed.R.Evid. 801(d)(1)).  *See* June 19, 2003 order (doc. 203).  Since Mr. Ellery did not deny this

22  account, the prior inconsistent statement rule does not apply, and the statement must be excluded.[45]  The

23  reserved objection is sustained.  The second declaration of Mrs. Turner was executed in August 1994,[46]

24  _____

25         [44]  In Detective Strength's stipulated offer of proof, he authenticated the interview transcript.
    June 5, 2003 Stip. re: Henry Strength, ¶¶ 4-7.

26         [45] At the evidentiary hearing, Mr. Ellery testified he didn't recall sending his investigator, Ray
27  Brown to the Bay Area to interview two possible witnesses on the issue of Mr. Savage's homosexuality.
    *See* Part IV.A.4.f.(1), *infra*.

28         [46] No day of the month is provided for this declaration.

EHT Exhibit 13, and previously considered by the Court as Exhibit 17 to the Petition in the April 27, 1999 Order, at Part II.C.1.a. The Warden interposed a general hearsay objection to this declaration. The Court overruled this objection in the June 19, 2003 order (doc. 231) noting: "This is a 38-page declaration in which Mrs. Turner describes the history of her horrible childhood, marriage, and employment as well as her sacrifices as a mother. The declaration testimony will be credited by the Court to the extent it is relevant and reliable."

Prior to Mrs. Turner's penalty phase testimony, Mr. Ellery met with her at her mother's (Turner's maternal grandmother's) house. EHT-2: 473. She recalled that this meeting was close in time before the trial. EHT-3: 578. Despite this meeting, she had no idea what questions Mr. Ellery was going to ask her during the penalty phase of the trial. She was unprepared. EHT-2: 481. Separately, defense investigator Ray Brown met with Mrs. Turner. *Id.*: 474. During the interview with this defense investigator, she was not asked about and did not discuss her ex-husband's alcoholism or the effect his drinking had on the children. *Id.*: 481. She wasn't told and she didn't know such family background issues could have been considered by the jury during penalty proceedings. *Id.*: 482. Mrs. Turner also went to Merced to talk to an assistant district attorney, but she testified she didn't tell anyone about Turner's drug problem. EHT-2: 475. During cross examination, Mrs. Turner was shown the transcript of her interview with Detectives Strength and Mayer, in which she did reveal her son had a drug problem, Accordingly she conceded she had mentioned the drug problem. She did not know, however, whether she mentioned it to Mr. Ellery. EHT-4: 701.

After the penalty phase proceedings were complete, Mr. Ellery told Mrs. Turner he hadn't been prepared for the penalty phase. He was apologizing to her. EHT-3: 523-24. He told her that he did the best he could given the fact that he had to live in the community. She understood him to mean that he didn't more clearly or aggressively develop evidence about Mr. Savage's homosexuality because he felt pressure from the community, possibly including the mayor, who spoke at Mr. Savage's funeral. *Id.*: 525. She recalled the occasion when Mr. Ellery came to her mother's house to talk to her about having people testify on Turner's behalf. Mrs. Turner testified that Mr. Elijah Barber had been present at that meeting. *Id.*: 526-27. She believed Mr. Ellery asked her about Turner's father when he came to interview her before the trial. *Id.*: 529. Defense investigator Ray Brown also came out to talk to her on

one occasion, mainly to obtain a photograph of Turner so he could show it to other people he planned to interview.  *Id*.: 530

Mrs. Turner described the eleven years she lived with Turner's father and his drunken outbursts. In front of the three oldest children, when they were very small and the family was living in an apartment, the father would hit and push Mrs. Turner.  *Id*.: 483.  She described one incident that began with him pouring a glass of water on her head as she lay down followed by a verbal challenge and ensuing physical contact.  Besides hitting and pushing her, Mr. Turner banged her head against the wall. When she tried to use the telephone to call her mother for help, he yanked the telephone from her and used it to strike her some more.  When she tried to hit him with a chair, he took it from her and hit her in the head (with his hands).  She ended up with a knot on her head but did not seek medical attention and did not contact the police.  *Id*.: 484.[47]  Turner was about two or three during this confrontation. There were other physical confrontations, in the range of a couple times a year, depending upon when Mr. Turner came home drunk.  *Id*.: 485.  The frequency of Mr. Turner's drinking and intoxication increased during their ten (or eleven) years together.  In addition to physical confrontations, there was a lot of yelling , as frequently as once or twice a week.  Mrs. Turner feigned sleep when Mr. Turner came home, so she wouldn't have to interact with him.  *Id*.: 486.

When Turner was nine or ten, Mr. and Mrs. Turner were involved in a physical confrontation in which Mr. Turner hit Mrs. Turner in the head.  She sustained a lump.  Mr. and Mrs. James Warren (neighbors) broke up this fight when Evelyn ran across the street to get help.  EHT-3: 503-04.  Another physical fight started when Mr. Turner became angry when he saw a basket of clean, folded clothes in a laundry basket in the living room couch.[48]  He kicked the basket over complaining to Mrs. Turner that the clothes should have been put away.  The couple engaged in name-calling and then Mr. Turner hit Mrs. Turner on her head – all while the children were home.  EHT-2: 493.  During further testimony about this incident, Mrs. Turner testified that Mr. Turner came in the house from a neighbor's and

---

[47] On cross examination, Mrs. Turner reviewed her August 1994 declaration, EHT Exhibit 13, which relays the same incident. EHT-3: 557-60.

[48] During her first day of testimony, Mrs. Turner stated the laundry basket fight precipitated the separation from her husband.  EHT-2: 493.  She clarified on the second day that this fight was not the precipitating event, but just one of many physical confrontations.  EHT-3: 502.

knocked the basket over because he was intoxicated.  It is unclear from the second description whether the act of knocking over the basket was intentional.  EHT-3: 504.  The fight between Mr. and Mrs. Turner following the clothes basket included name calling, Mr. Turner hitting Mrs. Turner, and finally Mrs. Turner retreating into the kitchen to obtain two knives.  She did not know whether Turner saw her threaten Mr. Turner with the knives.  EHT-4: 722-24.  At various times when Mr. and Mrs. Turner had been arguing, Mr. Turner would strike a karate stance pose, holding his leg up like he was going to attack her in a karate movement.  The children all observed this.  EHT-3: 546.  When Mr. Turner would start a fight (by hitting Mrs. Turner), Mrs. Turner didn't "just sit there."  She fought back.  *Id.*: 560-61. She finally left Mr. Turner because she couldn't take the drinking and the beatings any more.  She clarified that she left because she was being beaten.  She did not believe the children were being beaten (as is stated in her August 1994 declaration).  *Id.*: 562; EHT Exhibit 13, ¶ 25.

When the Turners finally separated, Mr. Turner stayed in the family home and Mrs. Turner moved in with her mother, nearby.  She took Turner to live with her there.  After eleven months of living with her mother, Mrs. Turner returned to the family home and demanded that Mr. Turner move out. EHT-3: 505.  She wanted to move back in the house with the children because she couldn't find a big enough place for all them.  They started fighting.  Mr. Turner tried to push Mrs. Turner's head into a rotary fan.  Mrs. Turner then grabbed a pot from the stove and hit him with it.  All the children were present witnessing this confrontation.  Evelyn was yelling for her father to leave her mother alone; Turner was yelling that he was going to kill his father.  *Id.*: 508.  Mrs. Turner finally did regain possession of the house after the intervention of the court system.  She moved back into the house with all four children while Mr. Turner moved in with Faye Hill and her five children down the street.  *Id.*: 509.

Mrs. Turner did not feel Mr. Turner was a good father to Turner.  First, he didn't spend time with his son.  EHT-2: 487.  For instance, during the eleven month period Mrs. Turner and Turner were living with Mrs. Turner's mother, Mr. Turner did not come to visit his son once.  EHT-3: 505.  Nonetheless, as the Warden brought out on cross examination, neighbor Elijah Barber did a lot of "fatherly" things with Turner, including him on father-son outings Mr. Barber took with his own son, Dexter.  *Id.*: 528.

At one point during the marriage, when Turner was between six and seven, Mrs. Turner worked outside of the home on the 3:00 p.m. to 11:00 p.m. shift at a nursing home. EHT-2: 488. Although Mrs. Turner never personally observed Mr. Turner physically abusing Turner when he was a child, she heard about it. She confronted her husband about an incident at the dinner table where Mr. Turner thumped Turner. On that occasion, Mrs. Turner was home, but not in the same room. *Id*.: 489. She observed Turner crying with his head down. One of the girls explained to Mrs. Turner that Turner was crying because their father had thumped him. She implored her husband not to thump Turner because it could cause brain damage. *Id*.: 490. There was another period during the marriage, when Turner was nine or ten, that Mrs. Turner attended school at night three nights a week from 7:00 p.m. to 10:00 p.m. During that time Mr. Turner usually was home with the children, but sometimes Mrs. Turner's mother came over. *Id*.: 491-92. She quit night school because she did not believe that Mr. Turner adequately cared for the children. EHT-3: 548-49. At the time of the trial, Mrs. Turner did not know about the razor strap beatings or Mr. Turner taking the children out to the irrigation canal. She did know that Mr. Turner demonstrated karate (since he tried using it on her), but she didn't know that he punched Turner in the stomach when he was a child. EHT-4: 693-95. Mrs. Turner described a razor strap hanging in the garage that used to belong to Mr. Turner's uncle. Mrs. Turner understood it was "like a memento." She never observed her husband using the razor strap on any of the children and didn't know he used the strap on Turner until the children reached adulthood. EHT-2.: 492.

Mrs. Turner also inflicted punishment on the children, the girls as well as Turner. She used a switch or a belt. *Id*.: 569. She explained this was called a whooping to black people, but it was the same as "spanking" to white people. *Id*.: 570. Turner did not get "that many" spankings. *Id*.: 571.

After Mrs. Turner returned to the family home (and Mr. Turner moved in with Faye Hill), Mr. Turner paid support in the amount of $200 a month and came to the house occasionally, but never took Turner on any recreational or other outings at all. EHT-3: 510. Mr. Turner did not teach Turner how to install a sprinkler system. Although he installed a system at the family home and Turner may have been outside at the time, Turner was very small. Nor did Mr. Turner assist Turner with any of his school work. *Id*.: 511. With respect to Mr. Turner's trade as a landscape gardener, Mrs. Turner believed her ex-husband taught Turner some skills about maintaining a yard (since Turner did yard work as part of

his household chores), but he did not teach Turner how to lay sprinklers or trim the bushes.  *Id*.: 544. Confronted with Turner's trial testimony that he told Mr. Savage that he did "sprinkling work" and yard work" with his father, Mrs. Turner stated that Turner did not go out on jobs with his father.  He only worked at home.  EHT-4: 690.  Even after Turner graduated from high school, when he visited his father, he did not go out on jobs with him.  He lived with Mrs. Turner.  She would have known if he were going out on jobs with his father.  *Id*.: 691.

When Turner was released from prison (before his arrest for the present offense), he worked at Cross Construction.  Sometimes his father would pick him up and take him to work.  Mrs. Turner also drove him to work "a lot of mornings."  *Id*.: 513.  He often took the bus home.  *Id*.: 514.  Mrs. Turner denied that her ex-husband picked Turner up "every morning" to drive him to work.  *Id*.: 566.  This testimony contradicts a statement she made to Detectives Strength and Mayer in their April 18, 1984 interview of Mrs. Turner.  EHT Exhibit 108: EH120.  At the evidentiary hearing she testified that her ex-husband might have taken Turner to work some times, but she took him "a lot of times."[49]  EHT-3: 568. When Turner was in high school he told Mrs. Turner he was going to visit his father.  *Id*. (direct examination); 565 (cross examination).  Mr. Turner attended Turner's preliminary examination hearing for the present crime, but did not come to the trial.  *Id*.: 566.

Before Turner's arrest for the present crime, Mrs. Turner observed him in what she believed was a drug-intoxicated state.  At the evidentiary hearing, she testified she thought this incident occurred about a week or two before the crime.  *Id*.: 477.  In her July 20, 1993 declaration, EHT Exhibit 8, she said this particular incident occurred about a month before Turner's arrest.  She adopted this time frame during cross examination.  EHT-3: 587  She became aware of a problem when she received a call from neighbor Dossie Warren who told her Turner had been trying to pick flowers off a flowerless tree and was tiptoeing down the street like he was trying to fly and rolling around on the ground..  *Id*.: 585. James Warren, Dossie Warren's husband reported that he was able to get Turner to sit in a car until Mrs. Turner came home, but that Turner lurched at him (Mr. Warren) when he tried to touch Turner.  *Id*.: 586. She observed Turner to be incoherent, in a "zombie state," and "just out of it."  *Id*.: 477.  Mrs. Turner

---

[49] The interview statement relays that Mr. Turner drove Turner to a co-worker's place and then the co-worker drove Turner to the construction site (in Orange Cove).  EHT Exhibit 108: EH120.

instructed Turner to go to and stay in his bedroom.  He then fell asleep for three to five hours and then came out.  *Id.*: 479.  Before falling asleep he tried to leave the house after Mrs. Turner told him to go lie down.  *Id.*: 585.  It was on this occasion that Turner "lost" his moped.  EHT-3: 516.  The moped was never recovered.  *Id.*: 517. Afterwards, Turner remembered none of this behavior having occurred.  He was embarrassed.  *Id.*: 586.  When she asked him if he would go with her to a hospital or other medical facility to get help for his drug use, he responded he would go.  Mrs. Turner did not have a chance to set up therapy or an appointment prior to Turner's arrest.   EHT-2: 479.   Mrs. Turner believed the drug Turner had used on this occasion was PCP because his behavior was the same as the daughter of one of her friends, and that young woman had been using PCP.  Mrs. Turner had observed Turner in this same condition on an earlier occasion, when he was in high school.  At that time, she didn't know the cause of Turner's behavior and didn't realize he had been using PCP.  *Id.*: 480.  She told detectives on April 18, 1984 that Turner actually told his mother he needed some help.  EHT-3: 589; EHT Exhibit 108: EH111.  She told detectives, however, she was concerned that if she took him to the hospital, the fact he was using drugs would be a violation of his parole terms and he would be sent back to prison.  EHT Exhibit 108: EH115.  The circumstances of this earlier incident were explained during Mrs. Turner's second day of testimony and described as the first time Mrs. Turner became aware Turner might have some problem with drugs.  EHT-3: 514; 581.  On that occasion, Turner was found by his (maternal) grandmother and cousin to be confused and incoherent.  *Id.*: 515.  He hadn't come home the previous night, but had been staying at a friend's house.  *Id.*: 581.  At some point, Mrs. Turner joined a program called Chemical Peoples Program so she could learn more about street drugs and what to do to combat drug use.  *Id.* 583-84.  Turner's former girlfriend, Pam Butler, told Mrs. Turner she was concerned about Turner's PCP use.  EHT-4: 721-22.

Mrs. Turner did not have a discussion with Mr. Ellery about Turner's use of PCP.  EHT-2: 474.  She didn't volunteer information about Turner's drug use because he didn't ask, and he was the lawyer.  *Id.*: 481.

During the post-arrest interview with Detective Strength (and Detective Mayer) on April 18, 1984, Mrs. Turner, stated Turner told her he needed help for his drug problem.  EHT Exhibit 108: EH111, EH115.  With her recollection refreshed from having reviewed EHT Exhibit 108, Mrs. Turner

remembered talking to Detective Strength about intending to get Turner help for his drug problem. EHT-3: 518.  She thought Turner's involvement in killing Mr. Savage was related to his use of PCP because she understood from her cousin that a person high on PCP could be talked to, but not touched. EHT-4: 695.  She told Detectives Strength and Mayer that she believed all of Turner's encounters with the criminal justice system were due to his use of drugs.  EHT Exhibit 108: EH106, EH110, EH112, EH116.  During her evidentiary hearing testimony, she confirmed this was her belief at the time of that 1984 interview.  EHT-4: 697-98, 700.  To contradict this notion, the Warden's counsel pointed out that in Turner's interview with a probation officer before sentencing in the present case, he represented that he had not used PCP until December 27, 1981, well after he graduated from high school.  *See* EHT Exhibit 103: EH030.  However, he had been convicted of robbery committed on February 2, 1980, and had experienced discipline problems at CYA after his commitment to that institution.  *Id.*: EH025-EH026.  Plus, according to a September 18, 1992 interview of Mrs. Turner conducted by Turner's federal habeas investigator, Turner engaged in numerous violent behaviors, long before December of 1981 when he said he started using PCP.  When Turner was in junior high school he became angry at one of his sister's boyfriends and threatened to or wanted to inflict some damage on his (the boyfriend's) bicycle, he got into a verbal argument with Faye Hill's daughter, Patsy, which escalated into a fight between some of Turner's cousins (and Turner) and Patsy's brother.  *See* EHT Exhibit 122: EH356-EH357.[50]    The Warden's counsel then mentioned Mrs. Turner's interview statements to the Merced detectives about Turner telling her he had to be tough while incarcerated so that the other inmates wouldn't be "all over" him.  She also recounted to detectives that Turner told her if somebody "came onto" him, that person "was going to be very sorry."  EHT Exhibit 108: EH124-EH125. EHT-4: 709.  Turning to Turner's relationship with his former girlfriend, Pam Butler, the Warden's counsel asked Mrs. Turner about her account to the habeas investigator of Turner having "roughed up" Ms. Butler.  *Id.*: 711-12; EHT Exhibit 122: EH383-84.  While Mrs. Turner apparently told the habeas investigator that Ms. Butler became ill and went to the hospital because of this incident, she explained at the evidentiary hearing that Turner had given Ms. Butler $65 earlier to go to the hospital or doctor because

_____

[50] The source of Mrs. Turner's information for this account is not stated.

she was sick and after the roughing up incident Ms. Butler decided to return the money so as to break her ties with Turner.  EHT-4: 712-15. On redirect, Turner's counsel had her clarify that although Ms. Butler reported to Mrs. Turner that Turner had "grabbed" her (Ms. Butler), Turner told his mother he would never hurt Ms. Butler.  EHT-4: 719. Ms. Butler's sickness had to do with latent effects of a fire which had damaged Ms. Butler's larynx and lungs.  She routinely had sick spells because of that injury. *Id*.: 720. The Warden's counsel also pointed out that Turner had a fight with Dexter Barber after calling Turner's cousin and Turner "faggots" and Mrs Turner stated she was aware (but had not observed) this event.  EHT-4: 708, 717.

Turner did not perform well and was slow in school.   His three sisters, however, were "pretty much outstanding students."  EHT-3: 511.  When Turner was in the fourth grade he had great difficulty with simple addition.  He was in a remedial reading class in high school and a remedial class for learning about the Constitution in the eighth grade during junior high school.  *Id*.: 512.  When Turner was in the second or third grade, she had him tested by a school psychologist about his poor performance in school. The psychologist told her he had a "mental block" about learning.  *Id*.: 573-74; EHT Exhibit 13: ¶ 80. Turner was in remedial classes in the tenth and eleventh grades in high school due to problems with reading.  EHT-3: 575.  Turner's older cousin, Phillip Haynes lived with Mrs. Turner (and Turner) when Turner was in the ninth, tenth, and eleventh grade.  He tutored Turner in reading.  and Turner's reading and writing skills improved so that Turner was in regular classes in the twelfth grade.  *Id*.: 575-76.

### (5)   Yvonne Turner Haynes

 Mrs. Haynes, Turner's paternal aunt, was three years younger than Turner's father. EHT-2: 459. In addition to a college degree, Mrs. Haynes had a "standard" teaching credential which allowed her to teach kindergarten through ninth grade.  *Id*.: 460.  Prior to and during Turner's trial, Mrs. Haynes was never contacted by a defense investigator or attorney.  She would have been willing to testify.  *Id*.: 461. The Warden brought out on cross examination, however, that Mrs. Haynes neither attended any part of Turner's trial nor visited him when he was in jail prior to the trial.  *Id*.: 468.

Mrs. Haynes was aware that her brother, Turner's father, had a drinking problem.  *Id*.  She observed the Turner household when Turner was growing up.  *Id*.: 462.  Because of his drinking, Mr. Turner did not care for his children the way he should have.  *Id*.: 463.  With respect to Turner's

childhood experiences, Mrs. Haynes did not observe but was aware of the karate punch demonstrations from Turner's mother, Ruth Turner.  *Id.*: 469.  Mrs. Haynes also was aware that Thelma Alexander, Turner's maternal grandmother helped support the Turner children by purchasing food and taking the children to church.  *Id.*: 469-70.

Mrs. Haynes taught a remedial reading class at Irwin Junior High School when Turner attended that school.  He was in her class.  *Id.*: 464.  When Turner was in the eighth grade, he was reading at the fifth or sixth grade level.  The purpose of the class was to help the students in it to "pass the American Constitution."  *Id.*: 465.  Turner made progress in the class and his reading improved.  *Id.*: 466. Ultimately, he passed the Constitution test.  *Id.*: 471.

### (6)   Thaddaeus Jefferson Turner

Mr. Turner provided a declaration to Turner's federal habeas counsel, which he executed on August 22, 1994.  EHT Exhibit 14.  A little over two years later, Mr. Turner died, on December 14, 1996. This declaration originally was considered by the Court as Exhibit 14 to the Petition in the April 27, 1999 Order, at Part II.C.1.b.  When Mr. Turner's declaration was offered into evidence in lieu of live testimony for the evidentiary hearing, the Warden objected on the grounds that the declaration constituted hearsay and the Warden did not have an opportunity to cross examine Mr. Turner.  The Warden's objections were overruled  under Federal Rule of Evidence 807 in the Court's September 20, 2004 order (doc. 276)

In the declaration, Mr. Turner described his own tumultuous upbringing, where he had to deal with an alcoholic father and care for his younger sisters by the time he was 11 or 12 (his mother having died when he was 10 and his father unfit).  His father died when Mr. Turner was 16.  He and his younger sisters lived in a foster home, but did not receive proper care.  EHT Exhibit 14 ¶¶ 7-9.  Mr. Turner learned martial arts while in the Marine Corps while stationed in Japan.  He learned that his fist and middle knuckle were his primary weapons.  He averred that sometimes he carried a wooden pole as a weapon.  *Id.*: ¶ 11.  He learned cruel ways to hurt people (snapping wet towels coated with salt and using a kerosene soaked leather belt for whipping).  *Id.*: ¶ 12.  He fathered two sons while he was in the Marine Corps both of whom he occasionally saw over the years.  *Id.*: ¶ 13.  He married Turner's mother in 1960 and shortly thereafter Evelyn was born.  *Id.*: ¶ 15.

During the early years of his marriage to Ruth Turner, he performed all the household chores during the day – cooked, cleaned, and cared for the three oldest children – *and* worked afternoons and nights at his job. His wife laid around all the time because of her leg pain, migraine headaches, and nerves. *Id*.: ¶ 17. They fought or Mr. Turner stayed in motels. *Id*.: ¶ 18. The fighting and arguing became worse when Mrs. Turner joined a church because she was susceptible to influence from her friends. *Id*.: ¶¶ 20-21.

Concerning Turner, Mr. Turner explained that he had learning problems in school and was in special programs. *Id*.: ¶ 23. Turner's speech problems made him the subject of ridicule. Mr. Turner taught his son all he "knew about self-defense, to make him tough and manly." *Id*.: ¶ 24. Mr. Turner moved out of the family home when Turner was a teenager. He moved in with Alice Faye Hill and her many children, in the same neighborhood. Together, they tried to have more children, but she miscarried. He referred to her children as his adopted family, and they called him "father." *Id*.: ¶ 26. He saw his own children very infrequently after moving in with Faye Hill. *Id*.: ¶ 26. Although two Merced sheriff deputies came to talk to Mr. Turner, no one else, including Mr. Ellery, did. *Id*.: ¶ 28.

### (7)     Pam Butler

Pam Butler, who passed away on March 17, 1996, executed a declaration on July 28, 1993. (EHT Exhibit 9) [51] Although the Warden initially objected to Ms. Butler on the grounds that it was hearsay and he didn't have the opportunity to cross examine her, he withdrew his objection on the last day of the evidentiary hearing, on July 29, 2003. EHT-5: 944. Ms. Butler averred that from early 1981 through the end of 1982, while Turner was committed to CYA, the two were dating. EHT Exhibit 9 ¶ 3. During that period, she observed him intoxicated on PCP most weekends. [52] *Id*.: ¶4. While normally a "very gentle and shy person," when intoxicated on PCP Turner "would become violent and out of control."

---

[51] Ms. Butler's declaration also was attached to Turner's September 10, 1993 state habeas petition as Exhibit 9 and to his (federal) Petition as Exhibit 9. The Court previously reviewed this declaration in the April 27, 1999 Order at Part II.C.4.h.

[52] It seems unlikely that Turner was using PCP while committed to CYA, or that Ms. Butler would have observed this. According to the probation officer's report for the present crime, Turner was committed to CYA from March 26, 1980 to May 4, 1981, when he was paroled. EHT Exhibit 103: EH025. He was then sent to state prison on October 6, 1982 for receiving stolen property and paroled on September 18, 1983. *Id*.: EH026.

1    *Id.*: ¶ 5.  Once she observed him "yelling at a tree and calling it names.  He then stabbed the tree with

2    a knife and ran away."  *Id.*: ¶ 6.  After returning home from prison in late 1983, he came to Ms. Butler's

3    house intoxicated on PCP and tried to break through the door when she refused to let him in.  *Id.*: ¶ 7.

4                           **(8)    Kathryn Carter Senegal-Price**

5          Kathryn Carter Senegal-Price,[53] was called by the Warden.  She explained her relationship with

6    Turner, that is, a cousin of some degree.  EHT-4: 759.  Except for a one year period from 1966 through

7    1967, from the time of Turner's birth (October 3, 1961) until 1970, Ms. Carter lived close by and  had

8    contact with the Turner family every day.  *Id.*: 760; 805.[54]  Ms. Carter was more than 13 years older than

9    Turner, having been born January 21, 1948.  *Id.*: 789.

10         During the three-year period from 1967 through 1970, when Turner was approximately six to

11   nine years old, Ms. Carter recalled that Mr. Turner was drunk every weekend.  He also drank every night

12   when he came home from work.  *Id.*: 807.  During that time period, Mr. Turner would always find fault

13   with Turner and thereafter thump Turner, yell at him, or threaten to "whoop him."  In response, Turner

14   would retreat.  Mr. Turner was very mean.  She saw him whip Turner twice: once in the backyard and

15   once when Mr. Turner took Turner in the garage and hit him with the razor strap.  She and Mr. Turner

16   got into an argument about this discipline.  *Id.*: 808.  Ms. Carter also observed thumping frequently.  It

17   was hard and she could hear it.  She intervened a couple of times.  *Id.*: 812.  In response to being

18   thumped, Turner would cry.  *Id.*: 813.

19         After she moved to the Bay Area, she came back to Fresno for special occasions and holidays

20   and continued to have contact with the Turner family.  She moved back to Fresno in 1979 and lived with

21   Turner's mother.  Turner, his sister, and their cousin Phillip (Haynes) also were living at the house.  *Id.*:

22   761-62.  After she moved into her own apartment, in Fresno, she continued to have regular, not daily,

23   contact with Turner and his family.  She was aware that Turner was committed to CYA.  *Id.*: 762.  She

24   was not permitted to have contact with Turner during this commitment, since visitation was restricted

25

26         [53] Although Ms. Carter Senegal-Price dropped her maiden name, Carter, by the time of the
27   evidentiary hearing, for consistency, the Court refers to her as Kathryn Carter or Ms. Carter hereafter.

28         [54] Ms. Carter confirmed on re-direct examination that she moved from Fresno in 1966 after
     graduating from high school, and returned in December of 1967.  EHT-4: 821

1   to his mother and father.  Later when Turner was incarcerated at an adult prison, she did visit him.  *Id*.:

2   763.  Between his parole from prison in September 1983 and his arrest for the present crime in April

3   1984, Ms. Carter had contact with Turner "all the time."  *Id*.: 764.  Ms. Carter knew Turner's former

4   girlfriend Pam Butler.  She and Ms. Butler were next door neighbors when Ms. Carter moved into her

5   apartment after returning to Fresno.  *Id*.: 764-65.

6       Confirming her statement to Merced Sheriff's authorities during an April 18, 1984 interview, Ms.

7   Carter had been aware that Turner and Ms. Butler got into arguments, and when that happened, Turner's

8   family would "fuss at him."  *Id*.: 766-67, EHT Exhibit 110: EH181.[55]  During the April 1984 interview

9   Ms. Carter reported that Turner and Ms. Butler had broken up about three weeks prior to the interview

10  (in other words, in late March 1984).  EHT Exhibit 110: EH176.  At the evidentiary hearing, Ms. Carter

11  thought that time frame probably was correct.  EHT-4: 769.

12      When Ms. Carter gave the April 1984 interview she told officers that Turner's father "lectured"

13  Turner rather than spanked him.  EHT Exhibit 110: EH173.  As she explained on cross examination,

14  Detective Mayer asked her if Mr. Turner spanked Turner a lot and Ms. Carter responded, "No, he would

15  you know, like —."  Then Detective Mayer interrupted her and asked if Mr. Turner lectured Turner a

16  lot.  *Id*.: EH173-EH174.  She wasn't able to respond to the spanking question.  *Id*.: 809-10.

17      At the evidentiary hearing she said that Mr. Turner was "straight up U.S. Marine Corps mean"

18  and that Mr. Turner was a hitter not a spanker.  EHT-4: 769-70.  She explained that she did not tell

19  officers of Mr. Turner's disciplinary practices because they were so abusive and she didn't want to get

20  him in trouble with authorities.  What he did to Turner was child abuse by the standards in effect at the

21  time of her testimony (19 years later).  *Id*.: 770-72.  Ms. Carter actually observed Mr. Turner abuse

22  Turner.  *Id*.: 772.  She saw him "whip" Turner a couple of times; she was aware that Mr. Turner took

23  Turner to "a room" to discipline out of eye-shot of onlookers.  *Id*.: 776.  Ms. Carter also confirmed

24  previous statements that Mr. Turner lectured Turner (as a child) and admonished him to "shut it down"

25  when Turner was crying.  *Id*.: 778.  Ms. Carter confirmed previous statements that Mr. Turner taught

---

27      [55] Exhibit 110 is a transcript of an interview conducted of Ms. Carter by Detectives Strength and
28  Mayer on April 18, 1984.  In Detective Strength's stipulated offer of proof, he authenticated the
    interview transcript.  June 5, 2003 Stip. re: Henry Strength, ¶¶ 4-7.

Turner about plants and flowers at the house and how to trim them. *Id.*: 779. Ms. Carter did not consider these teaching episodes to be positive because Turner was not interested in gardening. *Id.*: 818. Although Mr. Turner had a lawn service, Ms. Carter did not believe that Turner accompanied his father on his service calls. *Id.*: 780. The relationship between Turner and his father improved after he was released from CYA. *Id.*: 781-82. Turner was a man so his father could no longer thump him or scream at him. *Id.*: 783. Ms. Carter was aware that Turner visited his father during this time frame. *Id.*: 784. Ms. Carter did not confirm her April 1984 interview statement to the Merced detectives that Turner and his father had become "good friends" after Turner was paroled from prison (in September 1983). EHT Exhibit 110: EH181. Rather, she stated they *may have* become friends, but, she reiterated that Mr. Turner no longer could abuse Turner. EHT-4: 786. Prior to Turner's CYA commitment, she never observed any type of positive interaction or positive relationship between Turner and his father. *Id.*: 817.

Mr. Turner once took Ms. Carter, Turner and some other cousins to show them the sprinklers under the City of Fresno. *Id.*: 788. Mr. Turner took some of the kids to an irrigation canal by Roeding Park (in Fresno) and to swing time on a tire hanging from a tree. Other kids played in the water on inner tubes. Turner never went in the water or on the swing. *Id.*: 791-93. Some of the neighborhood children and Mr. Turner, as well as other adults, also would go to a canal near the house of Turner's maternal grandmother. Those who could swim would go in the canal. *Id.*: 794-95.

At the evidentiary hearing, Ms. Carter could not confirm whether she knew that Turner had been in a fight "the last time" he was in jail. *Id.*: 797; *see* EHT Exhibit 110: EH169. She did not know that Turner ever "roughed up" Pam Butler before they broke up. She was not even aware that Turner "grabbed" her. *Id.*: 797-98.

From September 1983, when Turner was paroled from Soledad, until his April 1984 arrest, he came over to Ms. Carter's house often. He was never high on drugs when he came over. *Id.*: 799. Ms. Carter was familiar with the smell of marijuana. *Id.*: 813-14. She also was familiar with the effect PCP or angel dust had on people who smoked it, that is, a zombie-like state, slowed speech and slowed movement. After Turner was released from CYA, Ms. Carter observed him trying to get on his moped, but he was so uncoordinated, he couldn't manage it. On another occasion, he came in the back door of his mother's house and just glared at Ms. Carter and his mother "not really seeing what [they] were

1  doing." *Id*.: 815.  Ms. Carter and Turner's mother were very concerned about his use of PCP, because

2  of the potential for brain damage. Although she had never observed "mood switches" in Turner when

3  he used PCP, Ms. Carter was aware that there would be "flare ups" with his sisters. *Id*.: 816.  She

4  observed such a flare up with his sisters on one occasion. *Id*.: 817.

5        Ms. Carter did not specifically recall talking to Mr. Ellery before the trial, at least not one-on-one.

6  She told Turner's mother there should be a change of venue.  She did not say this to Mr. Ellery.  She did

7  not know he was going to call her as a witness at the penalty phase. *Id*.: 799-800.  Her testimony came

8  about because someone from the defense team asked if anyone present at the trial could testify on

9  Turner's behalf.  Ms. Carter volunteered.  No one interviewed her in advance of her testimony.  She was

10  unprepared. *Id*.: 803.

11        Elijah Barber spent time with Turner when Turner was a child because Mr. Turner did not have

12  time for his son. Mr. Barber, his son, Dexter, and Turner would go to various activities, like ball games.

13  Turner also spent time with neighbor Lewis Coleman after he came home from CYA.  Mr. Coleman

14  tried to keep Turner out of trouble. *Id*.: 801-02.  Turner did odd jobs around Mr. Coleman's house and

15  Mr. Barber's house. *Id*.: 802.  After being paroled in September 1983, Turner worked for Cross

16  Construction Company, first as a security guard and then actually doing construction work. *Id*.: 802-03.

17           **(9)**    **Lewis Coleman**

18        As noted above in Part IV.A.2.f., *supra*, Mr. Coleman testified at Turner's trial in the penalty

19  phase. He also gave an interview to Merced County Sheriff's Detective Jill Mayer on April 17, 1984.

20  The Warden has offered a transcript of the interview, EHT Exhibit 111, a tape recording of the

21  interview, EHT Exhibit 111a, and notes Detective Mayer recorded about the interview, EHT Exhibit107:

22  EH098-EH100.[56]  Turner additionally has offered an interview of Detective Mayer conducted on January

23  2, 2003 by the Warden's counsel about her 1984 conversation with Mr. Coleman. EHT Exhibit 24.

24        During the 1984 interview, Mr. Coleman reported that he saw Turner on Friday, April 13, 1984,

25  as Turner was returning home from work.  Mr. Coleman was not sure whether he saw Turner on

26  Saturday morning, but was certain he hadn't seen Turner on Sunday night. EHT Exhibit 111: EH185.

27

28        [56] In Detective Mayer's stipulated offer of proof, she authenticated the interview transcript. June 5, 2003 Stip. re: Jill Mayer, ¶ 4.

1     They saw each other again on Monday, April 16, 1984 and talked about Turner's positive progress at

2     work and getting off parole.  Nothing in Turner's demeanor gave Mr. Coleman an indication that

3     anything was wrong or was bothering Turner.  *Id.*: EH186.  Turner looked very clean cut that evening,

4     whereas prior to the preceding month, Turner had not been taking care of himself.  *Id.*: EH187.  Mr.

5     Coleman described Turner as an introvert. *Id.*: EH189. At Mr. Coleman's request, he spoke to Detective

6     Mayer off tape for a few moments.  *Id.*.   The notes she recorded and the 2003 interview transcript

7     memorialized that Turner had been having trouble with PCP about three weeks prior to the crime.  EHT

8     Exhibit 24: 0375-76; EHT Exhibit 107: EH100.  Thereafter, Turner appeared to Mr. Coleman to be

9     sober.  EHT Exhibit 24: 0377.  Mr. Coleman reported that Turner was not aggressive.  EHT Exhibit 111:

10     EH102.

11                  **(10)   Sandra Goodman**

12         Ms. Goodman's interview was conducted by Detective Strength on the telephone April 24, 1984.

13     EHT Exhibit 112: EH194.[57]  She conceded that she and Turner were friends and stated that the fact of

14     Turner's arrest was a big shock to her.  *Id.*: EH194-95.  Turner used to be her sister's boyfriend.[58]  Ms.

15     Goodman reported that in the preceding month Turner had been "messing around with a lot of drugs."

16     *Id.*: EH195.  She never saw him when he was intoxicated on drugs, but she talked to him on the

17     telephone about his drug problem.  *Id.*: EH196.  The last time she saw him was a couple of weeks before

18     his arrest.  *Id.*: EH197.  He seemed depressed to Ms. Goodman at that time and reported that he was

19     "messing with different drugs."  *Id.*: EH198.  Another topic they discussed was Ms. Goodman's sister,

20     who Turner still loved (but she didn't like him).  *Id.*: EH199.

21                   **(11)   March 31, 1980 Probation Report**

22         Turner offered his March 31,1980 probation report and attachments (collectively, EHT Exhibit

23     18).  The report pertains to Turner's involvement in a convenience store robbery committed by Turner,

24     as the "look-out," and Ronald Cooper, as the party who had contact with the store clerk.  The date of the

25

26        [57]  In Detective Strength's stipulated offer of proof, he authenticated the interview transcript.

27     June 5, 2003 Stip. re: Henry Strength, ¶¶ 4-7.

28        [58] The Court understands from representations of the Warden's counsel that Sandra Goodman's
    sister was the late-Pam Butler.  *See* EHT-5: 944.

robbery was February 1, 1980. Mr. Cooper brandished a gun. The Warden objected to admission of this probation report on the grounds that Turner had not included the report in the materials presented to the California Supreme Court on state habeas corpus. The Court overruled the objection on the grounds that the Warden failed to establish a default under *Keeney v. Tamayo-Reyes*, 504 U.S. 1, 11 (1992), and received EHT Exhibit 18 into evidence. *See* September 20, 2004 order (doc. 276).

The value of the probation report to Turner is the existence of attachments comprised of letters written by friends, family members, neighbors, and school officials in connection with Turner's initial felony conviction, a robbery count. Letters from the following individuals speaking on behalf of Turner are included: (1) Dolphas Trotter, Principal of Edison High School, (2) Kathryn Carter (his cousin), (3) an unnamed sister (Evelyn Turner),[59] (4) friends, Mary Taylor, Dossie Warren, Denise Warren, Florence Barber, Virgie Wright, and James Warren,[60] (5) cousin Bryan Smith, (6) aunt Mrs. Rowland Haynes (Yvonne Turner Haynes), (7) cousin Yvette Smith, (8) sister Oweida Turner, (9) friend Mrs. Dossie Warren, (10) sister Elizabeth Turner, (11) supervisor at work, James Gill, (12) employer Mack Haynes, (13) Dulcena Taylor, attendance clerk at Edison High School, (14) Bud Taylor, counselor at Edison High School, (15) friend Mrs. A. Green, (16) aunt Oweida Smith, and (17) cousin Phillip Haynes. Some of the themes in those letters include Turner's potential for rehabilitation, his good characteristics regarding community and familial responsibility, and his regrettable tendency to associate with the "wrong" type of people.

### b.    School and Academic Records.

The Warden offered a Certificate of Records, comprised of transcripts and grade reports, from the Fresno Unified School District pertaining to Turner while he was enrolled in Fresno schools. EHT Exhibit 102. In the third through sixth grades, Turner was enrolled in non-graded classes. The notation "S.S. Tutorial Prog. 1970" is listed under the third grade column. In junior high school he received an 'F' and a 'D' his first and second semesters of English 7, and a 'C' in that subject in summer school. In the eighth grade his English 8 class was labeled Phase I. In high school, he earned a few 'A's in P.E.,

---

[59] Turner's other two full sisters, Elizabeth and Oweida, wrote separate letters.

[60] One additional signature on this letter is illegible.

quite a few 'D's, one 'F' in tenth grade math, and a smattering of 'B's and 'C's.  Standardized test scores included at EHT Exhibit 102: EH018, show that Turner's overall battery of scores in the 12th grade, 6.6 (grade level) which represented a decline from his overall score in the 11th grade, which was 7.0 (grade level).  The document indicates that Turner did graduate from high school on June 13, 1979, at age 17.

### c.    Witnesses Acquainted with Mr. Savage

Statements made by Betty Means Tavares and the late Joyce Slaton were presented and admitted to address the issue of Mr. Savage's sexual orientation and practices.

### (1)    Betty Means Tavares

A redacted version of an interview statement taken of Betty Means Tavares by the Warden's attorney and investigator on June 11, 2003 was stipulated into evidence by the parties on July 24, 2003. The statement and stipulation, collectively EHT Exhibit 25, was received into evidence on July 29, 2003. EHT-5: 940.  The interview statement refers to portions of Ms. Tavares's July 16, 1994 declaration offered as EHT Exhibit 11.[61]  Objections to portions of EHT 11 were sustained by the Court's evidentiary ruling of June 19, 2003 (doc. 231), notably statements describing conversations between Mr. Savage and David Reid, the former boyfriend of  Ms. Tavares (formerly Ms. Means), conversations between Mr. Savage and Ms. Tavares's sister, Helen, and representations made by Ms. Tavares of what her sisters and her friend Mary knew about Mr. Savage's reputation for homosexuality.  Those portions are not recounted in Ms. Tavares's interview with the Warden's investigator.

In the interview, Ms. Tavares confirmed that all of the information in her 1994 declaration was correct.  EHT Exhibit 25: 3.  When she was first approached by Turner's attorney in 1994, she was reluctant to get involved because Mr. Savage had been her landlord.  Despite her reluctance, Ms. Tavares did sign her 1994 declaration and report about Mr. Savage being  a "very dominating person" who tried to sexually exploit her when she was his tenant.  EHT Exhibit 11; EHT Exhibit 25: 2, 3, 15.  He told Ms. Tavares he wanted her to be his "female."  When he was showing her his large house, ostensibly for purposes of hiring her to clean it, he came up behind her and started caressing her breasts.  He offered

---

[61] EHT Exhibit 11 previously was attached to Turner's Petition as Exhibit 12 and considered by the Court in the April 27, 1999 Order at Part II.C.3.d.  During the June 11, 2003 interview, Ms. Tavares confirmed that the signature shown on the declaration was her signature.  EHT Exhibit 25: 2.

her free rent in exchange for sex. Ms. Tavares was pregnant at the time of this incident. She explained that she fought him off and declined the offer. While Ms. Tavares was fighting with Mr. Savage, he called his dog out, and the dog began snapping at her. *Id.*: 4, 14. Ms. Tavares did not report this incident to police authorities because Mr. Savage and another mutual friend, "Mary" a nightclub owner, pleaded with her not to do so and she didn't want to damage his career.. *Id.*: 4-5. She did report the incident to her then-boyfriend David Reid. Thereafter Ms. Tavares and Mr. Reid moved out of the house they rented from Mr. Savage. *Id.*: 5; EHT Exhibit 11, ¶ 4. Before Mr. Savage and Mr. Reid moved out, Mr. Savage came to the house and threatened to subjugate Mr. Reid, physically. Ms. Tavares reported that the two men then began to tussle and then Mr. Savage departed. EHT Exhibit 25: 6.

At some later date, Ms. Tavares was at a nightclub with her partner (she called him her "old man"). They saw Mr. Savage and Mary the nightclub owner at a table with a young man. She described Mr. Savage as "feeding him [the young man] drinks." *Id.*: 7. She believed she observed this nightclub occurrence approximately three to four weeks before Mr. Savage's death. *Id.*: 12-13. Ms. Tavares confirmed her declaration statement that Mr. Savage forced "himself sexually on people, mostly young guys." *Id.*: 8. While she never observed him pay anyone for sex, she did see numerous "guys" in his Cadillac with him when he came to pick up the rent. *Id.*: 9. Ms. Tavares also discussed one particular friend of Mr. Savage, Dougie. Dougie was effeminate (she said he looked and walked like a female). He and Mr. Savage "hung out." She also observed Mr. Savage kiss Dougie. *Id.*: 9-10.

At the end of the interview, the Warden's counsel stated: "And we had been told by the defense attorney in this case that uh they were going to possibly have somebody come out to interview you and that you declined to be interviewed." Ms. Tavares replied, "Yeah, I didn't, I just feel this way." *Id.*: 14.

### (2)   Joyce Slaton

Turner offered Ms. Slaton's July 3, 1994 declaration as EHT Exhibit 12.[62] Ms. Slaton gave background in her declaration about how she had known Mr. Savage, his former wife, and their daughter since 1970, and how Mr. Savage gave Ms. Slaton a great deal of assistance in financing her education through scholarship applications. EHT Exhibit 12: ¶¶ 1-3. After the separation and divorce between

---

[62] The Warden's objection to Ms. Slaton's declaration because she is deceased was overruled under Federal Rule of Evidence 807 in the Court's September 20, 2004 order (doc. 276).

1   Mr. and Mrs. Savage, Ms. Slaton averred she observed Mr. Savage to have various young men living

2   with him in his house.  When she was at the house (with Mr. Savage's permission) tutoring one or more

3   of these young men, a particular young man came into the house with his overnight bag to see Mr.

4   Savage.  Ms. Slaton stated the young man showered in Mr. Savage's bathroom, and then got into Mr.

5   Savage's bed.  *Id*.: ¶¶ 5-7.  When Ms. Slaton talked to mutual acquaintances about Mr. Savage's

6   lifestyle, he became angry with her and told her his private life was private.  *Id*.: ¶ 8.  Ms. Slaton also

7   observed that Mr. Savage was intimidating (in the classroom at Merced College) and in the community.

8   *Id*.: ¶¶ 10-11.

9                     **d.      Investigating Officers**

10          The Warden's counsel and investigators interviewed two of the Merced detectives who worked

11   on the investigation of Mr. Savage's murder.  The lead detective was Detective Henry Strength.  Former

12   Detective Jill Mayer also was interviewed.  Detective Strength's interview was offered by the Warden

13   and former Detective Mayer's interview was offered by Turner.  Stipulations of the proposed testimony

14   of both detectives also have been received.

15                     **(1)      Detective Strength**

16          The Warden's counsel interviewed Detective Strength on January 2, 2003, with a transcript of

17   the interview offered and received at the evidentiary hearing as EHT Exhibit 119.  *See* stipulation to

18   admissibility of EHT Exhibit 119 filed June 5, 2003 (doc. 228).  The parties also entered into a

19   stipulation about his testimony which was filed on June 5, 2003 (doc. 226).

20          Addressing the initial impression of the crime and the crime scene, counsel asked: "[i]n talking

21   to Ruth Turner, you were looking for, you were looking for things that were, would try to explain

22   Turner's conduct in this case?"  Detective Strength responded:

23          Yeah, it's, it's very rare that you have a homicide when you have that many stab wounds.
            And, you know, and when we first got there and we saw that and we found out how many
24          stab wounds, I think first we thought there was only about eight, and then when, then
            when the autopsy that was done we found out there was a lot more than eight.  And we
25          kinda' knew that was a uh, I'm, I'm gonna' call the word "sex crime."  It had to
            something with [sic], we thought maybe that his girlfriend was over there and got really
26          mad and just started stabbing him to death.  Is that we didn't know [sic], we didn't really
            at first suspect that it was a um, another, a guy, until we started gettin' into the
27          investigation.  But then, uh, we, we wanted to know what happened and why did it
            happen?  And so um, ah that's when we started talkin' to anybody that would talk to us
28          about the case.

*Id.*: EH293.

Investigators then started to explore "homosexual aspects" of the case, including whether Turner had been sexually abused during previous incarcerations. The investigation about Turner came up with no information. *Id.*: EH294. Detective Strength told the Warden's counsel that juries at the time of Turner's trial were very conservative, coming from a farming community. Detective Strength stated they did not like gays, or anything out of the norm, and they did not like drugs either. *Id.*:: EH297; June 25, 2003 Stip. re: Henry Strength, ¶ 16.

### (2)     Detective Jill Mayer

Former Detective Jill Mayer's testimony was stipulated by the parties on June 5, 2003 (doc. 225). Her stipulated testimony was derived from a tape-recorded, transcribed interview of her conducted by the Warden's attorneys on January 2, 2003. EHT Exhibit 24.

When Detective Mayer had contact with Turner at the Fresno Police Department after his arrest, he appeared to under the influence of drugs because he wasn't "engaged" in terms of eye contact. The Fresno authorities also felt Turner was under the influence of PCP ("dusted") just after his arrest. EHT Exhibit 24: 0377-78. Detective Mayer also shared with the Warden's counsel that in 1984 drug use was perceived very negatively in Merced County. *Id.*: 0378.

Detective Mayer recalled a conjecture during the early phases of the investigation that Turner may have led a homosexual life while previously incarcerated, but was uncomfortable with that aspect of his past on the outside. She did not recall that any leads were actually developed in terms of establishing that Turner had been sexually abused while in prison. *Id.*: 0379.

### e.     Expert Witnesses

The expert witnesses include psychiatrist Trevor D. Glenn, M.D., toxicologist Ernest D. Lykissa Ph.D. (declaration testimony offered by Turner), criminalist Dean Warden (declaration testimony offered by the Warden), psychologist Stephen M. Pittel, Ph.D. (declaration testimony offered by Turner), trial psychologist Phillip M. Hamm, Jr., Ph.D. (deposition testimony offered by Turner), psychiatrist Howard B. Terrell, M.D. (live testimony offered by Turner), and psychiatrist/ neurologist Reese T. Jones, M.D. (live testimony offered by the Warden).

**(1)     Trevor D. Glenn, M.D.**

On October 2, 1979, Dr. Glenn interviewed and evaluated Turner, who at the time was one day shy of age 18, to determine his "fitness" for criminal proceedings as an adult or a juvenile. Dr. Glenn reported that Turner was escorted to his office by Madera County Probation officers. The underlying crime was not disclosed in the report and Dr. Glenn was instructed by Turner's appointed counsel not to discuss the underlying crime with Turner. However, Turner did evidently report to Dr. Glenn that he had been arrested for "armed robbery" on September 16.[63]

Two segments of Dr. Glenn's report have been cited by the parties. The first concerns Turner's description of his family life to Dr. Glenn. Although Turner's parents had been divorced seven years previous, Turner visited his father two or three times a week. Dr. Glenn found the family, as described by Turner, to have been stable, despite the parents' separation and divorce. The second pertinent segment relates to Turner's school history. Turner reported he had difficulty in school, particularly with comprehending assignments and mathematics. He was placed in remedial classes, but returned to regular classes in high school. Despite having returned to regular high school classes and graduating, Turner reported that he attended vocational school to learn a trade as part of his education.

**(2)     Ernest D. Lykissa, Ph.D.**

The July 16, 1993 declaration of forensic toxicologist Ernest D. Lykissa, Ph.D. was offered at the evidentiary hearing in lieu of live testimony, without objection, and received as EHT Exhibit 5.[64] From August 1991 through October 1992, Dr. Lykissa was the director of California Toxicology Services, a nationally accredited laboratory. EHT Exhibit 5: ¶ 2. After receiving a sample of Turner's blood on September 30, 1992, Dr. Lykissa directed qualified technician Todd Glosier to perform a full

---

[63] There is no evidence presented in the record by either party as to any criminal activity in which Turner was involved prior to his February 1, 1980 robbery (which resulted in a conviction and was the subject of the March 31, 1980 probation report). It is unknown whether the criminal activity for which Dr. Glenn was evaluating Turner progressed into juvenile proceedings. The March 31, 1980 Probation Report indicates that Turner had no prior contact with the Fresno County Probation Department. No other county is mentioned with respect to juvenile proceedings. Since neither the trial prosecutor nor the Warden refer to a felony conviction based on 1979 criminal activity, the Court does not understand that there was a third prior felony conviction.

[64] Dr. Lykissa's July 16, 1993 declaration was previously considered by the Court as Exhibit 5 to the Petition, in its April 27, 1999 Order at Part II.C.4.c..

drug and alcohol screen on the specimen.  Mr. Glosier's screening was performed on October 8, 1992.

*Id.*: ¶ 5.  On October 13, 1992, Dr. Lykissa directed qualified technician Tim McClain to confirm Mr.

Glosier's results using a gaschromatograph mass spectrometric analysis.  The test results were positive

for PCP, at the level of .44 milligrams per liter (mg/L).  Dr. Lykissa averred: "the level at which PCP

becomes potentially toxic is .10 mg/L." *Id.*: ¶ 7.  Dr. Lykissa personally verified these results by Radio

Immuno Assay (RIA).  *Id.*: ¶ 8.  His report is attached to his declaration as Exhibit B.

### (3) Dean Warden

The Warden offered the declaration of California Department of Justice senior criminalist and

toxicologist, Dean Warden, as Exhibit 115 to the evidentiary hearing, without objection.  On December

11, 1992, Mr. Warden performed a toxicology analysis for PCP on a vial of blood he was informed was

drawn from Turner.  Using gas chromatography/ mass spectrometry, he determined the specimen was

positive for PCP at the level of .20 mg/L.  EHT Exhibit 115: ¶ 5.  Mr. Warden explained that the

quantitative difference between his laboratory results and that of California Toxicology Services could

be explained by differences in equipment, age or condition of the same, or methodology employed in

the analysis.  He did not comment on the accuracy of the results obtained the Dr. Lykissa.  *Id.*: ¶ 7.  PCP

produces a spectrum of effects including hallucinations, delirium, disorientation, agitation, muscle

rigidity, ataxia, nystagmus, seizures, and stupor.  *Id.*: ¶ 8.  An "experienced" user (with a high tolerance)

possibly could experience no effect from a PCP blood level ranging from .20 mg/L to .44 mg/L.  He was

sure, however, that "any attempt to determine drug effects or establish time of use based on blood levels

alone [wa]s inappropriate." *Id.*: ¶ 9.

### (4) Stephen M. Pittel, Ph.D.

Turner offered the July 20, 1993 declaration of psychologist Stephen M. Pittel, Ph.D. as EHT

Exhibit 6.[65]  In objections to Dr. Pittel's declaration in connection with the evidentiary hearing, the

Warden contended that the declaration itself constituted hearsay and further that Dr. Pittel was not a

credible witness because he was arrested for using cocaine in 1990.  In ruling on the objections the Court

found the hearsay objection to be overbroad and unfocused on any specific statements or passages.

---

[65] Dr. Pittel's declaration originally was presented to the Court as Exhibit 6 to the Petition and summarized in the April 27, 1999 Order at Part II.C.4.d.

Nonetheless, the Court noted that the declaration did recite certain information recounted by Turner, Turner's mother, and trial witnesses. This information, however, was the basis for Dr. Pittel's opinion, and thus did not constitute a hearsay use. Fed.R.Evid. 703. Dr. Pittel's prior arrest and the fact that he suffered no felony conviction following that arrest, have been considered when evaluating credibility. *See* June 19, 2003 order (doc. 231).

Dr. Pittel recited extensive qualifications to substantiate his credentials as an expert concerning the psychological effects of drugs and alcohol, including PCP, on human behavior. EHT Exhibit 6: ¶¶ 1-4. Based on his review of trial testimony, an April 18, 1984 interview with Mrs. Turner by investigating detectives (EHT Exhibit 108), toxicology reports, and a three hour interview with Turner, Dr. Pittel found that Turner had "an extensive history of drug and alcohol abuse that began in early adolescence . . . smoking marijuana on a daily basis beginning when he was 12 years old and drinking alcohol to the point of intoxication on a daily basis at approximately age 16." *Id.*: ¶ 8. He began smoking cigarettes dipped in PCP ("sherms") shortly after his release from Soledad Prison in 1983.[66] He smoked two or more sherms a day. He continued using marijuana and alcohol on a "more-or-less daily basis." *Id.*: ¶ 9. Like 75% of PCP users surveyed for various scientific studies, Turner reported PCP had "stimulant-like effects." He also occasionally felt zombie-like and hallucinated. *Id.*: ¶ 10. Turner reported to Dr. Pittel committing acts of violence (e.g. tearing down a fence and destroying a neighbor's plants) while intoxicated on PCP, but he did not recall these acts, even after being told. *Id.*: ¶ 11.

Turner's mother reported a bizarre set of behaviors whereby Turner was seen running down the street and attempting to fly. Turner had no recollection of this. *Id.*: ¶ 12. Dr. Pittel reported that uncharacteristic, bizarre, and unremembered behavior is typical in PCP intoxication. *Id.*: ¶ 13.

Turner described to Dr. Pittel his marijuana and PCP use on the day of the crime. He used both drugs (marijuana cigarette dipped in PCP) before being picked up by Mr. Savage and more while working in Mr. Savage's yard. *Id.*: ¶ 14. Turner also used "speed" (methamphetamine) on the day of the crime, consumed three or four brandies in the afternoon, and another drink in the early evening. *Id.*:

---

[66] Other evidence submitted by both parties indicates Turner began using PCP when he was in high school in the late 1970s.

¶ 15.  He smoked a second PCP dipped marijuana cigarette at a gas station after he left Mr. Savage's home following Mr. Savage's first, unexpected, upsetting sexual advance.  *Id.*: ¶ 16.  Turner did not recall stabbing Mr. Savage or cutting the telephone cords, but did recall the sequence of events immediately before and after the stabbing.  *Id.*: ¶ 17.  Dr. Pittel opined:

> Mr. Turner's behavior on the day of the homicide may have been significantly affected by his use of PCP and alcohol, and to a lesser extent by his use of marijuana and methamphetamine . . . these substances may have exacerbated his emotional reaction to actual homosexual advances made by the victim or caused him to misconstrue the victim's behavior as a homosexual advance. . . . [T]he combined effects of these substances and/or the effect of chronic abuse of PCP and alcohol may have significantly impaired Mr. Turner's ability to think clearly, to exercise appropriate judgment and to conform his behavior to the requirements of the law.

*Id.*: ¶ 19.  Dr. Pittel based his opinions on scientific studies documenting similar behavior in PCP users, Turner's use of PCP and other drugs throughout the day of the offense, especially a whole "PCP joint" just before the fatal attack, Turner's emotional upset at Mr. Savage's actual or perceived homosexual advances, Turner's apparent extreme rage as determined from the depth of some of the stab wounds, Turner's irrational acts after Mr. Savage lay dead (covering him with towels and pillow slips), his lack of historical violence and his ability to recall most events preceding the homicide.  *Id.*: ¶ 21.  Additional support came from the finding of .44 mg/L of PCP in Turner's blood drawn "approximately two days after the homicide."[67]  Clinically, an acute confused state would occur in concentrations of .01 to .10 mg/L.  Since PCP was excreted from the body slowly, Dr. Pittel considered this level of concentration consistent with intoxication on the day of the offense.  Dr. Pittel further found that the absence of alcohol, marijuana and methamphetamine in the blood sample tested was not inconsistent with Turner's account of substance use on the day of the offense, as these three drugs were excreted from the body at a much faster rate than PCP.  *Id.*: ¶ 23.  Dr. Pittel criticized trial expert Dr. Hamm for not providing "any detailed account of the effects of PCP."  Dr. Hamm did not explain PCP dissociation or psychosis in any detail.  Nor did he explain how Turner's behavior was consistent with these occurrences.  *Id.*: ¶ 26.

---

[67] Turner's blood was not drawn two days after the homicide.  He was arrested two days after the homicide.  As summarized in the testimony of Detective Wright, the blood sample was drawn on April 20, 1984, *six* days after the homicide.  *See* Part IV.A.1.e., *supra*.

### (5)     Phillip M. Hamm Jr., Ph.D.

The evidentiary hearing testimony of trial psychologist Dr. Hamm was presented by deposition, offered by Turner, and conducted on June 13, 2003.  In this testimony, Dr. Hamm's trial testimony was augmented in several respects, including his experience as a court-appointed expert, information about Turner's family background received during his interview, more detail in reciting the results of the MMPI, WAIS, and Rorschach Test, and  new information supplied by habeas counsel corroborating Turner's drug history.

Dr. Hamm worked extensively as a forensic psychologist since entering private practice in 1975. He was on the Merced Superior Court panel of mental health experts beginning in 1976 or 1977 and performed hundreds of evaluations for the Superior Court before being retained by Mr. Ellery in Turner's case.  Depo: 9.  As a panel expert for the Superior Court, he evaluated insanity and competence for the court.  *Id*.: 9-10.[68]  In his career he had developed penalty phase mitigation evidence in approximately ten cases.  This included reviewing family statements and interviewing family members to understand the defendants' respective backgrounds.  *Id*.: 62-63.

Dr. Hamm's role in the case was to consult with Mr. Ellery as to the psychological aspects of the case, including mental state defenses.  He did not recall being told by Mr. Ellery that the case was a death penalty case.  *Id*.: 18.  Although his billing statement did not include a line item for conferring with Mr. Ellery, he believed it likely that the conference with Mr. Ellery was included in one of the "Psychological Evaluation" entries.  *Id*.: 69; Depo Exhibit 1: 000059.  He did not believe that this conference amounted to much more than a telephone call.  Depo.: 68.

The defenses (in the guilt phase) Dr. Hamm was hired to explore included the effect of drug use at the time of the commission of the offense and Turner's mental state relative to the commission of the offense.  *Id*.: 19-20.[69]  In this case, the victim, Mr. Savage, alternated between being "kindly and solicitous" on the one hand, and highly coercive and threatening, on the other.  Turner's PCP use,

---

[68] Dr. Hamm became a board certified forensic psychologist by the American Board of Professional Psychology in 1987 *after* his trial work on Turner's case..  Depo: 8-9.

[69] The October 10, 1984 letter from Mr. Ellery to Dr. Hamm just prior to his testimony asked him to explore mental defenses under Penal Code §§ 28, 29 (diminished mental state).  Depo Exhibit 1: 000050.

background, and personality would have been important to explore in this context. *Id.*: 20. Dr. Hamm didn't recall whether Mr. Ellery asked him to prepare a social history of Turner, but he would have done that in any event. He did not recall if he prepared a report or provided Mr. Ellery with his written notes. It would have been unusual for him to have provided counsel with his notes. This was never requested and never offered. *Id.*: 21.

During his interview with Turner, Turner revealed to Dr. Hamm that his father was drunk frequently and physically abused him. *Id.*: 109. Dr. Hamm felt this physical abuse was consistent with Turner's anti-social behavior and later drug abuse. *Id.*: 110. The fact that his father may have taught him some gardening skills when Turner was young and that after Turner was grown up he and his father may have enjoyed a more cordial life did not impress Dr. Hamm. Alcoholics were known to be both abusive and kind to their children, simultaneously. *Id.*: 111. Turner also described his mother to Dr. Hamm as loving and nurturing. *Id.*: 112. In addition, Turner reported that he had a violent reaction while under the influence of PCP, namely that he "tore up some plants in the patio area" of his home. *Id.*: 113-14. Turner identified witnesses to his violent behavior, namely friend Ronald Cooper and girlfriend Ladonia Peavy. *Id.*: 115.

Dr. Hamm did not recall relaying information he obtained about Turner to Mr. Ellery, and testified after looking at his billing statements for this case that he believed at most he talked to Mr. Ellery for just a few minutes in advance of his testimony. *Id.*: 68-69. On cross examination, however, Dr. Hamm agreed with the Warden that it was possible he had consulted with Mr. Ellery before the testimony and failed to note that on his billing statements. The consultation would have included Turner's disclosure that his father was abusive. *Id.*: 132-33; 136. Although Dr. Hamm didn't recall, it also was possible that Mr. Ellery asked him (Dr. Hamm) to avoid certain subjects in his testimony and in rendering his opinion. *Id.*: 144. He didn't think that he would have minimized Turner's drug use, however, because that was a crucial part of the case. There would have been no way for Dr. Hamm to present his opinion about Turner's mental state without mentioning the drug use. *Id.*: 145-46.

Dr. Hamm did not recall being asked by Mr. Ellery to develop mitigating circumstances or mitigating evidence. *Id.*: 22. He did not recall whether Mr. Ellery asked him to testify at the penalty phase of Turner's case. *Id.*: 18. Had he been asked to develop penalty phase mitigation evidence, he

would have reviewed the results of the psychological testing and background information obtained from Turner (as he did).  He also would have performed additional work in exploring Turner's background, including reviewing mental health records, prior educational records, probation department reports, medical records (including toxicology reports), family member background.  *Id*.: 63, 71.  On cross examination, Dr. Hamm testified that if he had reviewed background medical records, he would have made a summary of them, and he did not do so.  *Id*.: 85.  He did, however, make a summary of police records provided him.  *Id*.: 87; Depo Exhibit 1: 000048-49.  For background family information, he would have wanted the source to have been other family members.  *Id*.: 177.  Obtaining outside independent information would be important to verify a defendant's version and perceptions of the events.   It would give a different perspective and could either corroborate or contradict information obtained from a defendant.  *Id*.: 64; 177.  Dr. Hamm found that Turner's account of his history and the circumstances of the crime were truthful, and largely accurate.  *Id*.: 179-81.

Mr. Ellery did not supply Dr. Hamm with any anecdotal information about Turner's PCP or other drug use from sources outside of Turner.  *Id*.: 43.  However, in Dr. Hamm's review of the police reports, he did become aware of anecdotal information from neighbor Lewis Coleman that Turner had been observed in an intoxicated state a few weeks before the offense.  *Id*.: 87; Depo Exhibit 1: 000048.  Had Dr. Hamm been aware that toxicology tests performed on Turner's blood came up positive for PCP, that fact also would have influenced his opinion about Turner's mental state.  Although he would have wanted to know, however, whether PCP measured in Turner's blood at the time of arrest was attributable to post-crime PCP use.  Even if it had been so attributable, that fact would be consistent with Turner's report of being an habitual PCP user.  Turner's description of his PCP use during the crime would have been more credible.  Depo: 44-45 (direct examination); 138-39 (cross examination).[70]  Dr. Hamm's opinion also would have been influenced (strengthened) if he had received anecdotal information that Turner previously exhibited bizarre behavior, like trying to fly.  *Id*.: 45.  Dr. Hamm believed that all the information discussed from his notes (Depo Exhibit 1: 000010-11) constituted mitigating evidence.

---

[70] He agreed with the Warden there would have been no way to determine the level of PCP in Turner's blood at the time of the crime given the six-day delay in drawing a sample and the intervening PCP use.  Depo: 151.

While PCP use alone wouldn't have been mitigating, the effects it had on Turner would have been mitigating.  Depo: 46.

The results of the MMPI indicated Turner had low ego strength, low dominance, high mental dullness, impaired thinking, difficulty expressing emotions, disorganization under stress, high level of social discomfort, limited social skills leading to awkward and inappropriate behavior, a state of being impressed by power, fear of emotional involvement, and conflicts about sexuality.  *Id.*: 25; Depo Exhibit 1: 000010.  The validity portion, or "lie scale" of the MMPI was in the normal range, so there was nothing to suggest Turner was malingering.  The other test results on the MMPI were consistent with the facts Turner related about his drug use and the crime.  Depo: 173.  Turner's score on the WAIS was 79 on the verbal portion, 86 on the performance portion, and 80 for a full scale IQ.  Turner's verbal score was in the range of borderline mental retardation.  *Id.*; Depo: 26.  A full scale average score would have been between 90 and 110.  *Id.*: 27.  A score in the borderline range of mental retardation, between 70 and about 82 or 80, would indicate "limited and certainly noticeably below average abilities to solve problems."  As a person with a full scale IQ of 80, Turner fell into that category.  *Id.*: 30.  A person with a full scale IQ of 80 would have difficulty learning to read, would not read at age level, would have academic difficulties in school, likely would be channeled into special education classes or some sort of special education intervention.  *Id.*: 30-31.  On the verbal comprehension subtest, Turner scored 6, whereas average was 10, with a standard deviation of 3.  His verbal comprehension and, therefore, his ability to understand issues of daily living were well below average.  *Id.*: 33.  This means Turner would have had difficulty comprehending social and interpersonal matters.  *Id.*: 72.  His score on the nonverbal comprehension subtest was 8, which was low, but within the range of normal.  *Id.*: 33.  The last subtest measured Turner's "fund of information."  Turner scored 6 on this subtest indicating poor knowledge about the world, and consequently poor problem solving abilities.  *Id.*: 33-34; Depo Exhibit 1: 000010.  The Rorschach test demonstrated that Turner functioned in a simple, direct way, and had a low capacity to organize his experiences and make sense out of what was happening to him.  *Id.*: 34.  He was passive, but had underlying hostility and aggression.  *Id.*: 35.  There was no indication of malingering on any of these tests.  *Id.*: 174.  Dr. Hamm did not feel that additional psychological testing was or would have been necessary for him to render a diagnosis.  *Id.*: 143.

In 1984, Dr. Hamm was familiar with PCP because he performed evaluations on inmates who had committed crimes while under the influence of this drug.  PCP at that time, however, was not common.  *Id*.: 36.  For Turner's case, Dr. Hamm reviewed newsletters concerning PCP.  *Id*.: 37.  After having familiarized himself with the effects of PCP (in 1984), Dr. Hamm understood the effects of the drug to be highly disorganizing, intrusive, causing misperceptions, disinhibition, psychosis, hallucinations, and delusions.  From his interview with Turner, Dr. Hamm understood that Turner had smoked two PCP cigarettes before the crime, that he used PCP several times a week, and had started using PCP as soon as he was released from prison (in September 1983).  Turner told Dr. Hamm he felt he had to have drugs "to function."  *Id*.: 38-39.  During re-cross examination, the Warden questioned Turner's ability to hold down a construction job, consistently for approximately five months, when he was a drug user.  Dr. Hamm responded that drug use in the construction industry was "epidemic."  He related his knowledge that worker's compensation claims often arose out of drug or alcohol injuries while people were on the job.  *Id*.: 185-86.  Turner's favorable job performance reviews were not inconsistent with drug use because he showed up for work and he was compliant to authority.  *Id*.: 186.

Dr. Hamm opined that PCP played a role in Turner's commission of the crime.  To begin, Turner had limited intellectual resources and limited problem solving abilities and also was susceptible to people of authority.  When such a person would use PCP he would be unable to sort out what was happening to him in a rational way and would become irrational, paranoid.  *Id*.: 39-40.  At trial, Dr. Hamm testified that he believed Turner was drug-induced or at least borderline psychotic, and he confirmed this opinion at his deposition.  *Id*.: 41 (direct examination); 159 (cross examination).  Dr. Hamm did not believe Turner suffered from anti-social personality disorder.  *Id*.: 159.  A psychotic person would be insane, that is unable to accurately perceive or appreciate or respond to reality, coupled with interfering, intrusive and disorganizing mental experiences such as hallucinations or delusions.  *Id*.: 41.  Manifestations of PCP induced psychosis might include unpredictable destructiveness, violence, bizarre actions, confusion, and difficulty sorting out experiences.  *Id*.: 42.  In reaching that conclusion at trial, Dr. Hamm relied on the drug and alcohol newsletter published by Vista Hill Foundation as well as information he obtained in the course of his practice.  *Id*.: 42-43.  Another source, was Turner, himself, describing the crime, as well as police reports describing the viciousness of the stabbing, and

psychological testing of Turner.  *Id*.: 43.  Crimes committed by people under the influence of PCP tended to be "overdone."  The fact that Mr. Savage had been stabbed over 40 times was consistent with this type of overdone violence seen in an individual completely out of control under the influence of PCP.  *Id*.: 49.  The excessive number of stab wounds was consistent with psychosis rather than an opportunistic meeting.  *Id*.: 79.  Dr. Hamm was aware of literature which linked PCP intoxication with violence.  *Id*.: 148.  He also conceded that the excessive number of stab wounds was consistent with anger on Turner's part.  *Id*.: 160.

In 1984 Dr. Hamm was aware that people who used PCP were highly susceptible to violent behavior due to the disorganizing, hallucinogenic, and disinhibiting effect of the drug.  *Id*.: 47.  Even someone with no history of violence could act violently after using PCP.  But a person who committed acts of violence previously would be more likely to commit acts of violence under the influence of PCP than an individual who had never shown violent behavior.  Based on Dr. Hamm's interview of people who had mixed PCP and alcohol, he believed there was an even more disorganizing and disinhibiting effect.  *Id*.: 48.  Dr. Hamm did not subscribe to the notion that PCP would cause a person to commit a homicide.  *Id*.: 141.

Turner described the events during the day of the homicide in detail until the last phase, when Mr. Savage was making attempts to have sex with Turner and the stabbing itself.  Dr. Hamm testified Turner's description of these events were not "really very detailed."  *Id*.: 126.  Although Turner wasn't in a confused and disorganized state the entire time he was with Mr. Savage, his "mental condition fluctuated and it actually deteriorated more toward the end."  *Id*.: 127.

On cross examination, the Warden pointed out that Turner asked Mr. Savage to compensate him for his work on the yard with clothes rather than money, because he would likely have spend the money on more drugs.  Dr. Hamm agreed with the Warden that such a request demonstrated cognitive awareness of having a drug problem and logical thinking *Id*.: 91-92. On re-direct examination, Turner's counsel, Mr. Charles Trudrung Taylor explained that during Turner's trial testimony he stated Mr.

1   Savage made the suggestion of purchasing clothes for Turner as payment for his yard work activities.

2   *Id.*: 171.[71]

3       Dr. Hamm believed that the sexual aspects of the crime were significant in the case.  Although

4   Turner testified he had not been offended by the homosexual acts he saw in prison and he did not

5   describe himself as having been pursued sexually in prison, Mr. Savage's sexual overtures were

6   threatening and confusing coming from a person who was an authority figure.  *Id.*: 50.  Mr. Savage's

7   large stature compared to Turner's small stature would have added to that impression.  *Id.*: 51.  Although

8   Dr. Hamm mentioned "conflicts with sexuality" in his notes, he wasn't referring to Turner being

9   confused about gender preference, although he did note that Turner had never married.  *Id.*: 51-52.  Dr.

10  Hamm disagreed that Turner demonstrated homophobia in the pure sense of disliking homosexuals,

11  because there was nothing in his past that showed he was homophobic.  It was more a matter of being

12  threatened with a sexual assault, although this clearly had a homosexual component.  *Id.*: 160-61.  The

13  sexually aggressive nature of Mr. Savage's conduct caused confusion for Turner because of his

14  deference to authority.  *Id.*: 161.  Dr. Hamm didn't think that Turner's past boastfulness to family

15  members that he would "take care" of anyone who came on to him sexually while incarcerated amounted

16  to much because in the case of Mr. Savage, Turner did put up with quite a bit before he reacted.  *Id.*: 162.

17      Dr. Hamm felt that Mr. Savage's conduct in driving all the way to Fresno for casual labor

18  indicated he (Mr. Savage) was seeking Turner out.  Buying clothes for Turner at the department store

19  also was extremely solicitous and seductive behavior on Mr. Savage's part, especially considering that

20  Turner only put in about a half and hour of work on Mr. Savage's yard.  Other factors informing Dr.

21  Hamm's opinion included that Mr. Savage gave Turner alcohol and access to video games as well as that

22  he took Turner with him when he went to run errands.  *Id.*: 53.  While Dr. Hamm conceded that Mr.

23  Savage's offer to purchase clothes for Turner could have been altruistic, he discounted this because

24  Turner hadn't performed significant work for Mr. Savage.  *Id.*: 92.

25

26  _____

27      [71] Both the Warden's counsel and Mr. Taylor's explanation were consistent with the record.  At trial, Turner testified that Mr. Savage made the suggestion of purchasing clothes for Turner.  *See* Part IV.A.1.j., *supra*.  Dr. Hamm recounted, however, that Turner said he made the suggestion.  *See* Part

28  IV.A.1.l., *supra*.

Dr. Hamm also considered that Turner might have been an opportunist looking at Mr. Savage as someone he could take advantage of. In Dr. Hamm's evaluation process, however, this notion became insignificant because it appeared more that Mr. Savage was the one being opportunistic toward Turner. *Id*.: 52. Dr. Hamm was aware that Turner took Mr. Savage's car and a television after the stabbing, covered the body, thought about stealing Mr. Savage's rings, but changed his mind, and that telephone cords in the house had been cut. *Id*.: 54-55. Dr. Hamm felt these factors were indicative of Turner's disorganized behavior. If he had been "intent on committing a robbery, you know, stealing items of real value, he certainly didn't do a very good job of it." *Id*.: 55. Dr. Hamm also was impressed with the fact that Turner didn't take any cash, which Mr. Savage had (when he paid for Turner's clothes). *Id*.: 56. Dr. Hamm did not believe that Turner's act in covering Mr. Savage's body was consistent with a premeditated or opportunistic intent to steal. Rather, it reflected a certain amount of respect. In light of the stabbing, the act was "kind of strange," indicative of psychosis. *Id*.: 80. On cross examination Dr. Hamm conceded that covering the body could have been for purposes of concealing it, *id*.: 123; 157, but, taking into account all of the circumstances, he discounted this because Mr. Savage's large covered body would have been just as suspicious looking as an uncovered body. The more rational action would have been to move the body. *Id*.: 123. Taking and then returning jewelry items also was consistent with psychosis in Dr. Hamm's opinion. *Id*.: 81. If Turner's intent had been to commit a theft then he would have taken what he wanted and left the premises as quickly as possible. Dr. Hamm felt that the time Turner took to cover the body and argue with himself over whether to steal Mr. Savage's jewelry was "just bizarre." *Id*.: 122. In Dr. Hamm's notes, he wrote that Turner at one point suggested that Mr. Savage take him to a bus stop rather than drive him home. This was a rational suggestion and it was made after Mr. Savage's initial attempt to have sex with Turner. *Id*.: 140. Having a logical or rational thought could, however, occur during a state of disorganization, confusion, bizarre behavior, and irrationality. *Id*.: 169-70.

Dr. Hamm testified that accompanying Mr. Savage on errands and to purchase clothes was inconsistent with a premeditated intent to commit robbery because he (Turner) would have been identified. *Id*.: 82 (direct examination); 158 (cross examination). On the other hand, during cross examination, Dr. Hamm conceded that if the telephone cords had been cut before the stabbing, that

would have indicated pre-planning. *Id.*: 130. During re-direct examination, Dr. Hamm clarified that his opinion Turner was borderline psychotic at the time of the stabbing was not derived solely from what Turner told him. There was corroborating evidence, that is, the circumstances of the crime, recounted in the police reports. *Id.*: 168.

In Dr. Hamm's mind, the degree of Turner's intoxication was not ameliorated simply because he was able to drive Mr. Savage's car back to Fresno. Driving is a reflexive activity. *Id.*: 57. He clarified on cross examination that given the information Turner was not a licensed or experienced driver, he (Dr. Hamm) was curious as to how Turner negotiated his way to Fresno from Merced. He wasn't sure, however, that Turner didn't get lost on the way home.[72] *Id.*: 125.

The factors that contributed to the crime were PCP intoxication, Turner's diminished intelligence level, his personality profile, and Mr. Savage's sexual overtures and general bullying persistence. *Id.*: 59-60. Mr. Savage kept asking Turner for sex, at one point disrobing to his underwear, and at another actually putting his hands on Turner. The size disparity between the two men and the difference in social status also would have contributed to the bullying persistence aspect. *Id.*: 60-61. Turner was passive aggressive. Although he didn't like authority, in fact, was not above committing theft, he respected authority. *Id.*: 61. On cross examination, Dr. Hamm explained that Turner was passive toward authority and this created a conflict with Mr. Savage in particular. *Id.*: 153.

### (6)   Howard B. Terrell, M.D.

Several sources of Dr. Terrell's testimony are before the Court, all offered by Turner. Dr. Terrell's July 19, 1993 declaration was offered and received as EHT Exhibit 7,[73] a supplemental psychiatric report dated March 3, 2003 was offered and received as EHT Exhibit 21, a May 22, 2003 cover letter enclosing a draft of a March 1, 1993 report was offered and received as EHT Exhibit 22,[74]

---

[72] The Court is aware of no evidence addressing this issue.

[73] Dr. Terrell's 1993 declaration originally was appended to Turner's Petition as Exhibit 7 and previously summarized by the Court in the April 27, 1999 Order at Part II.C.4.e. The Warden's objected to the admission of this declaration at the evidentiary hearing on the grounds that it presented hearsay information. The Court overruled this objection since Dr. Terrell's reliance on information recounted by Turner, Turner's mother, and other mental health experts was the basis for his opinions, not a hearsay use. Fed.R.Evid.703. *See* June 19, 2003 order (doc. 231).

[74] The March 1, 1993 report was the basis of Dr. Terrell's July 19, 1993 declaration.

a second supplemental psychiatric report dated July 18, 2003 was offered and received as EHT Exhibit 23,[75] and Dr. Terrell gave live testimony at the evidentiary hearing on July 23, 2003, EHT-2: 270-417.

Dr. Terrell, a board certified psychiatrist and forensic psychiatrist, *see* EHT-2: 273-74, was originally retained by Turner's federal habeas attorneys, Ms. Katherine Hart and Mr. Taylor to assess the effect Turner's use of street drugs had on his mental processes at the time he killed Mr. Savage. EHT-2: 278-79. Dr. Terrell predicated his original opinions (in the 1993 declaration and report) on a two hour, 25 minute examination of Turner at the prison on February 10, 1993, the declaration of Dr. Pittel concerning Turner's PCP use and symptoms of homophobia, the report of California Toxicology Services testing Turner's blood, and showing his PCP level to be .44 mg/L, also the Department of Justice report showing a .20 mg/L level of PCP, from the same sample, a police interview with Mrs. Turner, Dr. Hamm's psychological test results, a report of psychiatrist, Dr. Glenn, dated October 6, 1979, and other interview reports prepared by Turner's investigator. *See* Appendix, left column; EHT Exhibit 7, ¶ 3. Based on Turner's description of his drug use history recorded in Dr. Terrell's March 1, 1993 report, EHT Exhibit 22: 11/21, Dr. Terrell credited his (Turner's) statement that he was an habitual user of PCP, marijuana, alcohol, cocaine, heroin, and "crank." In particular, Dr. Terrell was impressed with the slang nomenclature for PCP ("dippers") Turner used, and the fact that he mixed drugs. Dr. Terrell explained that sometimes PCP was used with marijuana cigarettes and sometimes with just regular cigarettes. EHT-2: 282-84. In 1993, Dr. Terrell concluded that Turner was "much more likely than not [ ] seriously impaired by the effects of PCP" on the night of the crime. Based on his interview of Turner and the other information mentioned, Dr. Terrell believed PCP was a major factor in the manner Turner responded to Mr. Savage's sexual solicitation, namely, paranoia, panic, fear, and extreme violence. *Id*.: 289.

As part of the examination, Dr. Terrell also assessed Turner's then current mental competence. EHT-2: 280. Dr. Terrell found Turner to be alert, cooperative, oriented, with good reality contact as well as good long and short-term memory. EHT Exhibit 22: 16/21. Dr. Terrell did not enter the interview

---

[75] The July 18, 2003 report was offered by Turner at the evidentiary hearing during the cross examination of Dr. Terrell by the Warden. EHT-2: 371.

1   with the idea that everything Turner would tell him necessarily would be the truth.  It was his practice

2   to look for answers that might have been given for some secondary gain.  EHT-2: 281.

3          In discussing with Turner the circumstances of the offense, Dr. Terrell learned that Mr. Savage

4   was approximately 20 years older than Turner, appeared to be nice and friendly, engaged in pleasant

5   conversation, and when Mr. Savage offered to him the opportunity to do work at Mr. Savage's home,

6   Turner thought the offer was legitimate. Turner recounted there was supposed to have been another man

7   assisting in the work to be done at Mr. Savage's house, but the other man never showed up.   EHT

8   Exhibit 22: 11/21.  In his interview with Dr. Howard Terrell on February 10, 1993, Turner estimated Mr.

9   Savage was about six feet, three inches tall and weighed approximately 250 to 300 pounds. EHT Exhibit

10  22: 13/21.   Turner estimated his weight at the time of the crime was 140 pounds.[76] EHT Exhibit 22:

11  13/21.

12         Turner described the events shortly before the fatal attack.  After Mr. Savage prepared himself

13  dinner (following errands, meeting Mr. Albritton, and purchasing clothes for Turner), Mr. Savage went

14  upstairs and came down in only his underwear.  He grabbed Turner by the shoulder and said "'Let's go

15  to bed.'" Turner recounted to Dr. Terrell that he was surprised by this sexual advance and he refused.

16  Mr. Savage then chased Turner around the house in his underwear, "causing [ ] Turner considerable fear

17  and anxiety. . . . Turner stated that he did not want to become involved in any sort of homosexual

18  encounter as he had never done so in the past." He further told Dr. Terrell he did not want to contract

19  a venereal disease such as AIDS or Herpes. "He [Turner] went on to add that this was the first time in

20  his life that anyone had ever made a homosexual assault upon him." Turner ran out the front door to a

21  store where he purchased cigarettes.  Sometime later, when Mr. Savage drove up, he reassured Turner

22  that if Turner would return to the house, Mr. Savage would make no further sexual advances. *Id*.: 12/21.

23  When they returned to the house, Mr. Savage again grabbed Turner "by the shoulder and neck area and

24  attempted to assault him sexually."  Afraid of being "raped," Turner panicked, pulled out his knife and

25  stabbed Mr. Savage multiple times.  Turner explained to Dr. Terrell he was "just afraid," and wanted

26  to get "this guy off of him."  He had no plan to kill Mr. Savage.  Not aware that he stabbed Mr. Savage

27

28          [76] Turner's booking record indicated a weight of 150 pounds.  CT: 15.

91dp153.OFollEvidHrg.Tur.wpd                           80

"'that bad,'" when he went upstairs to get his coat, Turner also picked up the television set to throw at Mr. Savage in case he came after Turner again.  After coming downstairs and realizing that Mr. Savage was dead he set the television down, but felt someone else was in the house and generally felt paranoid (a feeling Dr. Terrell attributed to the PCP Turner smoked throughout the day and shortly before the fatal attack).  *Id.*: 13/21.  Turner explained to Dr. Terrell that he did not intend to steal prior to stabbing Mr. Savage.  He was still not sure why he took the television set.  He told Dr. Terrell he had no memory of taking Mr. Savage's rings and watch or placing these items anywhere in particular.[77]  *Id.*: 14/21.  When Turner returned to Fresno, someone tried to buy the television from him, but he declined because it was not his.  *Id.*: 17/21; EHT-2: 350 (cross examination).  Turner told Dr. Terrell that he developed a fear of sexual attacks when he was at CYA (after his first offense) when he heard other inmates discuss a plot to sexually attack another male in the facility.  *Id.*: 14/21.  He also reported that although he enjoyed using PCP and marijuana, sometimes be became paranoid when under their influence.  By paranoid, he meant "fearful in general, and especially fearful about being murdered, the victim of violence of some sort or being given a 'bad disease,' like AIDS, Hepatitis or Tuberculosis . . . [or] the victim of a homosexual rape."  *Id.*: 18/21.

At the time Dr. Terrell conducted his examination of Turner in 1993 and rendered his initial opinions, he was not asked to determine the effects childhood abuse may have had on Turner's mental state at the time of the crime.  Since being re-contacted by Ms. Hart and Mr. Taylor, Dr. Terrell reviewed additional information on these subjects.  EHT-2: 295-96.  He became familiar with the conduct of Turner's father toward him, in terms of disproportionately harsh physical punishment and mental abuse when drunk.  *Id.*: 309.  Specifically, he was aware that Turner was "thumped" all over his head, whipped with a razor strap, and socked or karate punched in the stomach.  *Id.*: 310-11, 324.  Turner also was verbally belittled and generally treated much differently, in terms of harsh discipline, from his sisters.  *Id.*: 325.  Dr. Terrell offered that a person mimics the conduct he observes in his parents as a child when

---

[77] Turner's recollection about these jewelry items, as memorialized in the March 1, 1993 report, conflicts with his trial testimony, where he stated that upon realizing Mr. Savage was dead, he originally decided to take the watch and rings, but then changed his mind.  RT-7: 1392-93.  As noted above, Mr. Savage's jewelry items were found underneath his body by investigators.  RT-6: 1281 (testimony of Detective Henry Strength); *id.*: 1283 (testimony of Detective Craig Wright).

he becomes an adult.  *Id*.: 326.  This was known in the mental health field at the time of Turner's trial.

*Id*.: 327-28.  The fact that Turner's three sisters all earned college degrees and had regular professional

employment did not discount the fact that Turner was abused and endured a miserable childhood.[78]  Dr.

Terrell opined that the manner in which Turner was treated very likely had "a very negative impact on

his personality development and his way of dealing with problems in the future."  *Id*.: 330.  A child of

an alcoholic may resort to substance abuse to deal with problems.  *Id*.: 331.  He expanded on this notion

during cross examination.  Dr. Terrell found that people who abuse drugs often had parents who were

very bad role models.  And although substance abusers could be found in any social group, people who

experienced horrible parenting and horrible role models were at higher risk.  *Id*.: 349.  While Dr. Terrell

conceded it also was possible Turner's developmental history and drug abuse had very little to do with

this case, he felt it more likely Turner's limited intellectual resources and his childhood experience of

brutal abuse, together with PCP were all significant factors.  *Id*.: 351. Dr. Terrell agreed with the Warden

that most people who become substance abusers, who had lousy childhoods did not commit murders.

*Id*.: 350.

Dr. Terrell also received and reviewed information in 2003 that Turner had significant academic

difficulties and an IQ in the borderline average range.  School reports revealed that in the twelfth grade,

Turner was still only reading at the sixth grade level.  *Id*.: 332.  Turner's intellectual functioning was

borderline.  *Id*.: 333.  He opined that people with borderline intellectual functioning would experience

difficulties in stressful situations because they had limited abilities to figure out what to do.  *Id*.: 334.

Expanding this on cross examination, Dr. Terrell said that a person's problem solving abilities would

be limited by a below normal intellect, and that one solution to problems people of below normal

intellect could understand was violence.  *Id*.: 364.  A person who didn't grow up in a violent household,

even if intellectually dull, may not resort to violence whether or not under the influence of PCP.

Nonetheless, Dr. Terrell believed that for Turner, his limited intellect was a factor in his use of violence

as opposed to getting away and staying away.  He observed a person brighter than Turner probably

wouldn't have been coaxed back to Mr. Savage's house.  *Id*.: 365.  Dr. Terrell was not asked to identify

---

[78] On cross examination, Dr. Terrell agreed that the father's abuse of Turner very well could have had a negative impact on the sisters as well.  EHT-2: 351.

a mental disorder or provide a five-axis diagnosis at the time of his original retention in 1993. *Id*.: 346 (cross examination). If he had been asked to do so, he would have given a diagnosis of phencyclidine (PCP) abuse or other substance abuse disorder. Another diagnosis would have been borderline intellectual functioning and probably borderline personality. *Id*.: 374.

In 2003, Dr. Terrell reviewed additional evidence supporting the notion that Turner was an habitual PCP user and was likely intoxicated on PCP the night of the crime. First there was a statement by Turner's ex-girlfriend (Pam Butler) that when he used PCP he exhibited violent and bizarre behavior. One of his sisters also commented about his drug use. There also was a statement of Detective Jill Mayer that Turner showed signs of being under the influence of drugs the night he was arrested (April 16, 1984). *Id*.: 296-97. The fact that Turner did not make eye contact with Detective Mayer was consistent with the manner in which people under the influence of PCP act. *Id*.: 412 (referring to EHT Exhibit 24: 0377). The unusually violent and overdone nature of the crime – over 40 wounds inflicted – also contributed to Dr. Terrell's opinion that Turner was under the influence of PCP at the time of the crime. The manner in which the crime was committed indicated psychotic behavior either from an underlying mental disorder or from drug-induced psychosis. *Id*.: 297-98. His opinion also was influenced by the concentration of PCP in his blood as recorded in the test results from California Toxicology Services and Department of Justice, as well as confirmation from Turner's mother about his drug use. *Id*.: 291. He opined that although Turner was under the influence of PCP and alcohol, and possibly marijuana and methamphetamine, at the time of the offense, Turner "believed that his actions were in self-defense." Dr. Terrell stated it was probable Turner "did not comprehend the wrongfulness of his behavior." EHT Exhibit 22: 18/21; EHT Exhibit 7, ¶ 4. He repeated this conclusion during the evidentiary hearing. EHT-2: 378.[79]

The DSM-III, published in 1980,[80] documented that PCP intoxication could produce a sense of feeling good to violent conduct. *Id*.: 291-92. Dr. Terrell was aware of literature on PCP to suggest that

_____

[79] Based on Dr. Terrell's understanding of the legal standard for determining insanity, he did not believe Turner's psychosis in this case would qualify for insanity because his intoxication was voluntary. *Id*.: 378.

[80] "DSM-III" is the abbreviation for the Diagnostic and Statistical Manual ("DSM"), third edition ("III"). Dr. Terrell had a copy of the relevant excerpt from the DSM-III at the time of his testimony.

persons under its influence who became violent appeared stronger than normal. *Id.*: 409. PCP use could also cause auditory hallucinations, paranoia, and partial memory loss. *Id.*: 413-14. Dr. Terrell was aware of extensive medical literature that PCP, alcohol, marijuana and methamphetamine could cause severe behavioral changes, especially with regard to the distortion of reality, paranoia, and violent behavior. EHT Exhibit 7 ¶¶ 5-8. PCP, particularly, was known to cause violent behavior. *Id.*, ¶ 6. The dose necessary to trigger violent conduct would vary. He testified the drug was unpredictable. Combining PCP with other drugs could cause a synergistic effect to impair judgment and induce paranoia or violence. EHT-2: 293. Turner reported to Dr. Terrell that in addition to using PCP prior to the attack, he drank multiple glasses of brandy on an empty stomach, and used marijuana on the day of the crime. Plus, he used cocaine, heroin, and crank on other occasions. When a person mixes drugs, maladaptive behavior that results can be far worse and more violent than "just the addition of those drugs alone." *Id.*: 294.

Asked about the delay between the crime and the blood sample draw six days later, Dr. Terrell opined that the high levels found in that sample nearly ten years after the draw, were consistent with but not proof of intoxication on the night of the crime. *Id.*: 290-91. Dr. Terrell was aware that Turner said he used PCP the day he was arrested, two days after the crime. Dr. Terrell had no explanation for the disparity in the results from the two labs (.20 mg/L and .44 mg/L). *Id.*: 389. Turning to the issue toxicity, as used by the laboratory relative to PCP levels, Dr. Terrell explained that actual toxicity (not just the numeric measurement) would depend on a person's tolerance. By "tolerance," he referred to the concept of a person having to use greater and greater quantities of a drug over time to attain the same level of euphoria or intoxication. *Id.*: 390. Tolerance was applicable to PCP. Dr. Terrell expected that since Turner was an habitual user of PCP and his blood level was measured at .44 mg/L, (or .20 mg/L) he had developed a tolerance. *Id.*: 392. Even though Turner likely had developed a tolerance to PCP and had to take more and more of the drug to feel the desired effect, there still could have been a synergistic effect on his mental functioning with the PCP interacting with the alcohol. Dr. Terrell testified: "My understanding is that PCP can have both stimulative effects and depressant effects and hallucinatory effects as well as anesthetic effects. And so if you add in there some alcohol, which is a depressant, then you can make a situation even worse." *Id.*: 413.

The bottom line, however, was that there would be no way to determine empirically the amount of PCP, if any, that was in Turner's body on the day of the crime. *Id.*; 396.  Typical PCP users would smoke PCP dipped cigarettes to get "high," to get "relaxed," to "feel no pain." *Id.*: 398.  PCP induced psychosis generally would last only briefly, although Dr. Terrell understood that some people remained psychotic for days or weeks. *Id.*: 399-400.  Detective Mayer's report that indicated that Turner was under the influence of PCP at the time of his arrest, did not indicate psychosis. *Id.*: 395-96.

Dr. Terrell was surprised that the lab results did not reveal a positive result for marijuana given the fact that Turner told examiners he smoked five to ten joints of marijuana per day. *Id.*: 396-97.  He thought the absence of evidence of marijuana or cannabis may have been attributed to the fact that the sample was tested nine years after it was drawn.  Urine tests generally were better for testing for the presence of drugs and alcohol than blood. *Id.*: 397.  He was not surprised that Turner's blood sample was negative for methamphetamine, since tests conducted after or long after the use often do not reflect methamphetamine use.

Prior to writing his July 18, 2003 report (EHT Exhibit 23), Dr. Terrell reviewed the declaration of Reese Jones, M.D., the Warden's expert.  Dr. Jones discounted the allegation that Turner was influenced by PCP intoxication at the time of the crime because he was able to articulate and remember a significant amount of detail about the crime.  Dr. Terrell disagreed with this assessment.  People who devolve into a psychotic mental state or become paranoid do not invariably completely lose their memories. *Id.*: 332, 400. He agreed that Turner had not used so much of the drug to have become delirious and thus memory impaired.  But drug-induced psychosis was a different concept than delirium. *Id.*: 401.  The Warden's counsel suggested that Turner's stated lack of recollection about cutting the telephone cords and stabbing Mr. Savage over 40 times might have been more attributable to his not wanting to talk about incriminating acts rather than a memory gap. *Id.*: 402-03.  Believing that the two cords cut were upstairs when the stabbing occurred downstairs, Dr. Terrell responded Turner's memory loss could be explained by his having been in a psychotic state. *Id.*: 404.  The Warden's counsel interjected that one telephone cord cut was in the upstairs master bedroom and the other was in the downstairs family room and that a third cord not cut was from a "partially hidden" telephone in the

kitchen.[81]  With that explanation, Dr. Terrell testified that if "the cords were cut before the killing, then one would suspect that there was more reason to suspect that he [Turner] was planning something." *Id.*: 405.  Turner's taking of the television could be interpreted one of two ways.  If he took it, as the Warden's counsel hypothesized, "to protect himself against [Mr. Savage] who was downstairs dead," Dr. Terrell responded that would indicate goal oriented behavior to steal.  If, however, Turner was psychotic and believed that Mr. Savage might still have been alive and try to attack him, then it would be more like "bizarre thinking."  *Id.*: 405-06.

On direct examination, Dr. Terrell discounted that stabbing Mr. Savage might have been purely a "rage-killing."  He also discounted the influence of alcohol as the sole cause.  *Id.*: 299-300.  On cross examination, the Warden elicited a contrary opinion.  Dr. Terrell was asked to assume that the trial pathologist testified the number, difference in orientation, and depth of the 44-plus stab wounds were attributable to the fact that Mr. Savage was moving around as he was being stabbed and that many of the stab wounds were defensive.[82]  Based on this set of facts, Dr. Terrell was asked whether the scenario was consistent with Mr. Savage trying to get away from Turner and defending himself, not that Turner was defending himself.  Dr. Terrell agreed these facts could have been consistent with a non-drug induced rage.  *Id.*: 408.

When Turner left the house the first time, following Mr. Savage's initial overt solicitation, Dr. Terrell did not see any psychosis.  Kicking Mr. Savage[83] and running from the house might not have been the best response, but it did not evidence psychosis.  *Id.*: 381-82.  Dissociation, a sense of being disconnected from one's own body and the feeling that he or she is observing rather than participating in what he or she is doing (like stabbing someone), can result from PCP intoxication.  *Id.*: 379.  Dr.

---

[81] By emphasizing that the kitchen telephone was partially hidden, the Warden suggested Turner didn't know about it and that is the reason he didn't cut it.  This suggestion is inconsistent with Turner's testimony that when he was waiting for Mr. Savage to prepare his (own) dinner, eat his dinner, and take Turner home, the telephone in the kitchen rang, and that earlier Mr. Savage used the telephone in the kitchen, in Turner's presence.  *See* Part IV.A.1.j., *supra*.

[82] Dr. Murdoch's testimony was, at both the guilt phase and penalty phase, that Mr. Savage was still able to move and was mobile after being and while being stabbed.  *See* Part IV.A.1.h. (guilt phase testimony summary) and Part IV.A.2.a. (penalty phase testimony summary).

[83] This is from Turner's guilt phase testimony.  RT-7: 1378-79.

Terrell didn't particularly see dissociation in Turner's behavior at the time of the crime.  He saw extremely violent and irrational behavior.  The Warden then posed a hypothetical question that if Turner made a post-crime statement that Mr. Savage got what he deserved, that could have stemmed from Turner's continued belief that he had been protecting himself from a sexual attack.  Dr. Terrell also conceded it could have signaled that Turner had no remorse.  *Id.*: 380.[84]  Later, on re-direct examination, Dr. Terrell confirmed that Turner's action in having stabbed Mr. Savage over 40 times was consistent with an irrational frame of mind.  *Id.*: 409.

Dr. Terrell agreed with Dr. Hamm's assessment that when Turner was stabbing Mr. Savage, the PCP and alcohol could have made him exhibit disorganized thinking, as well as become frightened, confused, vulnerable, hallucinatory, hysterical and psychotic.  *Id.*: 382-83.  Dr. Terrell concluded "with reasonable medical certainty" that Turner's PCP use, which led to violent and paranoid behavior, combined with Mr. Savage's apparent sexual attack, Turner's decreased intellectual abilities, and Turner's violent victimization as a youngster made for "a disastrous response."  Dr. Terrell conjectured that if the sexual attack had been removed from the equation, he doubted there would have been a killing.  *Id.*: 384.  Dr. Terrell did not consider Turner's surprise and anger at being grabbed from behind by Mr. Savage to be psychotic, especially given Mr. Savage's size and the additional evidence Dr. Terrell reviewed that Turner's perception of being sexually attacked probably was accurate.  *Id.*: 384-85.  Turner's belief that he was being sexually attacked would have been reasonable for someone who was not under the influence of PCP.  *Id.*: 407.  The high Turner reported to Dr. Hamm when Mr. Savage came up behind him could have come from adrenaline, but Dr. Terrell disagreed that Turner's "high" resulted from stabbing Mr. Savage over 40 times.  Rather, he concluded that the high or psychosis *caused* the overdone behavior of repeatedly stabbing Mr. Savage "far beyond would one would expect would be needed to kill another human being or stop an attack."  *Id.*: 386.

---

[84] In the Warden's opposition brief, he cites to Probation Report for the present crime as the source of Turner's comment that Mr. Savage "got what he deserved."  The Court has reviewed the Probation Report carefully and has not found any such statement attributable to Turner.  Rather Turner equivocated between not feeling remorse or guilt and feeling sad but believing the circumstances were not his fault because Mr. Savage should have taken him home once it was clear that Turner was not a homosexual.  EHT Exhibit 103: EH0024.  The Court also has not been able locate any other record of Turner telling anyone that Mr. Savage "got what he deserved," as posed in the Warden's hypothetical.

1   Dr. Terrell also believed that the synergistic effects of the drugs taken together should have been

2   considered in contrast to Turner's non-violent history. *Id.*, ¶ 10.  Dr. Terrell found that Turner acted in

3   a sudden and impulsive manner in response to a perceived sexual assault by Mr. Savage.   Any

4   misperception Turner harbored of Mr. Savage's intentions was caused by the distorting effects of the

5   drugs he consumed. *Id.*, ¶¶ 12-13.  EHT Exhibit 22: 19/21.  Dr. Terrell's opinion also was influenced

6   by the fact that PCP may exacerbate fear of a homosexual attack.  First, PCP induces paranoia, and

7   second heterosexual men often have a fear of a homosexual attack.  EHT-2: 302.  The DSM-III also

8   stated that paranoia was a documented result of PCP intoxication.  Specifically the DSM-III provided

9   that PCP intoxication could be accompanied by hallucinations, paranoid ideation, and bizarre or violent

10  behavior. *Id.*: 305.  Dr. Terrell concluded that Turner honestly believed Dr. Savage was attempting to

11  sexually assault him. *Id.*: 307.  The fact that Turner exhibited homophobic tendencies[85] was not new.

12  Dr. Terrell was aware that when Turner was a teenager, his friend Dexter (Barber) called him a "faggot,"

13  and that this name-calling resulted in a fight between the two boys.  To Dr. Terrell, getting into a fight

14  was an over-reaction to the name-calling, leading him to believe that Turner was particularly bothered

15  about being associated with homosexuality. *Id.*: 335.  Dr. Terrell opined there was a relationship

16  between Turner's homophobia and his PCP use on the night of the crime.  Being under the influence of

17  PCP would exacerbate Turner's pre-existing paranoia, which was manifested as homophobia. *Id.*: 336-

18  37.  As to whether Turner's perceptions were reasonable, Dr. Terrell found support for the notion that

19  Mr. Savage did exhibit sexually predatory conduct.  He specifically referred to the declaration of Betty

20  Means (Tavares).  EHT-2: 300.

21  On cross examination, the Warden asked about some of Mr. Savage's behaviors that suggested

22  his sexual interest in Turner long before he came downstairs in his underwear and asked Turner to "go

23  to bed" with him and whether a homophobic person would not have been alerted to an impending

24  solicitation.  Dr. Terrell was asked about Mr. Savage picking up Turner the preceding week from a bus

25  stop and driving him home, although they were total strangers.  Dr. Terrell also was asked about Mr.

26  Savage driving 50 miles from Merced to Fresno and back to have Turner do yard work, something that

27

28  [85] On cross examination, Dr. Terrell defined "homophobia" as an "unusual fear of homosexual people," with a great revulsion even if there is no sexual advance.  EHT-2: 339.

anyone could have done, and whether this would have given rise to a suspicion that Mr. Savage had a sexual interest in Turner.  Dr. Terrell responded that a person of dull intellectual ability would not necessarily have realized he was being sexually solicited.  *Id.*: 338-41.  Turner certainly was aware of Mr. Savage's sexual intent when he came downstairs in his underwear and asked Turner to "go to bed" with him.  *Id.*: 341.  A person of normal intellect would have thought "something funny" was going on before that.  Nonetheless, Dr. Terrell could not rule out the possibility that Turner's crime resulted from "gay-bashing."  *Id.*: 342.  Dr. Terrell did not believe that a substance abuse disorder or any of the other problems that Turner had would "cause" the afflicted person to murder and steal.  He did believe that such a person would be "at higher risk of doing something impulsive or violent or against the law" if in a situation where he was homosexually assaulted or believed he was being homosexually assaulted.  *Id.*: 348.

In his March 3, 2003 report, Dr. Terrell wrote:

> If Mr. Turner was honest with me when I interviewed him approximately 10 years ago, then one would tend to believe that he probably felt he was acting in self-defense, and most likely did not comprehend the wrongfulness of his behavior.  If this were the case, however, I would expect him to have merely killed the victim in what he reportedly believed to be self-defense.  *I am concerned over his reported stealing of the victim's vehicle and television set, in a manner that would represent a murder/robbery situation. If this were the case, it would be hard to believe that the subject [Turner] did not comprehend the wrongfulness of his behavior.*

EHT Exhibit 21: 12 (emphasis added).  Nonetheless, Dr. Terrell found it "unfortunate" that information about Turner's PCP use was not introduced at his trial.  *Id.*  He concluded: "It is well known among physicians that PCP can cause assaultiveness, impulsiveness, and impaired judgment resulting in violent and tragic behavior. [¶] I expect the court would have considered this as a mitigating factor at sentencing, had the relevant facts been adequately presented."  *Id.*  He repeated this same sentiment in his July 18, 2003 report.  EHT Exhibit 23: 24.[86]  On cross examination at the evidentiary hearing, the Warden asked Dr. Terrell about the italicized portion of his March 3, 2003 report, above.  While Dr. Terrell testified that he believed Turner "very likely" believed his act of stabbing Mr. Savage was self-

---

[86] The primary difference between the March 3, 2003 report and the July 18, 2003 report was the quantity of background materials Dr. Terrell reviewed.  The differences are noted in the attached Appendix.

defense to a sexual attack, and thus did not comprehend the wrongfulness of his behavior, he remained "concerned about the theft afterwards." He said "it would be hard for me to believe that he [Turner] did not know it would be wrong to steal the car and steal the television set." EHT-2: 357. Dr. Terrell testified that Turner "probably knew he was stabbing a human being [,] [b]ut he believed it would be in self-defense." *Id*.: 358. While Turner may have believed he acted in self-defense, he also should have known that taking Mr. Savage's television and car, and fleeing the scene with Mr. Savage laying on the floor and not calling for help was wrong. *Id*.: 360. But Dr. Terrell found that Turner was not rational at the time of the crime. The excessive number of stab wounds convinced him that Turner was not in a "rational or lucid frame of mind" at the time of the crime. *Id*.; 360-61.

### (7)   Reese T. Jones, M.D.

The Warden offered into evidence, without objection, the Curriculum Vitae of Board Certified Psychiatrist and Neurologist Reese T. Jones, M.D., as Exhibit 104 to the evidentiary hearing. Also offered without objection was Dr. Jones' January 24, 2003 letter report to the Warden's counsel. EHT Exhibit 105.

At the time of his testimony, Dr. Jones had been a professor of psychiatry at the University of California, San Francisco Medical Center since 1977. Since the early 1970's. Dr. Jones had been the director of research group on pharmacology (the study of drugs) and a subset of that, psychopharmacology (the study of drugs that affect the brain and the mechanism by which they affect behavior and thinking). EHT-3: 594. Dr. Jones had given expert testimony in criminal cases, including six or seven death penalty cases, approximately 50 times prior to this evidentiary hearing testimony. *Id*: 597. The testimony he gave in the death penalty cases concerned penalty phase issues. *Id*.: 672. In preparation for his testimony, Dr. Jones reviewed excerpts of trial testimony, post-conviction declarations and reports, as well as excerpts of the California Supreme Court direct appeal opinion and the Ninth Circuit Court of Appeals opinion remanding this case for an evidentiary hearing. *Id*.: 598. He was not familiar with the factor (k) catchall factor of Penal Code § 190.3.[87] He only rendered

---

[87] Factor (k) specified that a jury could consider any other circumstances which would extenuate the gravity of the crime even though those circumstances did not constitute a legal excuse. EHT-3: 673.

1   opinions about scientific matters.  He didn't believe the attorneys ever tried to teach him the law.  *Id.*:

2   674.

3        He always testified for the prosecution.  *Id.*: 597.  On cross examination he testified that his

4   decision to testify only for the prosecution might reflect a bias but he didn't think he was biased.  *Id.*:

5   650.  His efforts have been "to take the burden off of, you know, some illicit drugs, in this case PCP."

6   This follows from his experience in observing heavy users of drugs "lead remarkable lives" even if they

7   were not living up to their potentials. *Id.*: 650-51.  At the time of his testimony, he did not maintain an

8   on-going practice.  He was called in on consultations only.  He never treated a patient in a state of PCP

9   psychosis, although he did treat patients with drug induced psychosis from other illicit drugs.  The

10  publications to his credit listed in his Curriculum Vitae did not include any specifically addressing PCP.

11  *Id.*: 625.  He had been involved with experimental research concerning PCP, marijuana, alcohol, and

12  other psychoactive drugs.  *Id.*: 595.  He was not board certified in forensic psychiatry.  *Id.*: 649.

13       PCP originally was developed as an anesthetic agent in the 1950s but testing on human subjects

14  was abandoned because of bizarre psychiatric reactions.  It was thereafter replaced with Ketamine.  *Id.*:

15  625 (cross examination).  Except for research purposes, there were no legitimately produced sources of

16  PCP.  *Id.*: 626.  He believed PCP was an addictive drug.  *Id.*: 629.  Based on his review of the materials

17  supplied to him by the Warden's counsel, including Turner's self-report of PCP use and anecdotal

18  evidence from family members, Dr. Jones concluded that Turner had "some type of PCP problem."  *Id.*:

19  630.  He also understood that Turner used other illicit street drugs along with PCP.  *Id.*: 631.  When a

20  subject has used PCP and other substances which can be toxic to the brain, the PCP would become

21  neuroprotective, protecting the stability of the brain.  He was aware of no observed clinical reactions

22  between PCP and other drugs that were evident and he couldn't testify about PCP and other substance

23  combinations in non-clinical settings.  *Id.*: 633.  Although the DSM-IV correctly identified a relationship

24  between PCP use and outbursts of aggression, it did not report the "hundreds of thousands of instances

25  where PCP [wa]s used . . . without any violence and aggression."  *Id.*: 634.  While some users would

26  experience violence, aggression, and rage with PCP use, the "overwhelming majority of PCP users

27  would never experience those things."  *Id.*: 635.  PCP was termed a dissociative drug in the 1950s.  *Id.*:

28  638.  At very high doses, PCP and Ketamine could cause subjects to completely dissociate such that their

eyes would be open and they would have appeared awake, but a surgeon could have opened them up and performed major surgery.  At lesser doses, it could cause a psychotic reaction, but that would be uncommon.  *Id.*: 639.  Dr. Jones was familiar with the DSM-IV description of PCP intoxication as having the "essential feature" of "the presence of clinically significant maladaptive behavior changes, belligerence, assaultiveness, impulsiveness, unpredictable psychomotor agitation, impaired judgment or impaired social or occupational function" developed shortly after ingestion.  *Id.*: 655.  He did not agree with this description and used Turner as an example.  The night before the crime as well as the morning of the crime, Turner reported that he used PCP, but did not manifest any of these symptoms.  *Id.*: 656.  Dr. Jones did not think the DSM was necessarily helpful in forensic situations.  He also didn't believe that any of this information was available in the DSM-III, which was "the Bible" in 1984.  *Id.*: 655, 658.  While he didn't embrace the notion that PCP was benign, he rejected that it would produce all the behavioral abnormalities described in the DSM-IV.  *Id.*: 659.  Dr. Jones was not the only mental health professional who disagreed with various portions of the DSM.  On redirect examination, he explained that many of his research friends were appalled at the breakdown of various kinds of depression and anxiety in the DSM.  *Id.*: 676.  The purpose of the DSM was to develop a uniform system for treatment, and particular for determining appropriate diagnoses.  *Id.*: 678.

In Dr. Jones' opinion, the level of PCP concentration in Turner's blood in April 1984 was incapable of determination.  The toxicology tests were unreliable in predicting Turner's blood level PCP concentration on the night of the crime for two reasons.  First, the blood was stored for eight years in unknown conditions.  Variables such as temperature, light exposure, and the container seal would cast doubt on test validity.  *Id.*: 599-600.  Second, the blood ultimately tested was drawn six days after the crime and four days after his arrest.  *Id.*: 600.  Other problems included not knowing how much PCP Turner actually ingested and the fact that the rate at which PCP breaks down in the human body varied from person to person.  *Id.*: 601.  For instance, PCP ingested by smoking would be drawn in by different people at different rates.  *Id.*: 619.  Moreover, it couldn't be that the laboratory test results were accurate *and* that Turner hadn't ingested in PCP after the crime.  Calculating six days backwards from the .20 mg/L concentration would have put Turner's PCP level on the night of the crime in the area of 50 mg/L.  Calculating backward from .44 mg/L would give a concentration more than double that.  The level 50

mg/L would be undeniably fatal, for anyone.  Assuming the laboratory test results were accurate, Turner would have  had to have ingested PCP after the crime, as well as after his arrest (the latter of which Dr. Jones thought was unlikely).  *Id*.: 603, 646.  On cross examination Dr. Jones testified that he trusted the State toxicologic laboratory result more than the California Toxicology Services result.  *Id*.: 645.  Even extrapolating back to the date of the arrest, at the .20 mg/L level, Turner would have been more than spacey, as he was described by police authorities.  *Id*.: 647.  Dr Jones felt that the samples themselves were unreliable in unknown conditions over a period of eight years before being tested.  The test results did not reveal anything more than that the PCP was present in the blood.  *Id*.: 648.  Moreover, given the fact that Turner reportedly also used marijuana and amphetamines on the day of the crime, Dr. Jones was surprised the tests did not reveal the presence of these substances in the blood specimens.  Amphetamines in particular have a half life that is at least as long as that for PCP.  *Id*.: 680.

A person's tolerance to PCP is a better indicator of behavior or mental state than quantity consumed.  Based on Turner's self-report of past PCP use, together with the report of others about his use, Dr. Jones felt that he developed "a significant degree of tolerance" in the few years before the murder.  Much depended on how much of the drug had been used in the days before the day on which a mental state was trying to be determined.  The introduction of other substances for which the subject might have had different tolerances also would make prediction speculative.  *Id*.: 605-06.  Dr. Jones also felt that assessing a subject's behavior was a more accurate measure of drug effect than dose.  In Turner's case, because he had a high tolerance for PCP, using a small amount of the drug had little effect.  *Id*.: 641 (cross examination).

Dr. Jones accepted that Turner was an habitual user of PCP based on his self report and the anecdotal evidence of family members.  The laboratory test results did not add to that.  And even with the laboratory results there was no way to determine how much Turner used at any time, including at the time of the crime.  *Id*.: 642.  There was internal consistency across all accounts that "had a ring of authenticity."  *Id*.: 643.  Dr. Jones also accepted that Turner was under the influence of PCP at the time of his arrest, based on the description by police authorities that he was dusted or spacey, and that when he was being interviewed, he did not maintain eye contact.  *Id*.: 644.  When Dr. Jones wrote his report

(EHT Exhibit 105), he assumed Turner was an habitual user of PCP and had developed a dependence on it. *Id.*: 649.

Using the term PCP "delirium" rather than "psychosis," Dr. Jones identified defects in sensory perception, including hallucinations, profound delusions, impaired memory, restlessness, inability to focus, disorganized appearance, and unconsciousness. Turner's self-report of the crime and his behaviors were inconsistent with a delirious psychotic mental state, although they were consistent with "some level of intoxication. *Id.*: 607-08. Turner's memory of the events leading to the crime and the crime itself "was remarkably preserved." *Id.*: 608. While the auditory hallucinations Turner reported to Dr. Hamm were consistent with PCP psychosis, this was an isolated symptom that was unpersuasive to Dr. Jones. *Id.*: 609. Even though Turner didn't remember cutting the telephone cords in Mr. Savage's house, stabbing Mr. Savage over 40 times, and driving Mr. Savage's Cadillac back to Fresno, Dr. Jones maintained his opinion about Turner's memory generally being intact. *Id.*: 610. Dr. Jones believed that at the time of the crime Turner had sufficient mental function to weigh consequences, plan a course of action, and carry out that plan. *Id.*: 611-12. Dr. Jones based this opinion on the fact that Turner acted as someone who sensed he had done something wrong, in that he went home and washed, cleaned of the car "before he was going to dispose" of it,[88] and didn't contact the police. Driving the car from Merced, where he said he had never been, to Fresno, navigating the freeway, and finding his way home, was inconsistent with having been in a psychotic state. *Id.*: 612-13.

Dr. Jones found Turner to be the kind of person who used PCP to relax, and that is just what he did when he left Mr. Savage's house after the first sexual advance. He controlled the dose to take the edge off his nerves. While it was possible that Turner could have become delirious, Dr. Jones didn't accept this notion. *Id.*: 614-15. Dr. Jones dismissed as cultural, rather than irrational, Turner's covering Mr. Savage's body and placing a pillow under the head, as well as taking then returning the jewelry. *Id.*: 616. As to the "overkill" in the number of wounds inflicted, Dr. Jones worked with the hypothesis that many of the 40 plus wounds were defensive or inadvertent slashing that occurred in the struggle for Turner to "get[ ] the job done." *Id.*: 617. He rejected the theory that the high number of stab wounds

---

[88] There was no evidence introduced at trial, or anytime, supporting the notion that Turner planned or intended to dispose of the Mr. Savage's Cadillac.

invariably pointed to intoxicated, delirious, psychotic behavior on Turner's part. *Id.*: 668. Dr. Jones also rejected the idea that Turner's taking of the upstairs television with him to use as a defensive weapon was irrational. He didn't think it was the "best solution" and Turner may have been frightened (even after stabbing Mr. Savage over 40 times) but it wasn't irrational. *Id.*: 669-70. Rather it was misguided, unwise, unnecessary. *Id.*: 670. Turner's act of taking and then returning Mr. Savage's jewelry as well as covering the body may have inexplicable, but not irrational. *Id.*: 671.

Dr. Jones was aware of no studies concluding that PCP exacerbated homophobia. He admitted that he didn't well understand homophobia. But it wasn't a "well studied phenomenon." *Id.*: 617-18. If anything, Dr. Jones believed that PCP would decrease the likelihood of homophobic behaviors because it was like a tranquilizer, a relaxer. *Id.*: 618.

Dr. Jones was aware of case studies and newspaper articles associating PCP use with violent behavior. This association was in contradiction with the scientific facts about PCP. He personally had talked to subjects who related that they became "irritable," not violent, when they used PCP. But it is not certain that a person who used PCP necessarily would become violent. *Id.*: 620.

The fact that Turner was physically (and mentally) abused by his father and suffered from intellectual impairments would have had no impact on the potency of PCP he consumed or in any way affected his behavior while under the influence of PCP. Dr. Jones also clarified that there is no relationship between IQ and violence while under the influence of PCP. *Id.*: 621. Flashbacks have been reported in PCP users, but the empirical information is very undeveloped. *Id.*: 622. Dr. Jones did not find the extent of Turner's drug use, as self-reported to Dr. Hamm, to have been extraordinary. *Id.*: 623.

Given the hypothetical that Turner smoked marijuana and PCP on three different occasions on the day of the crime, plus drank four brandies, used methamphetamine, and ate only a fast food lunch, Dr. Jones did expect there would be some effect on Turner's mind and body from these substances. *Id.*: 660-61. What was significant to Dr. Jones was the fact that on the many other occasions Turner used PCP, he did not become belligerent, assaultive, impulsive, unpredictable, agitated, or impaired. *Id.*: 661. Dr. Jones conceded that when combining the PCP and other substances Turner ingested with the fear he felt at being confronted by Mr. Savage far from home, Turner's judgment could have been clouded and that he overreacted to Mr. Savage's conduct. *Id.*: 662. Again, however, Dr. Jones pointed out that

with almost as much PCP and the other substances in his system in the late afternoon when Mr. Savage took Turner to Gottschalks, Turner did not show signs of being intoxicated; he was not staggering and he wasn't assaulting people. *Id*.: 663.  The effect on Turner was not of a magnitude to preclude him being able to function reasonably well. *Id*.: 667.  However, Dr. Jones also conceded that if Turner's intent had been to kill Mr. Savage, were he unhampered by any effects of PCP and other substances, he could have accomplished that feat in a much cleaner fashion, by surprising Mr. Savage from behind or disabling him somehow and then killing him. *Id*.: 668.  Dr. Jones did not believe that Turner's behavior on the night he stabbed Mr. Savage to death was that of a sober person in full command of all rational faculties because Turner did have a number of drugs in his system that would impair ordinary mental faculties "to a degree." *Id*.: 674.

### f.      Trial Defense Team Witnesses

The members of the trial defense team from whom testimony was elicited at the evidentiary hearing and statements were received from correspondence include defense counsel John W. Ellery and defense investigator William Ray Brown. Mr. Ellery's testimony and statements were offered by Turner and Mr. Brown was called in the Warden's case.

### (1)      John W. Ellery

Mr. Ellery's testimony and statements from his declaration, correspondence, and evidentiary hearing testimony, revealed a very poor recall of Turner's trial and investigation efforts.  With the exception of his conscious decision not to offer Turner's use of PCP as a defense and that Mr. Savage's homosexuality was a very important component of the defense, he recalled very little about his strategy. Mr. Ellery's poor recollection of and mental distance from Turner's case were as evident at the evidentiary hearing as they were much closer in time to the trial.  In an undated letter Mr. Ellery apparently addressed to the deputy attorney general handling state habeas proceedings in 1994, Mr. Ellery relayed that he could not remember his defense strategy, or the events of the case, or what evidence existed at the time of trial supporting the theory that Mr. Savage engaged in homosexual practices, or his awareness of a blood sample that could have been tested for PCP and other drugs

contemporaneous with the trial. EHT Exhibit 123.[89]   The only area Mr. Ellery was certain about in 1994, as he was in 2003, was that he intentionally did not want to emphasize evidence of Turner's PCP use.  In 1994, he stated his belief that a PCP defense at guilt proceedings would "detract from the primary defense of resistance to homosexual advances."  He stated "there were probably additional reasons for failing to put on drug evidence," but he could only recall the concern about detracting from the resistance to sexual advances defense.  At the evidentiary hearing, Mr. Ellery, explained that he "had lots of memory problems with this case."  EHT-1: 187.

He testified that prior to Turner's trial, he had no experience conducting a penalty phase of a death penalty case. *Id.*: 187.  He remembered that he resolved not to "go into the drug aspects of the case," even on penalty, because he was concerned with the manner in which family members viewed Turner's drug problems.  He felt drug evidence would be harmful to Turner.  While he was aware that Turner did testify at the guilt proceedings that he had ingested PCP at the time of the crime, Mr. Ellery explained: "I didn't attempt to suppress evidence of PCP; I just simply did resolve not to put on evidence of PCP." *Id.*: 190.  Another reason he gave for not putting on evidence of PCP was that he didn't want the fact of drug use to affect Turner's credibility. *Id.*: 191.  He thought the jury would "react badly" to anecdotal evidence from his family about PCP use. *Id.*: 244, 251.  Mr. Ellery then conceded, that he felt "the issue PCP should have been gone into at a greater – to a greater extent." *Id.*: 191.  He recalled plenty of evidence, from lay witnesses, to corroborate that Turner was a regular, habitual PCP user. *Id.*: 193.  At the time of the trial, Mr. Ellery thought something could have been made of the PCP, but he didn't present it. *Id.*: 253.  Though he didn't recall that blood evidence was introduced at the preliminary hearing with regard to Turner's ABO blood type, he testified that even if he had been aware of it, he wouldn't have tested the blood for PCP since he had, in 1984, resolved not to put on the PCP evidence of testimony that existed.[90] *Id.*: 194.  On cross examination, he testified that he didn't "recall specifically

---

[89] This letter was attached to the State's opposition brief filed with the California Supreme Court on September 21, 1994 and previously summarized in the April 27, 1999 Order at Part II.C., sub-parts 3.c, 4.b, and 5.d.

[90] Evidence of Turner's blood type also was introduced during trial proceedings. Criminalist Rodney Andrus was called to compare blood samples of Mr. Savage and Turner with blood found on Turner's knife, the murder weapon.  Mr. Andrus referred to People's Exhibit Number 20, as a vial of blood labeled "blood of suspect." RT-6: 1233.  Further, as noted above, Part IV.A.1.e., *supra*, Detective

what [he] knew about blood" or the existence of blood samples. *Id.*: 239. His concern was testimony about the consequences of Turner's PCP use, that is, the affect on his credibility and his propensity for violence while under the influence of PCP. *Id.*: 194-95. Similarly, Mr. Ellery resolved not to put on expert testimony to explain the effects of PCP on an habitual user. He wanted "to minimize the whole PCP episode." *Id.*: 195. In 1984, Mr. Ellery had heard that some people became violent after ingesting or smoking PCP. *Id.*: 196. He believed he was aware in 1984 that PCP caused a user to become dissociated from reality. He did not make any assumption about what the jurors may have known. *Id.*: 197. Beyond learning from Turner that he was a chronic user of PCP, Mr. Ellery conducted no investigation about Turner's drug history. *Id.*: 198. Turner did not tell Mr. Ellery that PCP was the cause or a contributing cause to the fight with or the killing of Mr. Savage. Turner did tell Mr. Ellery that PCP made him violent; that he had beaten up his girlfriend when he was under the influence of PCP and that he had "done so repeatedly." *Id.*: 236. When Mr. Ellery met with family members, they told him the same thing Turner revealed, that when Turner used PCP he had been very violent towards his girlfriend. *Id.*: 238. One family friend, in particular, who was quite verbal, told Mr. Ellery this.[91] Mr. Ellery did not want family members or friends to testify that Turner became violent when he used PCP. *Id.*: 238. He did not think it would be favorable to Turner. *Id.*: 251.

Mr. Ellery met with Turner on numerous occasions prior to the trial. In talking to him, Mr. Ellery perceived that Turner suffered from memory problems about the crime. As time wore on, Turner's memory about the events leading up to the crime improved. *Id.*: 235. Mr. Ellery isn't sure whether he told Turner his case wasn't or shouldn't have been a death penalty case, but, he testified, he had said the case wasn't a death penalty case, often, to others. *Id.*: 237. Even though Mr. Ellery didn't think the death penalty was warranted in this case, he still prepared for the penalty phase. *Id.*: 252.

---

Wright testified in the prosecution case that he was present when two vials of blood were extracted from Turner on April 20, 1984.. Being informed of this trial testimony did not refresh Mr. Ellery's recollection.

[91] On further cross examination, Mr. Ellery thought this friend was Lewis Coleman, but, he believed that he talked to Mr. Coleman on a separate occasion from the family gathering. EHT-1: 237-38; 250.

Turner told Mr. Ellery that Mr. Savage's sexual advance was the reason for the fight between them. *Id*.: 236.  While Mr. Ellery considered Mr. Savage's homosexuality to be a very important part of the defense case, the only evidence he presented to establish the truth of Turner's account of the sexual advance (besides Turner's testimony) was that of a bartender from Fresno, Mr. Jay Bradshaw, *id*.: 208, and the suggestion from cousin Greg Mayo that Mr. Savage's weekend get-aways were for the purpose of engaging in sexual activities with homosexual partners, RT-5: 1045-47.  Mr. Ellery recalled that the investigating officers also were exploring the possibility that Mr. Savage was engaged in homosexual practices. *Id*.: 209.  He didn't recall that Detective Strength considered the case to be a "sex crime."  He didn't recall whether he considered calling Detective Strength to testify at the penalty phase.  *Id*.: 210.  He didn't recall witnesses called by the prosecution to show that Mr. Savage took Turner on a number of errands with him during the day time.  He recalled only generally testimony about taking a television to Gottschalks for repairs,[92] returning a pickup truck and retrieving Mr. Savage's Cadillac, and purchasing clothes for Turner at Gottschalks. *Id*.: 211.  Mr. Ellery did not consider calling an expert who could testify on the "grooming behavior of homosexuals for sexual encounters with strangers." *Id*.: 212.

Mr. Ellery explained that Kenny Roberts was an investigator used by the Merced Public Defender's Office. He worked on Turner's case to talk to local people in Merced, in particular tenants of Mr. Savage's rental properties.  Mr. Ellery did not ask Mr. Roberts to talk to any of Mr. Savage's students (or students Mr. Savage knew). *Id*.: 227.  The purpose of this investigation was to inquire about sexual matters.  But nothing turned up.[93]  Mr. Ellery became familiar with a statement of Joyce Slaton from either Turner's federal habeas counsel or the Warden's counsel.  He would have been very interested in learning the information she had to say about Mr. Savage in 1984, that is, that he was a homosexual.  But, he didn't know she had those views about Mr. Savage.  He didn't know her. *Id*.: 228.  He read the statements in Ms. Slaton's declaration, EHT Exhibit 12, only recently.  If he could have called Ms. Slaton as a witness, he would have used her testimony about Mr. Savage's homosexuality

---

[92] The only testimony about taking a television to Gottschalks for repairs came from Turner. RT-6: 1342-46, *see* Part IV.A.1.j., *supra*.

[93] Mr. Roberts stipulated testimony is summarized at Part IV.A.4.f.(3)., *infra*.

at both phases of the trial. *Id.*: 229. Mr. Roberts did not mention any names of tenants, including the name Betty Means. *Id.*: 247.

Mr. Ellery also retained Mr. (Ray) Brown to look at men thought to have been sexual partners of Mr. Savage. He didn't recall receiving any reports, event after reviewing Mr. Brown's billing statement.[94] *Id.*: 230. *See* EHT Exhibit 101: EH005. Mr. Ellery did not recall any information about any of the people interviewed and looking at the billing sheets did not refresh his recollection, except for the name Gregory, which Mr. Ellery thought might have referred to Gregory Mayo. *Id.*: 230-31. He did not recall learning or hearing that Mr. Savage was sexually violent. *Id.*: 231. During the trial, he felt that he should have been able to present some evidence about Mr. Savage's homosexuality, but he and his investigators couldn't find any. *Id.*: 253.

As early as November 18, 1992, Turner's federal habeas attorneys learned Mr. Ellery and his former associate at the Merced County Public Defender's Office, James Barnett, discovered that Mr. Savage collected matchbooks from gay bars and credit card slips for San Francisco hotels.[95] These statements were memorialized in Mr. Taylor's July 21, 1993 declaration. EHT Exhibit 3, ¶¶ 13, 17.[96] Neither the matchbooks nor the credit card receipts were introduced or mentioned during Turner's trial. On September 21, 1994, the People of the State of California filed an undated letter over Mr. Ellery's signature with their opposition brief to Turner's state habeas corpus petition. The letter confirmed Mr. Ellery's statement about finding evidence of Mr. Savage's homosexual life style shortly after the crime. In an attachment to the letter, Mr. Ellery wrote:

> Several evidentiary items suggested to me that Mr. Savage was interested in homosexuality. One matchbook cover, the testimony of one bartender and the testimony of Mr. Turner were the only items I recall which directly supported such and inference. Other material I examined showed only a lifestyle which may be consistent with

---

[94] The report indicates that on November 2 through 4, 1984, Mr. Brown made contact with and interviewed two witnesses in the Bay Area, "Williams" and "Smith." On November 5, 1984, the report indicates that Mr. Brown telephoned Mr. Ellery. EHT Exhibit 101: EH005

[95] Mr. Ellery and Mr. Barnett reportedly also discovered cancelled checks written to individuals for sex, but Mr. Ellery later denied he had ever stated this.

[96] Mr. Taylor's July 21, 1993 declaration was previously considered and summarized in the April 27, 1999 Order at Part II.C.3.a. The Warden's objection to paragraphs 11 through 17 were sustained in the June 19, 2003 Order (doc. 231) as to Mr. Hallford's plea offer and reserved as to statements Mr. Ellery made about his trial strategy. Otherwise, the Court overruled the objection.

homosexuality. I did not know of evidence, and I deny saying to anyone, that Mr. Savage paid for sex. While the inference of homosexuality is apparent from the evidence, I am not sure that the practice of homosexuality was "obvious."

Attachment B to Opposition to Turner's September 10, 1993 state habeas petition.

On cross examination Mr. Ellery described his history in Merced County, as the Public Defender since 1964. *Id.*: 213. He tried hundreds of jury trials, including 800 against Mr. Hallford. He handled many drug cases. *Id.*: 214. He wasn't sure whether he ever used drug intoxication as a mental defense. *Id.*: 215. Although the Public Defender's Office and the District Attorney's Office had a good working relationship, Mr. Hallford did not open his files to Mr. Ellery. Nonetheless, Mr. Ellery believes that when he requested discovery, Mr. Hallford would provide it. Sometimes the defense would request additional documents, and those would be provided as well. *Id.*: 218. Referring to the Warden's EHT Exhibit 107 (notes of interviews conducted by sheriff's detectives), Mr. Ellery recognized and was familiar with the names Oweida Turner, Kathryn Carter, Ruth Evelyn Turner, and Lewis Coleman. *Id.*: 220. He characterized jury venires in Merced County in 1984 as having been politically conservative, comprised of a lot of military people and farmers or people involved in farming. *Id.*: 243. There were fewer professional people in Merced County than elsewhere. *Id.*: 244.

He couldn't remember what witnesses were presented. *Id.*: 187. He didn't recall arguing that the jury should be precluded from deliberating about the robbery count when the jurors failed to return a verdict in the first instance. *Id.*: 188. He didn't recall that jury was sent to deliberate about the robbery count on the first day of the penalty proceedings or that the entire penalty case through a verdict lasted less than one day or that he represented to the trial court he was unprepared to go forward with the penalty phase at the time the jury returned the guilt verdict on the murder charge. He couldn't recall in what manner he was unprepared to proceed with the penalty phase.[97] *Id.*: 189, 240. His usual practice was to begin preparing for the penalty phase before the trial began.[98] *Id.*: 242.

_____

[97] Reviewing the transcript of his statement to the trial judge about not being prepared to proceed with the penalty phase and waiting for discovery, RT-8: 1715-20, did not refresh Mr. Ellery's recollection.

[98] This statement is a bit difficult to comprehend because Mr. Ellery testified at the beginning of his examination that Turner's case was his first time presenting a penalty phase in a capital trial.

He didn't recall telling Turner's mother he was unprepared for the penalty phase. *Id*.: 190. Although he read a transcript of the trial testimony, Mr. Ellery couldn't remember the testimony of his expert, Dr. Phillip Hamm, or that at trial, Mr. Hallford asked Dr. Hamm about Turner's revelation of PCP ingestion at the time of the crime. It did not occur to him that the jurors may not have believed Turner had ingested PCP. *Id*.: 192. He did not recall his contact with Dr. Hamm or his testimony. He was surprised to have learned that Dr. Hamm even testified. *Id*.: 197-98. He did not recall Dr. Hamm testifying or involvement in the case at all.[99] *Id*.: 204, 233. He could not recall whether he was aware that authorities investigating the crime were looking into Turner's PCP use. *Id*.: 195. At the time of his testimony, he was aware that "the lore of PCP included impulsive acts or acts that were without control of impulse," but he didn't recall if he was aware of that in 1984. At the evidentiary hearing and in 1984 he was unaware that PCP use could induce panic. *Id*.: 196. He did not know that PCP could cause a person to misperceive events, any more than any other drug. *Id*.: 196-97. Mr. Ellery had no recollection of receiving evidence of an interview of Ruth Turner conducted by Detective Strength. His recollection was not refreshed when he was referred to the specifics of Mrs. Turner's statements to Detective Strength that Turner was an habitual PCP user and she attempted to find a program to help him. *Id*.: 200. On cross examination, he confirmed that he recalled no report of an interview with Mrs. Turner. *Id*.: 220. He did recall Mrs. Turner telling him information about Turner being a good kid (always coming home as a teenager) that was consistent with the content of the interview transcription. *See* EHT Exhibit 108: EH104. With respect Turner's cousin, Kathryn Carter, Mr. Ellery did not recalled her denying that Turner used drugs and that someone, possibly Ms. Carter, described Turner as a follower. *Id*.: 223.[100] He didn't recall having cassette tapes of interviews with Greg Mayo, Lewis Coleman or Lee Anna Levingston, as shown in EHT Exhibit 113: EH210. He maintained a defense file, including accumulated discovery, for this case, but he testified he hadn't seen it in many years. He sent it to Turner's appellate counsel. *Id*.: 225-26.

---

[99] Reviewing Dr. Hamm's recent June 13, 2003 deposition transcript and his 1984 billing statement to Mr. Ellery, EHT Exhibit 101: EH009, did not refresh Mr. Ellery's recollection.

[100] Ms. Carter did tell Detective Strength that Turner was more of a follower than a leader. EHT Exhibit 110: EH164.

His memory of family background investigation was incomplete.  He recalled one group contact of family members and perhaps one other person who was not a family member.  He also recalled asking an investigator, Ray Brown, to contact family members. *Id.*: 201.  On cross examination, he stated that he went out to interview family members, but didn't recall if Mr. Brown was there with him.  *Id.*: 232. Except for some discussion about drugs and Turner's reaction to PCP, Turner's work, Turner's earlier conviction, Turner's poor school performance, but that Turner made out all right, Mr. Ellery did not recall what matters were discussed.  *Id.*: 201-02.  He also believed that Turner's ex-girlfriend, Pam Butler, was present at this meeting, but he didn't recall her saying much. *Id.*: 250.  He did not recall any other specifics.  He did not recall obtaining any information or directing Mr. Brown to gather any information about Turner's upbringing during his formative years.  He did not recall receiving any written reports.  He did not recall that he "asked questions with the idea of using it [the responses] in [at] penalty" proceedings.  *Id.*: 202.  With respect to abuse, Mr. Ellery recalled being "acquainted with the term 'thump,'" but did not recall any details of beatings or physical abuse.  He did not recall learning about his father practicing karate with him or his father's alcoholism.  *Id.*: 203.  He didn't think he considered asking Turner's (adult) sisters, Evelyn and Elizabeth to testify at the trial.  He didn't recall whether they were present at the trial.  *Id.*: 212.

Mr. Ellery recalled he had material relating to Turner's prior incarceration and conviction, but he didn't know if he had the probation report filed with the Fresno Superior Court on March 31, 1980. *Id.*: 205-06.   The Court then curtailed further questioning about this probation report (marked EHT Exhibit 18) on the grounds that the Warden's outstanding objection to the admissibility of this document was still unresolved at the time of the hearing. No specific questions about its content were presented.[101] Mr. Ellery did confirm that he could not recall whether he gleaned the names of family and friends from probation reports he received.  *Id.*: 207.  He didn't recall what investigation was conducted concerning Turner's character or reputation in the community, although he did recall presenting "some evidence of what people thought of him."  *Id.*: 207.

---

[101] Ultimately, the Court overruled the Warden's objections to the March 31, 1980 probation report and numerous letter attachments by order filed September 20, 2004 (doc. 276).

Mr. Ellery's self-assessment was that because he "developed a prejudice against the people describing his [Turner's] violence," he was "kept in blinders," and didn't test the blood or get expert testimony or "get people to enlarge upon their perceptions of him [Turner] while under – while he was under the influence of PCP." *Id*.: 242. Mr. Ellery described this alternatively as hindsight, wishful thinking, and rationalization. *Id*.: 243.

### (2)    William Ray Brown

William Ray Brown, an experienced Fresno private investigator with extensive law enforcement background, was contracted to perform investigative services on Turner's case by Mr. Ellery. The topics of investigation included character, childhood, schooling, and relationships. Mr. Brown also was to serve subpoenas. EHT-5: 891. To begin work on the case, Mr. Brown received a police report and some other documents the nature of which Mr. Brown could not recall. *Id*.: 892-93. Mr. Brown recorded all interviews. He submitted "quite a few" interview reports to Mr. Ellery. *Id*.: 893. Mr. Brown's activity log for the case, included in the Warden's Exhibit 101 to the evidentiary hearing, indicated he began working on the case May 17, 1984. EHT Exhibit 101: EH011. EHT-5: 899-900.

He interviewed Turner's mother, Ruth Turner, and he canvassed the neighborhood to talk to other people who could shed light on the kind of person Turner was. He "faintly" recalled speaking to some people about Turner's drug use, but could not remember "to what extent." *Id*.: 894. Generally drug use was part of a defense in criminal case. He also would have looked into childhood abuse issues. For upbringing issues, Mr. Brown generally consulted the client's mother. He didn't have a good recall of what exactly he did in Turner's case. *Id*.: 895. Mr. Brown's billing records show that he billed one hour for checking at the Turner residence and neighbors, which he explained during his testimony entailed talking to Mrs. Turner and to neighbors about Turner's character, habits, and associates. EHT Exhibit 101: EH011; EHT-5: 901. On June 4, 1984, he interviewed Mrs. Turner for .5 of an hour and later that day, after going to Merced to talk to Mr. Ellery and Turner, he talked (telephoned) Mrs. Turner for .25 of an hour. No further interviews with Mrs. Turner are shown on his billing sheets. EHT Exhibit 101: EH011.

He did recall investigating the homosexual aspects of the case, starting by visiting the "gay" bar in Fresno in front of which Turner and Mr. Savage first met. Mr. Brown also checked out a steam

bathhouse in Fresno and went to the Bay Area to interview potential partners of Mr. Savage. *Id.*: 896; *see also id.*: 909 (Fresno establishments); 914 and 922-23 (possible partners in San Francisco). His time sheet shows  Mr. Brown was looking for anything which could have mitigated Turner's culpability for the murder. *Id.*: 897.  A review of his activity logs show that he drove 2,788 miles, billing his time for driving as well as conducting business at the listed designations at $90 per hour.[102]

After talking to Mrs. Turner and neighbors on May 19, 1984, Mr. Brown attempted to contact the principal at Edison High School (which Turner attended).  This high school principal also had been the principal at the junior high and at the elementary school Turner attended.  He was a major contact for Mr. Brown.  Mr. Brown then canvassed more neighbors.  *Id.*: 902.  He interviewed the mother of one of Turner's school mates, Catherine Crozier, but not the school mate, Charlene.  *Id.*: 904-05.  He also interviewed neighbor Dossie Warren. *Id.*: 911.  On cross examination, he testified that since there was no indication on the report that he obtained Turner's school records, he probably did not obtain them.  Also because his activity log didn't indicate he interviewed the principal, he testified he probably did not do so.  *Id.*: 927-29.  He didn't recall if Mr. Ellery ever asked him to prepare or gather information that would be included in a "social history" of Turner.  *Id.*: 930.  He couldn't say whether there was more emphasis on investigating Mr. Savage's background than Turner's background, but he knew that he did both.  *Id.*: 930-31.  He had no independent recollection of interviewing Turner's father and did not see any log entries about having done so.  *Id.* 931-32.  He did not recall interviewing any of Turner's sisters, Evelyn, Elizabeth, or Oweida, although he did recall interviewing some family members.[103]  Had he interviewed them, there would have been a notation in his activity log (which there

---

[102]  For his June 4, August 24, November 9, and  14  trips to Merced, he drove 104 miles, each trip, for a total of 416 miles.  He made two trips to the Bay Area, one on July 13 (476 miles) and one on November 2 (583 miles).  He traveled to Modesto on July 20 (238 miles), August 11 (226 miles), September 1 (227 miles), and September 30 (200 miles).  On June 11, he traveled 75 miles to Orange Cove; on September 22, he traveled 175 miles to Sequoia Park; on October 3, he traveled 41 miles to interview a person named Williams, and on November 16, he traveled 131 miles to bring trial witness Jay Bradshaw to the trial.  Mr. Brown's travel time is combined with his interview or subpoena serving time.

[103]  Oweida recalled being interviewed by a black investigator (that is, Mr. Brown).  *See* Part IV.A.4.a.(3), *supra*.

was not for these siblings).  *Id*.: 932.  He believed an investigator should not only talk to the mother of a client but to the siblings as well.  *Id*.: 933-34.

The Warden's counsel went down the activity log, item by item, he asked Mr. Brown about the entries.  Mr. Brown could not remember many of the people listed or what information they provided. At most the questioning revealed Mr. Brown's practice for recording information contemporaneous with his investigative service and that he served a number of trial subpoenas.  *Id*.: 903-09; 914-17; 920-22 He did recall interviewing Turner, Turner's mother, and neighbors Lewis and Monica Coleman.  *Id*.: 909.  Monica Coleman's father was Elijah Barber, but Mr. Brown did not recall talking to Mr. Barber about this case.  *Id*.: 909.  The activity log indicated that Mr. Brown spoke to Turner's employer at Cross Construction and drove out to the Orange Cove construction site at which Turner worked, but Mr. Brown did not recall any of this during his testimony.  *Id*.: 910-11.  He also did not recall trying to find or interview what the Warden's counsel referred to as Turner's "running buddies."  *Id*.: 903-04, 911. The last billing entry was November 16, 1984, when Mr. Brown brought bartender Jay Bradshaw to court for his guilt phase testimony.  *Id*.: 935; EHT Exhibit 101: EH005.  He had no recollection and the log did not reflect any investigative work after the guilt phase of Turner's trial.  EHT-5: 936.

Mr. Brown provided a self-assessment in which he stated he thought his work was thorough based upon the information he was given and the leads that were developed.  *Id*.: 925.  He did not feel he left undone anything with respect to Turner's upbringing, his drug use, or his educational background. *Id*.: 925-26.  Although Mr. Brown maintained copies of reports he transmitted (or delivered) to Mr. Ellery, as well as the tape recordings of the interviews, at the time of his testimony, he no longer had any of the materials for Turner's case.  *Id*.: 938-39.

### (3)    Kenneth Roberts

Kenneth Roberts was the in-house investigator employed by the Merced Public Defender's Office at the time of Turner's trial.  He worked on Turner's case with Mr. Ellery.  The parties stipulated to his evidentiary hearing testimony and filed their stipulation on June 5, 2003 (doc. 223).

His assignment in the case was to focus on Mr. Savage and his background, his position at Merced College, and his clandestine homosexual lifestyle.  Mr. Roberts interviewed several people who knew Mr. Savage in Merced and Atwater.  He investigated the high odometer reading on Mr. Savage's

1   new Cadillac in attempt to tie that fact in with his alleged homosexual lifestyle.  June 5, 2003 Stip. re:

2   Kenneth Roberts, ¶ 5.

### g.      State Appellate and Post-Conviction Attorney Witnesses

The Warden offered testimony from three attorneys who worked on Turner's appeal regarding

the fact that Mr. Ellery's trial file, including investigation reports, was lost and has never been recovered.

### (1)      Dennis A. Fischer

In a declaration executed May 19, 2003, EHT Exhibit 20, Mr. Fischer averred that as appellate

counsel for Turner before the California Supreme Court, he did not develop extra-record claims and

accordingly it was not his practice to request trial counsel's files.  While Mr. Fischer recalled conversing

with Mr. Ellery by telephone, he did not recall the purpose or the content of those communications.  He

asked Mr. Douglas Otto to consider investigating possible habeas claims.  Mr. Fischer transmitted all

records pertaining to Turner's appeal to federal habeas counsel Katherine Hart in January 1992.  He had

no recollection that there were any non-record materials for Turner's case in his possession at any time,

but if he did, it would have been his custom and practice to pass those files on to new habeas counsel.

Prior to the execution of this declaration, Mr. Fischer transmitted a letter, dated May 14, 2003 to Deputy

Attorney General Robert Whitlock to the same effect. EHT Exhibit 117.

### (2)      John M. Bishop

Mr. Bishop, an associate of Mr. Fischer gave a declaration that he never had in his possession

any of the defense trial files while he was assisting Mr. Fischer with Turner's appeal.  EHT Exhibit 118.

### (3)      Douglas W. Otto

Mr. Otto, an attorney who assisted in Turner's direct appeal, gave his testimony via telephonic

hearing.  He thought that his entire role with the case was with the appeal, but his conversations with

federal habeas counsel, Ms. Hart, led him to believe that he may have conducted some extra-record

investigation on the case, including talking to Mr. Ellery in Merced some time in the 1980s.  EHT-1:

154.  While Mr. Otto remembered reviewing transcripts, he had no recollection of reviewing counsel

or trial investigation files.  He did not recall being asked by Mr. Fischer to investigate possible grounds

for a state habeas corpus petition.  *Id*.: 155-56.  Other than reviewing transcripts, Mr. Otto had no

independent recollection of reviewing any materials regarding Turner's case.  *Id*.: 156.  He had no

recollection how many pages or boxes of materials he reviewed. He did not recall witness interviews, police reports, psychological testing records, attorney billing records, trial counsel notes, photographs, audio tapes, or video tapes. *Id*.: 157-58. He recalled the name of a female investigator, but was unsure whether she worked on Turner's case and he did not try to contact her in connection with the present proceedings. *Id*.: 158. His last contact with the investigator was in the mid- to late-1980s. If he had any materials relative to the case, he would have returned them all to Mr. Fischer. He has checked and re-checked his office and storage areas. He discussed the matter with his paralegal. *Id*.: 159.

Mr. Otto recalled speaking with Turner's federal habeas counsel, Ms. Hart, in approximately 1993 about locating trial counsel and defense investigation files. He looked at the time, understanding the importance of finding any materials that could be useful to the defense. *Id*.: 162.

### h.   (Former) District Attorney Patrick Hallford

Mr. Hallford testified both as a percipient witness, concerning the trial proceedings of Turner's case, and as an expert witness. The areas of Mr. Hallford's proffered expertise included two areas:

(1)   The makeup, characteristics, and culture of jury venires in Merced County at the time of Turner's trial in 1984; and

(2)   Whether, given the makeup, characteristics, and culture of jury venires in Merced County in 1984, it is reasonably probable that Turner would have received a more favorable result had Mr. Ellery presented evidence of Turner's PCP intoxication and historical drug use, his difficult family history, and of his educational shortcomings.[104]

Turner objected to all testimony from Mr. Hallford as an expert. In the Court's September 20, 2004 order (doc. 276), Turner's objection to the first area of expert testimony was overruled and to the second area was sustained. Accordingly, only that part of Mr. Hallford's percipient testimony and his

---

[104] The Warden also intended to offer Mr. Hallford as an expert on whether it would have been tactically sound for Mr. Ellery to have presented evidence of Turner's PCP intoxication and historical drug use, his difficult family history, and of his educational shortcomings given the makeup, characteristics, and culture of jury venires in Merced County in 1984. Mr. Hallford did not offer an opinion on this third topic.

expert testimony to the makeup, characteristics and culture of jury venires in Merced County at the time of Turner's trial in 1984 are summarized below.

Confirming his retired status from the Merced County District Attorney's Office, his intention to remain retired, and his neutrality to the outcome of Turner's habeas proceeding, EHT-4: 740-41, Mr. Hallford explained he had been the elected District Attorney for six consecutive terms beginning in 1962 through 1986. *Id.*: 742-43. As District Attorney, Mr. Hallford tried many cases against Mr. Ellery, the Public Defender, prior to Turner's case in 1984. The working relationship was pleasant. The discovery practice was open, including in Turner's case. *Id.*: 745. Mr. Hallford made available to Mr. Ellery cassette tapes of interviews conducted by the sheriff's department detective, including Greg Mayo, Lewis Coleman, Oweida Turner, Kathryn Carter, and Ruth Turner. Photocopies of cassette tapes and lists of names including these people were included in Exhibit 113 to the evidentiary hearing and admitted without objection. *Id.*: 756.

The guilt phase verdict in Turner's case came in the Wednesday before Thanksgiving. Mr. Hallford did not want to proceed until the following week, because he needed more time to present his penalty phase case. *Id.*: 824. He also didn't want to give Mr. Ellery any excuses or grounds for an appeal because of lack of preparation. *Id.*: 825. Mr. Hallford suggested the following Wednesday, but Mr. Ellery suggested the following Tuesday. Mr. Hallford did not recall Mr. Ellery's saying he was unprepared to proceed with the penalty case. He thought he would have remembered that if it had happened. *Id.*: 826. In fact, when Mr. Hallford asked for more time to present the penalty case until the following week, he didn't know whether Mr. Ellery was ready or not. *Id.*: 827. Although Mr. Hallford couldn't recall whether there was one or there were two probation reports concerning Turner, if Mr. Hallford had received two, both would have been passed on to Mr. Ellery. *Id.*: 861.

As the elected District Attorney, he met with civic clubs from time to time and sometimes would speak at those gatherings. *Id.*: 829. He was in touch with law enforcement officers; he advised the grand jury; he campaigned a lot. *Id.* He instituted a witness program sometime before his retirement in October 1986. As part of that effort, he was in contact with community members. *Id.* He interacted with law enforcement agencies, engaging in conferences and refresher programs. *Id.* His work with the grand

jury assisting in the preparation of reports.  During his interaction with grand jurors, they expressed their views and attitudes on crime and punishment.  *Id*.: 831.

Mr. Hallford agreed that as a long-time resident of Merced County, since 1958 or 1959, he "experienced the cultural aspects of Merced County both on a professional level . . . [and] on a personal level."  In 1984, Merced County was rural, with the biggest products being dairy, almonds, and tomatoes.  There also was a military presence in Merced County.  *Id*.: 832.  Castle Air Force Base operated in Merced County at that time.  There were many active and retired military personnel residing in the County and called for jury duty.  *Id*.: 833.

Mr. Hallford opined that residents of  "central valley had a little more conservative view and were a little bit strict[er]" than people in other counties.  Likewise, in his view, the concept of personal accountability was stronger among Merced residents.  *Id*.: 834.  He testified that Turner's jury was similar to other 1984 Merced County juries.  About half of its members were farmers or involved in the military.  *Id*.: 855.  Although Merced was a conservative community, however, it was not a homogenous community.  *Id*. 866.

### B.  Analysis

To establish constitutionally ineffective assistance of counsel, Turner must demonstrate (1) that Mr. Ellery made errors so serious that he was not functioning as the counsel guaranteed by the Sixth Amendment, and (2) that the deficient performance prejudiced the defense.  *See Bonin v. Calderon*, 59 F.3d 815, 833 (9th Cir. 1995), *quoting Strickland v. Washington*, 466 U.S. 668, 687 (1984).

### 1.  Performance

To meet the requirements of the performance prong of the *Strickland* test, Turner must demonstrate that Mr. Ellery's performance fell below an "objective standard of reasonableness." *Strickland*, 466 U.S. at 688.  The assessment must be made from Mr. Ellery's "perspective at the time," so as "to eliminate the distorting effects of hindsight."  *Id*. at 689.  Further, the Court must entertain a "strong presumption" that Mr. Ellery's conduct fell "within the wide range of reasonable professional assistance," and hence judicial scrutiny "must be highly deferential."  *Id*. at 689.  "Although there is a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance, and judicial scrutiny of counsel's performance must be highly deferential, counsel must, at

a minimum, conduct a reasonable investigation enabling him to make informed decisions about how best to represent his client." *Sanders v. Ratelle*, 21 F.3d 1446, 1456 (9th Cir. 1994).  A decision characterized as "strategy" does not render it immune from attack.  *Correll*, 539 F.3d at 948 (quoting *Jones v. Wood*, 114 F.3d 1002, 1010 (9th Cir. 1994)).  Rather, the chosen strategy must be "an informed one."  *Sanders*, 21 F.3d at 1457; *see also Correll*, 539 F.3d at 949 (an uninformed strategy is not reasonable).  "To perform effectively in the penalty phase of a capital case, counsel must conduct sufficient investigation and engage in sufficient preparation to be able to 'present[ ] and explain[ ] the significance of all the available mitigating evidence.'" *Mayfield v. Woodford*, 270 F.3d 915, 927 (9th Cir. 2001) (quoting *(Terry) Williams v. Taylor*, 529 U.S. 362, 393, 399 (2000)), *quoted by Caro v. Woodford*, 280 F.3d 1247, 1254 (9th Cir. 2002). "[I]t is imperative that all relevant mitigating evidence be unearthed for consideration at the capital sentencing phase."  *Ainsworth v. Woodford*, 268 F.3d 868, 874 (9th Cir. 2001).

Turner complains that Mr. Ellery failed to investigate and present evidence concerning Turner's early childhood abuse, his borderline intellectual capabilities, his drug abuse and drug abuse history, and Mr. Savage's predatory sexual practices.  The Warden responds that Mr. Ellery reasonably chose not to present some evidence and was reasonably unaware of other evidence.  Moreover, the Warden argues that Mr. Ellery's alleged failure to conduct a reasonable investigation is not capable of being determined because his trial file was lost.

### a.      Childhood Abuse and Dysfunctional Family Dynamics

Turner argues he suffered abuse, abandonment, and neglect as a child, singled out by his alcoholic father for physical abuse and belittlement.  Turner's three sisters and his cousin Kathryn Carter all witnessed the thumping.  Mrs. Turner was aware that her ex-husband had thumped Turner during a family meal causing him to cry.  Sisters Evelyn and Elizabeth testified about their father using karate moves to punch Turner in the stomach when he was a child.  Evelyn and Elizabeth, as well as Ms. Carter, personally witnessed Mr. Turner whipping Turner with the razor strap in the garage.  During trial preparation, Turner told Dr. Hamm he had been physically abused by his father when his father was drunk.  Family members also were well-acquainted with the parental discord between Mr. and Mrs. Turner and of Mr. Turner's ultimate departure from the family home only to move in with a woman in

the same neighborhood.  Turner complains that though the fact of Mr. Turner's harsh treatment of Turner was readily available, and Mr. Ellery recalled being acquainted with the term "thump," he did not interview any of the knowledgeable witnesses nor instruct his investigator, Mr. Brown to do so.  It follows that at the evidentiary hearing, he testified he did not recall any details of beatings or physical abuse or learning that Turner's father practiced karate on his son during his drinking binges.

The record supports Turner's allegation that the family background investigation Mr. Ellery conducted was minimal and superficial.  The focus for what little family background information was developed was on Mrs. Turner.  None of the three sisters was contacted by Mr. Ellery, although Oweida was present during a group interview conducted by Mr. Brown.[105]  Nor was there any effort by the defense to interview Mr. Turner.  Since Merced detectives interviewed quite a few family members, including Mr. Turner, as well as numerous acquaintances, Turner argues Mr. Ellery was deficient for failing to follow up with any defense interviews of these individuals.  Turner also finds fault with Mr. Ellery's failure to follow up on the friends and family members who wrote letters appended to Turner's March 31, 1980 probation report.

The Warden counters that because of the missing trial file, Turner is mistaken to assume that Mr. Ellery did not investigate the childhood abuse Turner endured at the hands of his father or the family dysfunction.  He states that Mr. Ellery "obviously investigated" Mr. Turner "on some level" because Mrs. Turner recalled being asked about her ex-husband during her interview with Mr. Ellery.  Further, Mr. Ellery directed Mr. Brown to talk to family members and acquaintances to look into Turner's character, *childhood*, schooling, and relationships.  Mr. Brown testified that looking into the matter of childhood abuse was something he would have done.  He felt his investigation in the case was as thorough as possible and that he left nothing undone when it came to Turner's upbringing.  Because of Mr. Brown's extensive experience, the Warden maintains Mr. Ellery reasonably relied upon his investigation methods and results.  The Warden characterizes as unfortunate that Mr. Brown did not

---

[105] Neither Evelyn nor Elizabeth was contacted by Mr. Ellery or by Mr. Brown, by telephone or otherwise.  Although both sisters came home to Fresno on occasion, Evelyn was living in Southern California and Elizabeth was attending college in Hayward, California at the time of the investigation.

learn of Mr. Turner's abuse of his son from Mrs. Turner, but attributes this to the fact that Mr. Turner's abuse of Turner always took place outside of Mrs. Turner's presence.

Turner, in turn, dismisses investigative efforts which focused solely on Mrs. Turner for information about family background issues. Notably, the interview Mr. Ellery conducted was preliminary, and the interviews Mr. Brown conducted similarly were neither in depth nor lengthy. Mr. Brown's total time in a face to face interview with Mrs. Turner was half an hour, followed up with a 15 minute telephone conversation.[106] Citing *(Terry) Williams*, 529 U.S. at 396, Turner argues Mr. Ellery had an obligation to conduct a *thorough* investigation into family background. He claims it would not have taken an unmanageable effort for Mr. Ellery, or Mr. Brown, with proper instructions from Mr. Ellery, to have uncovered evidence of an abusive childhood, parental violence, and Mr. Turner's abandonment of his family. At the very least, Mr. Ellery could have consulted with Dr. Hamm about the results of Dr. Hamm's mental state examination during the trial. He also could have conducted a more in depth interview of Mrs. Turner, who described significant spousal abuse, including being afflicted with black eyes, bruises, and knots on her head. To defend herself, Mrs. Turner resorted to pulling knives out of the kitchen, attempting to use a chair to strike Mr. Turner, and using a kitchen pot to hit him in the head and break out the windows in the house. The sisters also were an abundant source of information about the family dysfunction generally, about the paternal abuse of Turner specifically, and about the humiliation they experienced because their father was financially caring for the children of Faye Hill, but not providing for his own children. Even Mr. Turner revealed to Turner's federal habeas counsel that he had a very tumultuous and unhappy marriage with Mrs. Turner, attempted to make Turner "tough and manly," and that when he finally left the family home, he moved in with Faye Hill and her children, caring for those children like they were his own. Since Mr. Ellery apparently met Mr. Barber at least once with Mrs. Turner, and Mr. Barber did testify at penalty proceedings about Mr. Turner's abandonment of his family, Mr. Ellery easily could have learned more about this sad phase in Turner's life. Mrs. Turner certainly knew her husband had taken up residence with another woman and

---

[106] There was also an earlier billing for an hour, total, to check at the Turner residence and to canvas the neighborhood. If Mr. Brown interviewed Mrs. Turner on this occasion, it was not the focus of his task and it was not noted on his activity log.

1   her children in the neighborhood.  Oweida, who was present in Fresno during the entirety of the pre-trial

2   period, also had emotionally charged comments about her father's failure to provide for his own children

3   while he did provide for the children of Ms. Hill.

4        The Warden argues Mr. Ellery's investigation was comprehensive.  Mr. Ellery conducted a

5   group interview consisting of at least Mrs. Turner, Elijah Barber,[107] and Pam Butler.  Separately, he

6   recalled speaking to Lewis Coleman.   Mr. Brown interviewed Mrs. Turner, Monica Coleman, Dossie

7   Warren, Catherine Crozier, and at least one person from Cross Construction.[108]  In addition, he tried to

8   find Lewis Coleman, the principal of Turner's high school, and some of his friends, including one who

9   had been a principal with Turner in his 1980 prior robbery.   With respect to the detective-conducted

10  interviews Turner complains Mr. Ellery did not follow up, the Warden cites *LaGrand v. Stewart*, 133

11  F.3d 1253, 1274 (9th Cir. 1998), for the proposition that trial counsel does not need to interview a

12  witness if the witness's account is fairly known to counsel.

13       The Warden's arguments are unpersuasive.  The problem with the investigation was not a lack

14  of quantity of witnesses interviewed, but the quality of the interviews.  At the very least, Mrs. Turner,

15  her teenage daughter, Oweida, Mr. Barber, and Mr. Coleman were aware of serious family dysfunction

16  in the Turner household during Turner's childhood and early adolescence.  Since the Warden maintains

17  the investigation did not put Mr. Ellery on notice about the abuse and dysfunction, and it is clear that

18  these witnesses freely discussed these topics during the federal habeas investigation, it follows that they

19  were not asked the questions which would have elicited the information.  Without the questions having

20  been asked, there is no indication that the subject matter would have been obviously important to the

21  family members, and thus volunteered.  The Warden's reliance on *LaGrand* also is not well-taken.  In

22  that case, all of the witnesses,[109] except the one eye-witness trial counsel did interview, previously had

23  been interviewed by the defense investigator, and trial counsel reviewed all the investigator reports.

24

25       [107] Evidence of Mr. Barber's presence at the group meeting came from Mrs. Turner's evidentiary
26  hearing testimony.

27       [108] Although she is not mentioned in Mr. Brown's activity log, Oweida evidently was present
    during one of these interviews.

28       [109] The opinion indicates that 18 witnesses were called by the prosecution.  133 F.3d at 1274.

Further, the trial attorney put in the equivalent of 27 eight-hour days in preparation for trial. *Id*. Nowhere near that level of preparation is evident in Turner's case. Including Oweida, Mr. Brown interviewed five family and friend witnesses; Mr. Ellery interviewed only four, with Ms. Butler saying very little, if anything; and none was interviewed substantially..

Focusing on the missed opportunity to interview Turner's sisters, the Warden discounts the benefit Mr. Ellery could have derived had he or Mr. Brown separately interviewed Oweida about family background because most of the dysfunctional family dynamics occurred when she was a toddler. With respect to Evelyn and Elizabeth, the Warden maintains that Mr. Brown, and by extension, Mr. Ellery, having interviewed two members of the immediate family (i.e. Mrs. Turner and Oweida), were not unreasonable for not seeking out Evelyn and Elizabeth who had "relocated geographically far away" (Southern California and Hayward, respectively). The Warden adds Elijah Barber to his list of witnesses interviewed who did not suggest Evelyn and Elizabeth would have been good sources for mitigation evidence.[110] Citing *Williams v. Head*, 185 F.3d 1223, 1237 (11th Cir. 1999), the Warden argues Mr. Ellery's decision not to have interviewed Evelyn and Elizabeth was reasonable because nothing learned in the interviews with Mrs. Turner, Oweida, or Elijah Barber suggested the other sisters would have anything helpful to offer. He relies on *Dyer v. Calderon*, 122 F.3d 720, 735 (9th Cir. 1997), *vacated on other grounds*, 151 F.3d 970 (9th Cir. 1998), for the same proposition that counsel need not "uncover every aspect of a defendant's past" or pursue leads that are fruitless.

The Warden's position is not well taken. To say that Mr. Ellery was reasonable for not seeking out Evelyn or Elizabeth because the three witnesses with family background information that were interviewed didn't suggest the two older girls would have had any useful information begs the question. The testimony of Mrs. Turner and Oweida demonstrate that neither one of these witnesses was asked about abuse or family dysfunction. If they were not asked, they cannot be faulted for not volunteering information. Both Elizabeth and Mrs. Turner testified at the evidentiary hearing that they did not presume to tell Mr. Ellery how to handle Turner's defense, because he was the lawyer. It is not

---

[110] The Warden writes: "Impliedly, when [Mr.] Ellery met with Ruth [Turner] and Elijah to discuss having people testify on Turner's behalf [ ], neither of them suggested Evelyn or Elizabeth would be worth pursuing in that regard."

reasonable to suppose Oweida, who was 15 or 16 years old at the time of the trial, would have been more sophisticated than her mother or older sister when it came to understanding, let alone influencing Mr. Ellery's trial strategy.  To excuse Mr. Ellery's failure to seek further interviews with Evelyn or Elizabeth because they had relocated geographically "far away" also is unpersuasive.  Mr. Brown traveled well over 2,500 miles pursuing potential witnesses in San Francisco, the Central Valley, and the Sierra foothills.  Compared to San Francisco, Hayward and Los Angeles are not convincingly "far away." (Hayward is closer, and Los Angeles is one hour farther.)

Next, the Warden maintains that because Mr. Hallford made all of the evidence gathered in the case available to Mr. Ellery, including  the interview tapes recorded by Merced detectives, the Court must presume that Mr. Ellery relied on the detective-conducted interview of Kathryn Carter "in assessing her potential testimony before calling her as a penalty phase witness."  He points out that the interview of Ms. Carter implied that Turner's father lectured Turner rather than spanked him.  She also told detectives that Turner and his father had become "good friends."  Since Ms. Carter testified at the evidentiary hearing that she did not remember having been interviewed by Mr. Ellery or anyone working on his behalf before her testimony, the Warden further suggests she had or might have been interviewed by the defense team and Mr. Ellery purposefully selected her for her penalty phase testimony.  The argument is implausible.  Given Mr. Ellery's apparent penalty phase strategy of lingering doubt regarding Turner's intentional and purposeful robbery motives, it is unlikely Mr. Ellery would have chosen to call Ms. Carter because she indicated Turner had not been physically abused or that he and his father had become good friends. The subject of Turner's family background was not broached during Ms. Carter's penalty phase examination.  Rather, she was asked about Turner's lack of aggression and kind demeanor towards her four children.  The Warden's contention that Mr. Ellery chose to call Ms. Carter also is refuted by her evidentiary hearing testimony that her penalty phase examination followed the question by someone from Mr. Ellery's office asking if anyone present was available to testify on Turner's behalf.  The record is devoid of any evidence of careful consideration to elicit specific testimony before Ms. Carter was called.  The Warden's suggestion to the contrary, as prompted by the lost trial file and the presumption under *Strickland*, 466 U.S. at 691, that Mr. Ellery's representation fell "within the wide range of reasonable professional assistance," is both remote and improbable.  Nor does

Ms. Carter's evidentiary hearing testimony explaining her lack of knowledge about the elements of child abuse in 1984 excuse Mr. Ellery's failure to conduct a full family background investigation. Ms. Carter knew that Mr. Turner whipped, beat, thumped, and verbally berated his son. She knew that he was "straight up U.S. Marine Corp mean." The fact that she might not have been able to characterize his conduct toward Turner as "child abuse" is irrelevant. Mr. Ellery would (or should) have recognized it as such, if he had undertaken to learn of it.

The Warden advances a similar argument about the names of friends, family members, neighbors, and school officials who wrote letters attached to Turner's March 31, 1980 probation report, witnesses Turner claims Mr. Ellery should have pursued as leads for family background information. Because the trial file was lost, the Warden maintains Turner has not and cannot show that Mr. Ellery did not possess and actually use those letters.[111] At least three of the letter writers, Kathryn Carter, Oweida Turner (Doxey), and Dossie Warren, were otherwise interviewed. Ms. Carter was interviewed by detectives and Mr. Ellery had access to that interview, while both Oweida Turner (Doxey) and Dossie Warden were interviewed by Mr. Brown. He suggests that because many other of the letter writers resided in the Turner neighborhood, Mr. Brown likely interviewed them or their family members when he canvassed the neighborhood for information on Turner's character and background. The fact remains, however, that Mr. Ellery did not develop mitigating information about Turner's abusive childhood or family dysfunction, even though he was familiar with the term "thump," and was aware of at least some form of child abuse. To the extent Mr. Ellery was aware of Mr. Turner's thumping of his son, the failure to develop and present this evidence to the jury was inexplicable.

With respect to attorney-client conferences between Mr. Ellery and Turner, the Warden reasons that because Mr. Ellery did not recall Turner telling him that he was abused by his father, there is no reason to suppose that Turner relayed such information. In addition, despite the references in Dr. Hamm's notes of his interview with Turner about his father having whipped and abused him when the father was drunk, together with Dr. Hamm's belief that he must have spoken to Mr. Ellery before

---

[111] This argument is at odds with the Warden's earlier contention that the March 31, 1980 probation report should be excluded from the Court's consideration under *Tamayo-Reyes*, 504 U.S. at 11.

testifying at Turner's guilt phase trial, the Warden contends Turner has not established that Mr. Ellery was made aware of Mr. Turner's abuse by Dr. Hamm.  Pointing to the absence of evidence of communications between Mr. Ellery and Dr. Hamm about Turner's child abuse, the Warden argues Mr. Ellery's reliance on Dr. Hamm's communications, which he suggests did not include information about child abuse, was reasonable under *Harris v. Vasquez*, 949 F.2d 1497, 1525 (9th Cir. 1990) (holding trial counsel provides competent representation by relying on "properly selected experts").  This argument is puzzling because on cross examination at Dr. Hamm's deposition, the Warden devoted a considerable effort to eliciting that it *was* possible Dr. Hamm *did* disclose the fact of Turner's childhood abuse to Mr. Ellery.  The Warden's syllogism is, however, consistent with the argument about why Mr. Ellery failed to develop evidence of child abuse and parental discord from lay witnesses.  In the case of lay witnesses the Warden argues that Mr. Ellery had knowledge of which family members and friends  would have had family background information from detective-conducted interviews, but none of that information tipped him off that Turner was abused, the household generally was violent, or Mr. Turner had abandoned his family.  With respect to Dr. Hamm, the Warden maintains that Mr. Ellery adequately consulted with his expert before calling him to the witness stand, but simply that the revelation of Turner's abuse was not communicated to him.

The Warden's position cannot withstand scrutiny.  He asks the Court to make too many assumptions about what Mr. Ellery did and did not do to develop penalty phase evidence at the trial.  The Court is asked to assume that Mr. Ellery read all the police reports and adequately reviewed Dr. Hamm's test results with him, but because the issues of child abuse and family dysfunction were not brought to his attention, he was not unreasonable in failing to dig a little deeper, in spite of his familiarity with the term "thump."  The argument flies in the face of prevailing authorities.  Conducting an adequate investigation to inform strategic decisions is exactly what is required, *Sanders*, 21 F.3d at 1456, and is exactly what wasn't accomplished.

The Warden's separate attempt to ameliorate the impact of childhood abuse and family violence and therefore establish Mr. Ellery's reasonableness is equally unpersuasive.  Pointing to the detective-conducted interviews of Ms. Carter, Mrs. Turner, and Mr. Turner, the Warden concludes that by the time of the present crime, Turner and his father had a good relationship and therefore any impact the turbulent

family dynamics had on Turner were long since dissipated.  The Warden additionally has offered Dr. Glenn's October 6, 1979 report to confirm the notion that although Turner's parents had divorced, the family was stable and Turner visited his father two or three times a week.  The evidence from Ms. Carter and Mrs. Turner on the good relationship between Turner and his father, however, is conflicted.  While the record shows that Ms. Carter did tell detectives Turner and his father had become good friends, during her evidentiary hearing testimony, she did not fully endorse that sentiment.  Rather, she pointed out that the relationship had improved since Turner had been released from CYA because Mr. Turner no longer abused his son.  Similarly, Mrs. Turner reported to investigating detectives that her ex-husband drove Turner to work every morning before the crime, but during the evidentiary hearing, she clarified that she also frequently drove him to work.  Mr. Turner, himself, told detectives he drove Turner to work the Friday before the crime and the day of his arrest.[112]  Other than transporting his son to work, Mr. Turner's declaration provides no insight into the nature and character of their relationship in the months prior to the crime.

The Warden's conclusion that Turner "obviously had gotten past" "whatever problems [he] had" with his father "while growing up" is offered without the benefit of expert opinion or support.  The fact that Turner may have reconciled with his father as an adult does not necessarily ameliorate the impact of childhood abuse.  The Warden's assertion to the contrary is rejected.

In general, the Warden defends Mr. Ellery's trial strategy as one which presented Turner's "self-worth."  Mrs. Turner testified at the penalty phase that Turner was a good son and an average student in school.  At the time of the crime, he was working and sharing his paycheck with his mother and younger sister.  His half-sister and cousin testified about Turner's non-aggressiveness.  Mr. Barber touched briefly on the abandonment by Turner's father, Turner's wish to have had a father like Mr. Barber, and Turner's helpfulness after Mr. Barber's heart attack.  Mr. Coleman testified about Turner's positive job evaluations, and Ms. Carter testified about Turner's family ties and non-aggressiveness.

---

[112] A detective-conducted interview of Mr. Turner, although not tape recorded or transcribed, was reported in Detective Strength's lengthy report.  EHT Exhibit 106: EH080.  Mr. Turner also reported to detectives he saw Turner on the day of the crime at 10 or 11 a.m. This recollection conflicts with all the other evidence presented about Turner's being present at Mr. Savage's house all day, until the fatal stabbing.

Citing California law, *In re Andrews*, 28 Cal. 4th 1234, 1256 (2002), the Warden argues at the time of Turner's trial, presenting more than good character and good deeds, including a lengthy presentation of witnesses describing in detail various aspects of the defendant's background would have been "atypical."

The Warden's argument lacks foundation for two reasons. First, although Mr. Ellery did present some very limited penalty phase evidence and argument of Turner's good character, paternal abandonment, and occupational responsibility, during his summation he emphasized the "uncertainties" presented by the case and the concept of the jurors' lingering doubt about Turner's intentions. He mentioned differences in the coverings on Mr. Savage's body from those described by Turner in his testimony. He mentioned the large quantity of personal property missing from Mr. Savage's house but never recovered. He mentioned the fact that there appeared to be some effort to wipe or mop up blood from the patio where Mr. Savage collapsed but no evidence of towels used for that purpose. He reiterated his guilt phase suggestion that these factors, together with the broken key in the front door, suggested that someone entered the house after Mr. Savage died and that this person was responsible for cutting the telephone cords as well as for taking the unrecovered property. To be sure, he mentioned the high regard family members, friends, and employers had for Turner. His concession about four "wrong" aspects of Turner's life, including the use of drugs, the prior robbery conviction, the prior receiving stolen property conviction, and Turner, himself, juxtaposed with the summary of this high regard was not a reasonable strategy for casting Turner in a positive light. It was disjointed, confusing and lacking in real mitigation value. Second, the Ninth Circuit has rejected the notion that a less demanding standard of performance existed in the 1980s when Turner's trial was conducted. In *Ainsworth v. Woodford*, 268 F.3d 868 (9th Cir. 2001), a penalty phase trial conducted in January 4 through 8, 1980, the court found:

> With the Supreme Court stressing the importance of the jury being able to consider the background and character of a defendant in order to assure the individualized sentencing required by the Eighth Amendment in a trial conducted in 1980, *a fortiari* it was the obligation of a defense attorney to present that evidence so the jury could consider it.

*Id.*, 871-72, 876-77. *See also Bean v. Calderon*, 163 F.3d 1073, 1080 (9th Cir. 1998) (rejecting similar argument to trial counsel's professional competence during a 1981 trial, noting that the finding of ineffectiveness arose from "inadequacies in rudimentary trial preparation and presentation" including

inadequate investigation and witness preparation); *Karis v. Calderon*, 283 F.3d 1117, 1125, 1134 (9th Cir. 2002) (trial counsel found constitutionally incompetent at trial conducted in September 1982 for inadequate investigation of petitioner's childhood, family situation, and serious abuse he suffered and witnessed his mother suffer). The notion that the standard for death penalty cases was merely good character and good deeds also is refuted by the May 1983 article authored by Gary Goodpaster about how defense attorneys should try a capital case. The Goodpaster article is cited by the Supreme Court in *Strickland*, 466 U.S. at 689-90, itself decided May 14, 1984. The article exhorts:

> the defense must attempt to show that the defendant's capital crimes are humanly understandable in light of his past history and the unique circumstances affecting his formative development, that he is not solely responsible for what he is. (Footnote omitted.) . . . Counsel's demonstration that upbringing and other formative influences may have distorted the defendant's personality or led to his criminal behavior may spark in the sentencer the perspective or compassion conductive to mercy. Thus, effective assistance of counsel in such circumstances entails at a minimum the attempt to gather and present at least some evidence of the defendant's background which might serve to explain the defendant's crimes and elicit a compassionate response from the sentencer.

Gary Goodpaster, "The Trial for Life: Effective Assistance of Counsel in Death Penalty Cases," 58 N.Y.U.L.Rev. 299, 335-36 (1983). Even earlier, in 1982, the Supreme Court held that evidence about a defendant's upbringing and turbulent family history is relevant to the individualized sentencing process in a death penalty trial. *See Eddings v. Oklahoma*, 455 U.S. 104, 115 (1982).

Mr. Ellery forfeited the opportunity for developing mitigation evidence about Turner's childhood abuse and dysfunctional, violent family life. He either didn't even think of developing background evidence, or, if he did, as the Warden argues, he inexplicably chose not to pursue it. Neither course is reasonable, especially since there was no downside to the admission of evidence about Turner's childhood victimization. To the extent Mr. Ellery presented a "self worth" theory, it was incomplete, at best, giving a distorted view of normalcy and non-violence in Turner's family. The investigation revealed nothing about Turner's violent home life as a child, the beatings, the alcoholism, the broken home, the broken windows, the frightening outings, or the subsequent abandonment and humiliation. Mr. Ellery did not conduct a sufficient investigation to explain the significance of all available mitigating evidence. *See (Terry) Williams*, 529 U.S. at 399; *Caro*, 280 F.3d at 1254.

### b.       Borderline Intellectual Capabilities

Despite many verifiable indications that his intellectual capabilities were depressed, Turner complains that the only person Mr. Ellery called to have testify about his intellectual abilities at the penalty phase trial was his mother.  Her testimony described him as a student who achieved good or average grades and had few problems in school (after being put in remedial class for a year).  Turner complains that for Mr. Ellery to have made him appear as normal, mainstream, and decent as possible, was unreasonable.  In contrast, as elicited at the evidentiary hearing by his sisters, Turner had difficulties in school and was always considered "slow."  Mr. Ellery did not recall investigating Turner's academic background, and although Mr. Brown did attempt to contact the former principal of Turner's high school, he never did make contact.  He also did not obtain any of Turner's school records.

The Warden argues that because the evidence of Turner's borderline intellectual capabilities actually was elicited from Dr. Hamm at the guilt phase proceedings, and the jurors were told during penalty instructions to consider *all* evidence received *during any part of the trial*, Mr. Ellery did not perform incompetently at the penalty phase by not reiterating that testimony.   While the Warden's argument has merit, the merit dissipates when considering Mr. Ellery's failure to explore fully Turner's borderline mental retardation with Dr. Hamm at the trial or even elicit Turner's actual IQ score.  The merit further dissipates because Mr. Ellery failed to investigate and corroborate Turner's marginal intelligence with anecdotal evidence and easily available school records.  Because "evidence of significantly impaired intellectual functioning is obviously evidence that might serve as a basis for a sentence less than death," *Smith v. Texas*, 543 U.S. 37, 44 (2004) (quoting *Tennard v. Dretke*, 542 U.S. 274, 288 (2004)), and "to perform effectively in the penalty phase of a capital case, counsel must conduct a sufficient investigation and engage in sufficient preparation to be able to present and explain the significance of all available mitigating evidence," *Mayfield*, 270 F.3d at 927 (internal quotation marks and brackets omitted), Mr. Ellery cannot be said to have conducted a reasonable investigation.  His strategy, if it was a strategy, to rely on evidence previously adduced at the guilt phase proceedings was not well informed.  *See Sanders*, 21 F.3d at 1456. The bare evidence of psychological test results discussed by Dr. Hamm at the guilt phase lacked the corroboration of the sisters' collective testimony that Turner was always "slow" in school and the documentation of his poor school performance in the

1   school standardized test records.  In any event a penalty phase strategy to rely solely on evidence

2   adduced during guilt phase proceedings is not reasonable when all relevant evidence has not been

3   brought forth to the jury.  Citing *Eddings*, 455 U.S. at 117, the Ninth Circuit decision remanding this

4   case noted that because *all* relevant mitigating evidence must be considered by the jury, the scope of trial

5   counsel's penalty phase investigation necessarily must be broader than that conducted during the guilt

6   phase.  280 F.3d at 891.

7          Alternatively, the Warden repeats his earlier argument that whether Mr. Ellery did or did not

8   consider conducting an investigation into Turner's academic background cannot be determined based

9   on Mr. Ellery's lack of recollection because of the lost trial file and accordingly the Court must presume

10  his representation was constitutionally competent.  Again, this line of reasoning requires the Court to

11  assume entirely too much.  If Mr. Ellery did take Turner's low intellectual functioning into account and

12  decided *not* to corroborate it or reiterate it during the penalty phase, his strategy at the very least is

13  puzzling and unexplained.  In light of the mitigating value of low intellectual functioning the Court

14  cannot assume that Mr. Ellery was reasonable in his decision not to more fully develop and present this

15  issue and to emphasize it as a mitigating factor during penalty proceedings.  As with the abuse and

16  family background issue, there was no down side to presenting the jury with evidence of Turner's

17  depressed intelligence beyond the testimony of his paid defense expert.

18          **c.      Drug Abuse and Drug Abuse History**

19          Turner argues Mr. Ellery's resolve not to present expert testimony to explain the effects of PCP

20  on an habitual user or anecdotal evidence to corroborate Turner's history of PCP use was myopic and

21  misguided.  He further maintains that the basis for Mr. Ellery's strategy was not supported by a

22  reasonable investigation required under *Strickland*, 466 U.S. at 691.  As Mr. Ellery testified at the

23  evidentiary hearing, he felt drug evidence would have been harmful to Turner's credibility and to the

24  case in general.  Thus, he wanted "to minimize the whole PCP episode" so as not to detract from the

25  "primary defense of resistance to homosexual advances."   Yet, an intoxication defense was the main

26  event at the guilt phase.

27          The Warden maintains that in spite of the lost trial file and Mr. Ellery's lack of memory about

28  this case, the Court must assume that Mr. Ellery conducted a reasonable investigation into Turner's

history of drug abuse, and followed this investigation with a strategic decision not to present further drug evidence beyond Turner's account.  In support of the Warden's premise, he points to demonstrative examples in the record, including Mrs. Turner's statement to Merced detectives that Turner had a problem with PCP together with her description of a PCP episode Turner experienced, Lewis Coleman's statements to Detective Mayer about Turner having trouble with PCP three weeks prior to the crime, and the statement of friend Sandra Goodman that Turner probably used PCP.[113]  Mrs. Turner also testified at the evidentiary hearing that she believed she told Mr. Ellery about Turner's drug problem before the trial.  Mr. Ellery recalled in his testimony that someone connected to the family (i.e., Lewis Coleman) had negative feelings about Turner's drug use and also of being told that Turner became violent when he used PCP.  The Warden maintains that Mr. Ellery consciously and reasonably stayed away from the subject of PCP to avoid having Turner's family testify about his violence while under its influence.  In any event, although Mr. Ellery conceded at the evidentiary hearing that in retrospect he believed Turner's PCP abuse should have been explored, the Warden stresses that this type of "hindsight" is proscribed under *Strickland*.  *See* 466 U.S. at 689.

The gravamen of the Warden's argument is that since information about Turner's drug intoxication on the night of the crime already was presented at the guilt phase, and the jury clearly rejected it, Mr. Ellery was reasonable not to reprise this evidence at the penalty phase.  The Warden recounts Dr. Hamm's guilt phase testimony which detailed the circumstances leading to the crime and included his professional opinion about the interaction of Turner's low native intelligence, Mr. Savage's real or perceived sexually aggressive behavior, and Turner's use of PCP in contributing to Turner's resort to senseless and overdone violence to repel the perceived attack.  He emphasizes that the instructions forbade the jurors from finding a robbery unless they determined Turner had formed the intent to steal before he used force against Mr. Savage.  The Warden surmises that Mr. Ellery believed that because the jury convicted Turner of robbery under this instruction, it would have been useless or even detrimental to raise the issue of PCP again.  In making this argument, the Warden assumes that

---

[113] The Warden also refers to the statements of Oweida Turner to detectives that she didn't know whether Turner used drugs or PCP and statements of cousin Kathryn Carter that Turner didn't use drugs to her knowledge and did not ever come to her house "high."  These references do not support the notion that Mr. Ellery was aware of anecdotal accounts of Turner's drug use.

PCP intoxication always would be considered negative in Merced County given the description of its residents as conservative by Mr. Hallford, Detective Strength, Detective Mayer, and Mr. Ellery. He cites *Wade v. Calderon*, 29 F.3d 1312 (9th Cir. 1994), *abrogation on other grounds recognized by Rohan ex rel. Gates v. Woodford*, 334 F.3d 803, 815 (9th Cir. 2002), for that precise proposition. *Wade* in fact did hold that the trial attorney's decision not to use evidence of PCP during the guilt phase proceedings was reasonable because the jury likely would have viewed it in a negative light. *Id*. at 1318-19. *Wade*, however, is distinguishable from Turner's case for the reason that in *Wade* there was no evidence the petitioner ingested PCP on the day of the offense. *Id*. at 1319. A more apt analogy is presented in *Mayfield*, 270 F.3d 915. There, the Ninth Circuit found trial counsel ineffective for not developing evidence of Mayfield's PCP use and toxicity during penalty proceedings. *Id*. at 928. Although the attorney's error in *Mayfield* was to have stipulated mistakenly that drug test results were negative for PCP (as well as failing to develop evidence of Mayfield's childhood-onset diabetes and complications), the result was similar, that is, Mayfield's description of his PCP use to the testifying mental health expert was discounted for lack of corroboration. While no one argues that using PCP is a good thing, once Mr. Ellery decided to elicit evidence of Turner's intoxication on the day of the crime, corroborating Turner's chronic PCP use and dependence was imperative. Lay witness sources for this corroboration were readily available.

Putting aside corroborating anecdotal evidence from friends and family members, the Warden discounts corroboration through empirical testing of Turner's blood. Echoing Mr. Hallford's penalty phase summation, the Warden contends that the .44 mg/L and .20 mg/L PCP blood level test results also would have been unavailing for Turner because of the six-day lapse of time between the crime and the blood draw and Turner's admitted intervening PCP use. All the testifying experts, Dr. Terrell, Dr. Hamm, and Dr. Jones, agreed it was impossible to determine how much PCP was in Turner's system on the night he killed Mr. Savage. The Warden also raises the issue of Turner's voluntary drug use despite objections and warnings from family members and friends about his violent behavior during PCP intoxication.

The Warden advances valid points. Turner was a compulsive, chronic user of PCP. The record is clear that he used PCP after the crime, including on the day of his arrest. No one will ever know what

his blood PCP content would have measured on the night he stabbed Mr. Savage. His possession and use of PCP was illegal as well as dangerous. The dangers of PCP and the fact that Turner was addicted to using it, however, did not justify Mr. Ellery's inconsistent approach to Turner's defense. To present an intoxication defense in tandem with resistance to sexual advances by the victim, without any corroboration for the PCP intoxication and minimal support for Mr. Savage's sexual aggression, was not reasonably tactical. Although, as discussed below, it is not certain how much persuasive corroboration Mr. Ellery could have presented of Mr. Savage's aggressive sexual behavior, he certainly did have at his disposal anecdotal evidence and the means to obtain scientific empirical evidence to corroborate Turner's chronic PCP use. The fact that Turner voluntarily used a dangerous drug that caused him to act aggressively was an issue Mr. Ellery should have been prepared to meet. But the negative facts about PCP did not excuse Mr. Ellery from fully investigating and supporting the intoxication defense he did employ. There was no reasonable investigation or strategy supporting the decision to "minimize the whole PCP episode." *See Sanders*, 21 F.3d at 1456. At the penalty phase, even Mr. Hallford conceded that if Turner had been under the influence of PCP at the time of the crime, that would have been a factor for the jury to consider in mitigation of his sentence, despite the voluntary use. The PCP use may well have explained to the jury why the defense theory of the case was consistent with the Turner's actions in committing the crime (the excessive number of wounds) and immediately afterwards (stealing the television yet leaving the jewelry). Contrary to Mr. Ellery's fears, Turner's chronic drug use and the reasons therefor, were valid mitigating factors that could and should have been presented at the penalty phase.

As a kind of afterthought, the Warden suggests that evidence of Turner's intoxication on the day of his arrest would have led the jury to infer that he disposed of the other unaccounted for property missing from Mr. Savage's house in order to purchase more PCP. This argument lacks merit. First, and foremost, there is nothing in the record to suggest that Mr. Ellery conceived of this notion. The Warden is speculating about another potential reason Mr. Ellery might have thought of to justify his failure to conduct an adequate investigation. Second, the argument overlooks the argument Mr. Ellery did make during the penalty phase summation, about the uncertainties surrounding various aspects of the crime. This includes uncertainty that Turner would have had the ability or presence of mind to load the

considerable quantity of unaccounted for property – property which included a full-size stereo and full-size speakers, cassette tape and miniature speakers, a second stereo system, two glass end tables, several statues, and most of the clothes from Mr. Savage's closet – into Mr. Savage's Cadillac, given that the upstairs television already was in the trunk.

### d.    Mr. Savage's Sexual Practices

In remanding this case for an evidentiary hearing, the Ninth Circuit suggested that Turner may have been especially susceptible to sexual predation due to sexual victimization he experienced during prior incarcerations.  281 F.3d at 894.  Evidence to this effect previously was determined by the Court to contain so much hearsay and to lack foundation that it was unreliable.  April 27, 1999 Ord., pp. 59-60. No evidence recounting past sexual victimization of Turner was proffered at the evidential hearing.  To the contrary, Dr. Terrell and Dr. Hamm both reported that Turner had *not* been sexually victimized in prison, although Dr. Terrell testified that Turner had been fearful of being sexually attack and did not want to contract herpes, AIDS, or tuberculosis.  Mr. Savage's sexual practices, both his homosexuality and his sexual aggressiveness, however, were explored as part of the evidentiary hearing.

In particular, Mr. Ellery was asked about his trial strategy, that being Turner's resistance to Mr. Savage's sexual advances.  The Court received testimonial evidence from trial investigators Mr. Brown and Mr. Roberts of their efforts to find homosexual partners of Mr. Savage and former tenants with knowledge of his sexual practices.   Mr. Roberts also investigated the high odometer reading on Mr. Savage's new Cadillac in an attempt to tie that fact in with his alleged homosexual lifestyle.  Similarly, the unsworn statements of Mr. Ellery indicated that he and Mr. Barnett found matchbooks and credit card receipts at Mr. Savage's house consistent with a homosexual lifestyle. The interview tape of Detective Strength also reveals that authorities considered this to be a "sex crime."   Finally, the suspicion that Mr. Savage offered Turner employment as a casual laborer for sexual purposes was harbored and expressed by Dr. Hamm at his deposition as well as by Dr. Terrell during his evidentiary hearing testimony.  Both experts felt Mr. Savage's conduct in driving all the way to Fresno from Merced so Turner could perform yard work at his house indicated he (Mr. Savage) was seeking Turner out for sexual purposes.  Dr. Hamm found that Mr. Savage's indulgence in supplying Turner with alcohol, letting Turner play video games, having Turner accompany him while he ran errands, and buying clothes

for Turner also was extremely solicitous and seductive.  Dr. Terrell testimony that Turner's pre-existing homophobia, exacerbated by the PCP he consumed and the stressful situation, was a factor in the killing. During the evidentiary hearing, the Warden spent a considerable effort in developing the notion that Turner's brutality in stabbing Mr. Savage stemmed from his homophobia, as a general proposition, and not induced by PCP.  Neither expert agreed with the Warden that PCP was not a factor.

Turner complains that Mr. Ellery failed to develop or present meaningful evidence to corroborate Turner's story about Mr. Savage's sexual advances.  As to the evidence Mr. Ellery did develop, no effort to enter the matchbooks, credit card receipts, or the high odometer reading of Mr. Savage's Cadillac into evidence is reflected in the record.  Turner, however, does not emphasize these omissions.  Nor does Turner advance any argument about whether Drs. Hamm and Terrell would have been available to testify at the time of trial as they did at the evidentiary hearing proceedings about Mr. Savage's behavior, or whether the trial defense investigators would have been qualified to offer testimony consistent with Detective Strength's interview statement that Mr. Savage's death was a "sex crime."[114]  The only bits of evidence Mr. Ellery did offer at the trial to corroborate Turner's account of Mr. Savage's sexual advances included a telephone index found by Greg Mayo, Grey Mayo's testimony that Mr. Savage often left town to go to San Francisco or Fresno and did not disclose his purpose in these excursions (while he did provide details when he visited friends and family members), the testimony of bartender Jay Bradshaw that Mr. Savage patronized a gay bar in Fresno, and testimony from the pathologist, Dr. Murdock, about semen at the tip of Mr. Savage's penis and his looser than normal sphincter.

This evidence turned out to be unpersuasive to corroborate Turner's defense theory that Mr. Savage was sexually predatory and aggressive.  The findings of Dr. Murdock, in particular were not compelling, since he testified that ejaculation often can occur at death, and the fact of or possible reasons for Mr. Savage's looser than normal sphincter were not explored at all.  With respect to the telephone index, the out of town trips, and Mr. Savage's patronage at a gay bar, they may have suggested a homosexual lifestyle, but did not establish predatory or aggressive sexual behavior. Just as Mr. Hallford

---

[114] Dr. Hamm's deposition testimony did refute one of the Warden's themes on the issue of the sexual aspect of the crime.  That is Dr. Hamm didn't think Turner's past boastfulness to family members he would "take care" of anyone who came on to him sexually while he was incarcerated was significant, because, in fact, Turner did put up with quite a bit of Mr. Savage's sexual conduct before reacting.

1    discredited Turner's account of having been under the influence of PCP, he also completely discounted

2    Turner's description of Mr. Savage's sexual overtures, calling it concocted and unbelievable.   Turner

3    argues that if resistance to sexual advances was the primary strategy, Mr. Ellery should have presented

4    the testimony of Betty Means (Tavares) or other people (Joyce Slaton) with knowledge of Mr. Savage's

5    predatory sexual behavior and intimidating demeanor.

6         The Warden counters that Mr. Ellery was not constitutionally deficient for not discovering Mr.

7    Savage's alleged homosexuality and sexual aggression, because nothing in his reasonable investigation

8    (and that of Messrs. Brown and Roberts) put him on notice of the existence of these factors.   Referencing

9    the 1994 declaration and 2003 interview of Betty Means (Tavares), the Warden argues that because she

10   testified she had not wanted to get involved in denigrating Mr. Savage's name at the time she was

11   interviewed by Turner's attorney in 1994, Mr. Ellery cannot be faulted for not developing her testimony

12   in 1984.   Separately, the Warden suggests that Turner stabbed Mr. Savage to death because he was

13   homophobic, as a general proposition, and not as a result of his PCP use or intoxication.   Dr. Terrell's

14   findings support the notion that Turner had homophobic tendencies.   First there was the fight with

15   Dexter Barber over Dexter's name calling Turner and his cousin Phillips "faggots."   Next, Turner

16   relayed to Dr. Terrell about his having developed a fear of sexual attacks when he was at CYA.   Third,

17   he also told Dr. Terrell he was especially fearful of contracting Herpes or AIDS.

18        Taking into account all of the evidence and assertions about the sexual nature of the crime, the

19   Court is persuaded that Mr. Ellery's strategy, investigation, and defense were constitutionally deficient.

20   Mr. Ellery's suggestion to Mrs. Turner that he didn't want to expose Mr. Savage's homosexuality to

21   preserve his own status in the community, falls short of his duty as defense counsel.   The fact that Mr.

22   Ellery and Mr. Barnett, both attorneys, conducted an investigation at the crime scene, without an

23   investigator, or a way to introduce the matchbooks and credit card receipts is equally troubling.   Given

24   Dr. Hamm's and Dr. Terrell's testimony at the evidentiary hearing, the Court cannot defer to Mr. Ellery's

25   failure to develop expert testimony on the sexual aspects of the case, at least in terms of Turner's

26   perceptions or misperceptions.   The failure of the defense team to come up with witness testimony like

27   that provided by Betty Means (Tavares), however, does not appear to be deficient.   As the Warden notes,

28   Ms. Means (Tavares) informed the State investigator and deputy attorney general representing the

Warden that she didn't really want to get involved. While it is true that she gave quite a bit of descriptive information about her past experiences with Mr. Savage, there is no evidence that she would have been available or willing to testify in 1984. Similarly Ms. Slaton's declaration does not affirm her availability or willingness to have testified in 1984. Finally, Mr. Ellery specifically testified at the evidentiary hearing that he did not recollect or know that Detective Strength thought the stabbing of Mr. Savage involved a "sex crime" and there is nothing to suggest that Detective Strength would have conveyed that sentiment.

The record establishes that Mr. Ellery had more evidence about Mr. Savage's sexuality available to him than he presented and, if Mrs. Turner's testimony is to be believed, his motives for not presenting this evidence were self-serving. Although the evidence developed at trial and at the evidentiary hearing regarding the sexual aspects of the crime may not have been as persuasive as evidence of Turner's childhood abuse, borderline mental retardation, or PCP use, it *was* available. The most compelling aspect of Mr. Ellery's deficient performance respecting Mr. Savage's sexual practices isn't his failure to have developed more persuasive evidence about these sexual aspects, but rather his continued and indefensible adherence to Turner's sexual advance resistance defense strategy when he could not or would not substantiate it. A reasonable attorney would have adjusted the trial strategy to theories that could be substantiated, like childhood abuse, borderline mental retardation, and PCP intoxication. In the alternative, he would have substantiated the chosen theory.

### 2.    Prejudice

In the Ninth Circuit opinion remanding this case for an evidentiary hearing, the court states:

> At the guilt phase Mr. Ellery was trying to establish lack of premeditation and intent as a defense, while at the penalty phase Mr. Ellery should have been trying to make Turner seem less culpable and therefore more deserving of life. Not only did Mr. Ellery fail to question Turner's mother, half-sister, and cousin, all of whom he called to testify at the penalty phase, about Turner's drug use, he also failed to question them about whether Turner's father was abusive toward his children or whether there was any history of substance abuse in the family. In sum, Mr. Ellery did nothing to demonstrate that Turner's actions were influenced by his early childhood.

281 F.3d at 894.

The prejudice prong under *Strickland* requires a showing of a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable

probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694. *(Terry) Williams* clarifies that a reasonable probability is a lower standard than a preponderance of the evidence. 529 U.S. at 405-06. Assessing prejudice requires reweighing the "evidence in aggravation against the totality of the available mitigating evidence." *Wiggins*, 539 U.S. at 534; *(Terry) Williams*, 529 U.S. at 397-98.

In comparison to the evidence developed and presented during the evidentiary hearing, the background information presented at the penalty phase trial was general and superficial. Turner's mother testified of a relatively stable home life, that his sisters had no trouble with the law, that after a year in a remedial reading class, Turner was an average to good student in high school, and that Turner paid his mother and young sister, a portion of his weekly salary. His half-sister, Lisa Haynes, testified he was shy, quiet, and not known for violent behavior at school. His cousin, Kathryn Carter similarly testified about his lack of aggression and his positive relationship with her young sons. Neighbor Lewis Coleman testified in his capacity as a "job developer" for Turner, emphasizing Turner's positive job performance reviews. The only truly sympathetic evidence was elicited from neighbor Elijah Barber, but only briefly. Mr. Barber mentioned the abandonment by Turner's father of his family while providing for the children of his girlfriend in the same neighborhood. Mr. Barber also noted Turner expressed that he wished he had a father like Mr. Barber. Finally, Mr. Barber explained how Turner helped him with his yard work after suffering a heart attack. Even with Mr. Barber's brief sympathetic testimony, the result of Mr. Ellery's failure to conduct a thorough investigation, was the presentation of a sanitized version of Turner's life with no explanation of his turbulent childhood, severe intellectual limitations, or dependence on PCP, and very little information about Mr. Savage's lifestyle and conduct which might have corroborated Turner's story of resistance to a sexual attack.

In contrast with this benign portrait, Turner's childhood and upbringing was chaotic. He was the product of a marriage between two people who fought constantly, verbally and physically. His mother succumbed to listlessness and depression. His father resorted to alcohol and dangerous behaviors, including drunken family excursions. Turner's sisters and his cousin Kathryn Carter recounted the dangerous rides in the circular driveway of a parking structure and on country roads as well as outings to open irrigation canals with rushing water. His father was volatile, irrational and cruel

in his treatment of Turner.   Turner was singled out by his father for cruel treatment.  Mr. Turner's declaration is direct evidence that he was familiar with martial arts and effective ways to cause pain. The declaration supports the factual scenario that when Mr. Turner was trying to teach his son how to defend himself or to fight, he went overboard, and consistent, with the testimony of Turner's sisters, punched Turner in the stomach to make the child fight back.  With respect to punishment, Mr. Turner's declaration gives more dimension to the testimony at the evidentiary hearing of the tumultuous childhood Turner experienced.  Mr. Turner's description of how his fist and middle knuckle were his "primary weapons" in performing martial arts augments the testimony Turner's sisters gave of his "thumping" Turner's head.  Finally, the fact that Mr. Turner spoke of soaking a leather belt in kerosene in order to render a subsequent whipping more painful relates to the sisters' and cousin's testimony about the whippings Mr. Turner inflicted on Turner with a razor strap in the garage of the family home.[115]  Then, the father abandoned the family for a woman and her children in the same neighborhood. Turner's sisters testified about the humiliation they experienced as a result of knowing that their father provided for his girlfriend's children, but not for his own.  Had Turner's sisters, cousin, and mother been prepared and had testified about his family background, Dr. Hamm would have been able to explain that the physical abuse Turner endured was consistent with his anti-social (criminal) behavior and drug abuse as an adult.   Similarly, Dr. Terrell could have offered the opinion that children raised in abusive environments are known to replicate the same behavior in later life and that abused children are at an increased risk for using drugs as adults.  Dr. Terrell could have added that the disproportionately harsh physical and emotional  treatment Mr. Turner reserved for his son had long term effects and factored into Turner's response to Mr. Savage on the night of the crime.  All of the foundational evidence for these opinions was readily available at the time of trial.  Analogizing his case with *Bean v. Calderon*, 163 F.3d 1073, 1078 (1998), Turner argues that the snapshot of him at the trial as normal, mainstream, and decent missed the mitigation evidence of his father's sadistic and drunken punishment, his borderline intellect, and his decline into PCP abuse.

---

[115] There is no suggestion in the record that Mr. Turner ever soaked the razor strap he used on Turner in kerosene.

The Warden argues the childhood abuse and parental discord were of negligible importance for a number of reasons.  First the suggestion in Dr. Terrell's testimony that children who are abused are at risk of replicating the same abusive behavior as adults draws a false analogy.  Turner did not thump Mr. Savage, or beat him with a razor strap, or punch him in the stomach.  Using a buck knife, he stabbed Mr. Savage to death.  Second, Mr. Turner's abuse occurred during a limited time-span of Turner's life from age five or six to age ten when Mr. and Mrs. Turner separated.  Even acknowledging that the thumping periodically continued until Turner was in the ninth grade, the razor strap beatings, karate punches, as well as the frightening automobile and irrigation canal excursions ceased.  Third, even while Mr. Turner was in the home and perpetrating abuse on Turner, Turner was not abandoned by his family.  Mrs. Turner remained loving and attentive, nurturing him in the home and supporting him in school.  Two cousins mentioned in the proceedings, Phillip Haynes and Kathryn Carter as well as Turner's maternal grandmother also nurtured Turner.  Fourth, once Mr. Turner moved out, Turner had Elijah Barber as a father role-model, developing a father-son-like bond.  Fifth, the Warden minimizes the parental fighting to only three "really bad physical fights," only two of which Turner would have been old enough to have remembered.  Sixth, the Warden points to Turner's three (full) sisters, who all witnessed the same parental discord and were comparably subjected to physical abuse from Mrs. Turner, yet they did not turn to a life of drugs, rob anyone, or murder anyone.  Elizabeth, in particular was "knocked around" by Mrs. Turner in what the Warden characterizes as a similar manner Turner was abused by Mr. Turner.  Further though the sisters used marijuana, they all stopped using this drug in their early twenties.  Seventh, Turner apparently reconciled and renewed his relationship with his father well before the crime.  The Warden posits that based on the renewed father-son relationship, a reasonable trier of fact would have discounted any residual traumatic effect of the prior abuse.  Eighth, because Ms. Carter's testimony at the evidentiary hearing indicated that in 1984 she didn't appreciate that the beatings Turner received at the hands of his father constituted abuse, Turner's jury also would not have considered to have been abusive.

The Warden's argument overlooks the importance placed on evidence of a troubled childhood by the Supreme Court and the Ninth Circuit.  *Wiggins*, 539 U.S. at 535 (the omission of severe physical and sexual abuse was prejudicial); *(Terry) Williams*, 529 U.S. at 398 (the omitted evidence of

petitioner's abusive and deprived childhood, together with other factors undermined the jury's death sentence); *Correll*, 539 F.3d at 944 (evidence of drug abuse and a troubled childhood constitute "classic mitigation evidence"); *Lambright v. Schriro*, 490 F.3d 1103, 1123 (9th Cir. 2007) (constant emotional and physical abuse was mitigation evidence that should have been presented); *Frierson v. Woodford*, 463 F.3d 982, 987 (9th Cir. 2006) (presentation of a normal rather than an abusive childhood contributed to finding ineffective assistance of counsel).  The fact that much of the abuse and dysfunctional family dynamics occurred when Turner was a child also does not render it irrelevant.  *See Wiggins*, 539 U.S. at 535 ("Wiggins experienced severe privation and abuse in the first six years of his life").  Similarly, the fact that Turner had a positive relationship with his mother and Elijah Barber did not negate the effects of child abuse perpetrated by his father.  The abuse he suffered was consistent with his later anti-social behavior and drug use.  Next, nothing before the Court suggests that evidence of later contact and reconciliation between Turner and his father ameliorated the effect of childhood abuse.  Turner's decision not to estrange his father as an adult does not demonstrate immunity to the damage caused when he was a child.  The Warden's argument that Turner's three sisters, although raised in the same environment did not turn to a life of crime as he did, is unpersuasive for minimizing the impact of Turner's background.  While the sisters graduated from college and testified about their respective regular and gainful employment, they were fortunate to have well-above average intellectual abilities. There also was a qualitative and quantitative difference in the father's treatment of Turner versus the sisters.  Evelyn summarized the manner in which Turner was singled out by their father for unreasonable and harsh punishment.  Elizabeth described that Turner was the only one of the children punished for minor transgressions when all the children were misbehaving.  Finally, as noted in the discussion of deficient performance, Part IV.B.1.a., *supra*, the fact that Ms. Carter failed to recognize Mr. Turner's treatment of his son as abusive in 1984, is irrelevant.  Mr. Ellery would (or should) have recognized it as such and he could have put those facts before the jury.

Evidence of Turner's learning disabilities is before the Court from a variety of witnesses and documentary evidence. Lay testimony confirmed that Turner was a slow learner, had difficulties in math and reading, and was placed in remedial classes at school.  School records confirm special education, vocational training, and many low marks in his course work throughout his school career.  Dr. Hamm's

deposition testimony explained in detail Turner's scores on the WAIS, the MMPI, and the Rorschach tests, all of which tests were administered pre-trial. In particular, Dr. Hamm stated Turner's overall IQ was 80 and his verbal IQ was 79 (with an average IQ score being 100). At the guilt phase summation, Mr. Ellery went so far as to argue that Turner was of low-average intelligence, ill-equipped to handle stressful situations, and submissive. He did not, however, elicit from Dr. Hamm specific test results for the WAIS. The testimony Mr. Ellery did elicit was limited to comments about Turner's limited problem solving abilities. The jury didn't know Turner's IQ score, didn't know he was placed in special education in elementary, junior, and senior high school, and didn't know that when he graduated from high school, standardized tests showed that he was functioning at a 6.6 grade level. At his deposition, Dr. Hamm explained that Turner was in the borderline mentally retarded range and would have been intellectually deficient in his problem-solving abilities. Even Dr. Glenn's report (offered by the Warden) regarding Turner's 1979 juvenile arrest in Madera County noted that Turner had difficulty in school and had been placed in remedial classes. Dr. Glenn also was impressed by the fact that although Turner returned to regular classes in high school, he went to vocational school to learn a trade. Instead of highlighting his intellectual problems and how they could explain physical evidence and verbal testimony, Mr. Ellery stressed Turner's normalcy and average grades.

The Warden relies on *Williams v. Calderon*, 52 F.3d 1465, 1471 (9th Cir. 1995), for the proposition that since this evidence was presented during guilt proceedings, there is no prejudice for not repeating it during the penalty proceedings. This argument dovetails with the Warden's argument regarding Mr. Ellery's performance. The Warden points out that Dr. Hamm testified Turner was a person with "slightly below average intellectual abilities" with "a lesser capacity than the average person or people . . . to solve problems, to handle unique and novel problems, situations." He explained that Turner tested in the 30th percentile for intelligence. He was mentally dull and a man of "low native intelligence." In addition to confirming his lack of intelligence, testing also demonstrated Turner's lack of creativity. At trial Dr. Hamm opined that Turner's low intelligence exacerbated the effect of the PCP and alcohol he consumed on the day of the crime such that his mental state was highly disorganized. On cross examination Dr. Hamm commented that Turner's low IQ score was consistent with his crime

1  because people with lower intelligence tended to utilize more of a physical than a mental approach to

2  problems.

3      The Warden's argument about lack of prejudice falls short.  Although Mrs. Turner's penalty

4  phase testimony mentioned the fact that Turner had been in a remedial reading class for a year and Dr.

5  Hamm's guilt phase testimony gave quite a few details on the subject of Turner's low intelligence, Mr.

6  Ellery said nothing about Turner's intellectual functioning during his penalty phase summation.  He

7  didn't tell the jurors Turner's low intelligence was a factor they were to consider in their deliberations.

8  The fact that the trial judge instructed the jury to consider all the evidence presented during the guilt

9  phase as well as during the penalty phase wasn't particularly helpful, since Mr. Ellery's penalty phase

10  summation did not emphasize Turner's character or background.  To have made Turner's background

11  and lack of intelligence real issues for the jury to consider, Mr. Ellery needed to mention them.  Turner's

12  low intelligence and inability to cope with difficult situations was evidence in mitigation of the death

13  penalty.  *Smith v. Texas*, 543 U.S. 37, 44 (2004) (petitioner's IQ scores and history of participation in

14  special education classes might well have been considered as a reason to impose a sentence more lenient

15  than death); *Wiggins*, 539 U.S. at 523, 535 (IQ score of 79 constitutes relevant mitigation evidence)

16  (cited by *Smith*, 543 U.S. at 44).  Had Mr. Ellery presented this information to the jurors along with the

17  other available but omitted information, there is a reasonable probability that the outcome of the penalty

18  phase would have been a life without parole rather than a death sentence.  *See Harris by and through*

19  *Ramseyer v. Wood*, 64 F.3d 1432, 1438 (9th Cir. 1995) (prejudice may result from the cumulative impact

20  of multiple deficiencies) *cited by Silva v. Woodford*, 279 F.3d 825, 836 (9th Cir. 2002)

21      An effort to have developed and presented corroborating evidence of Turner's PCP dependence

22  and history also would have provided a significant mitigation effect. Family members, especially

23  Turner's mother, and friends were aware of his drug dependence.  They were concerned for Turner

24  himself and also for the fact that he exhibited bizarre, violent behaviors when under the influence of

25  PCP.  He was observed in the throes of one such episode a few weeks before Mr. Savage's death.  A

26  sample of Turner's blood drawn four days after his arrest (six days after the crime) and tested for the

27  presence of PCP over eight years later showed very high levels of PCP (.20 mg/L by the Department of

28  Justice Laboratory and .44 mg/L by California Toxicology Services). Turner testified he smoked PCP

and marijuana before Mr. Savage arrived early in the morning on April 14, 1984, at which point he described himself as "pretty gone." After working a short time in Mr. Savage's backyard, Turner took a break and then smoked more PCP. Upon being invited into the house, he drank three or four brandies while chatting with Mr. Savage about his prison experience and past drug use. After the first reported sexual overture by Mr. Savage, and before the stabbing, Turner smoked more PCP. Dr. Hamm gave considerable testimony about the deleterious effects of PCP. Based on Turner's low native intelligence, his historical and current PCP use, together with his description of the events leading to the stabbing, Dr. Hamm testified at the guilt phase that Turner was mentally impaired, confused, nearly hysterical, dissociating, and borderline psychotic at the time of the crime.

In the absence of corroboration, however, Mr. Hallford strongly suggested that Turner had *not* used PCP on the day of the crime during his cross examination of Dr. Hamm. Mr. Ellery's omission provided Mr. Hallford the opportunity to eviscerate the entire premise of Dr. Hamm's testimony. Dr. Coleman then further discredited the significance of Dr. Hamm's testimony by characterizing it as misleading, unreliable, and irrelevant. Mr. Ellery's failure to present corroborating, anecdotal evidence as well as empirical scientific test results from the blood Merced authorities collected from Turner, was especially damaging to Turner's mitigation case given the fact that very little evidence was presented to support Turner's primary defense of resistance to actual or perceived sexual advances. Moreover, Mr. Ellery did nothing to rehabilitate Dr. Hamm's credibility after Dr. Coleman discounted his opinions as worthless. At the time of his trial testimony, Dr. Hamm was on the Merced Superior Court panel of mental health experts designated to evaluate insanity and competence for the court. He had performed hundreds of such evaluations prior to his testimony in Turner's case. At trial, however, Mr. Ellery elicited only that Dr. Hamm was a licensed psychologist and had prior testimonial experience.

Mr. Ellery's penalty phase case also completely glossed over Turner's PCP intoxication. Turner's mother testified that Turner might have used the remains of his salary he did not give to her or his younger sister for drugs. Mr. Ellery mentioned in summation that Turner was using "some kind of intoxicant." He did not tell the jurors that Turner's intoxication at the time of the crime would have been mitigating. Even Mr. Hallford, although he earlier discounted the notion Turner was under the influence

of PCP at the time of the crime, during his penalty summation, told the jurors that if Turner had used PCP, that fact probably would have been mitigating.

Corroboration for Turner's PCP use was readily available, as Mr. Ellery's evidentiary hearing testimony indicates. Foundational information from Turner's mother, three sisters, former girlfriend, friends, and neighbors would have substantiated Dr. Hamm's opinion about how PCP affected Turner the night be stabbed Mr. Savage. Further testimony, of the kind elicited from Dr. Terrell at the evidentiary hearing that people subjected to childhood abuse often turned to drugs as adults, also would have been quite helpful. Like Dr. Hamm, a psychologist, Dr. Terrell, a psychiatrist, explained that PCP was known to cause paranoia, and specifically, homophobic paranoia. Had Mr. Ellery conducted a reasonable investigation he could have offered evidence that Turner's violent childhood propelled his drug abuse and that the effects of PCP caused him to overreact to Mr. Savage's real or perceived sexual aggression. "[D]efendants who commit criminal acts that are attributable to a disadvantaged background or to emotional and mental problems, may be less culpable than defendants who have no such excuse." *Boyde v. California*, 494 U.S. 370, 382 (1970). The facts of Turner's his case are comparable with those presented in *Karis*, 283 F.3d 1117, where the Ninth Circuit found that trial counsel failed to investigate and develop mitigation evidence about Karis's serious and horrific childhood abuse and poverty. The court concluded that this undeveloped evidence amounted to "crucial information" consequently withheld "from the jury faced with sentencing Karis to life or death." *Id*. at 1135.

An expert on the psychological effects of drugs and alcohol, including PCP, like Dr. Pittel, also could have been called to explain that Turner's behavior on the day of the crime was consistent with PCP intoxication and chronic PCP abuse. Dr. Pittel found indications that Turner's ability to think clearly, exercise appropriate judgment , and to conform his behavior to the requirements of law were impaired. This opinion was influenced by the circumstances of the crime, from Turner's description as well as from the police reports.

Similarly, Dr. Hamm particularly was impressed by the number and depth of the stab wounds, the high level of PCP tested in Turner's blood, Turner's irrational acts after Mr. Savage died, and Turner's lack of historical violence prior to the crime (at least when he was free of the influence of PCP). The focus on Turner's irrational conduct also was the corner stone of Dr. Hamm's evidentiary hearing

1   testimony.  The "overdone" manner in which the crime was committed was consistent with PCP-induced

2   psychosis.  He believed the stress of the situation, with Mr. Savage portraying both a benevolent and

3   abusive authority figure, showing generosity and demanding sex, contributed to Turner's loss of control.

4   Dr. Hamm found that the stress of the circumstances also influenced Turner's description of the crime.

5   While he described the events of the day of the killing in detail, when he reached the point in time when

6   Mr. Savage began urging Turner to have sex with him and the stabbing itself, the description of the

7   events was not detailed, but rather was confused and disorganized.   Dr. Hamm opined that if Turner's

8   intent had been to commit a theft, he would have taken what he wanted and then left as soon as possible.

9   He wouldn't have taken the time to cover Mr. Savage's body or argue with himself over whether or not

10  to steal Mr. Savage's jewelry.  Among other factors, Turner's failure to take any cash from Mr. Savage

11  impressed Dr. Hamm.  Dr. Hamm's opinion was not influenced by the fact that Turner drove back to

12  Fresno from Merced.  There was no evidence about the directness or indirectness of the route Turner

13  followed or how much time it took him to make the trip.

14          The Warden's expert, Dr. Jones, also agreed, based on anecdotal evidence, that Turner had "some

15  type of PCP problem" and was an habitual user.  However, Dr. Jones did not believe Turner's use of

16  PCP necessarily would have lead to or caused his violent behavior.  As Dr. Jones explained, PCP was

17  an anesthetic that had a tranquilizing and relaxing effect on the user, as exemplified by Turner himself

18  throughout the day before the stabbing.  Dr. Jones disagreed with Dr. Terrell's conclusion that PCP

19  could exacerbate the paranoia of a homosexual attack because of its anesthetic properties.  He opined

20  that PCP actually would have decreased the likelihood of homophobic behaviors, concluding that at the

21  time of the crime, that Turner was able to weigh consequences, plan a course of action, and carry out

22  specific goals.  Dr. Jones also highlighted the fact that in 1984, when the crime and Turner's trial

23  transpired, PCP addiction, dependence, and withdrawal were non-issues since Dr. Jones did not believe

24  the DSM-III, which was the "Bible" at that time, included PCP dependence as a diagnosis.

25          Turner's PCP intoxication evidence is not completely one-sided in Turner's favor.   Both Dr.

26  Hamm's and Dr. Terrell's findings reflected the potential for conflicted conclusions.  They both were

27  troubled by the cut telephone cords, as showing advance planning.  Dr. Terrell additionally was surprised

28  that the lab test on Turner's blood did not also reveal the presence of marijuana which Turner also

claimed to have used on the day of the crime.[116]   The Warden also recounts that there were overwhelming aggravating factors, including the severed telephone cords, the extreme brutality of the killing, the motive for personal gain, and Turner's recidivism despite prior incarcerations. He maintains it is not reasonably probable the jury would have rendered a life without parole verdict had it been presented with the mitigation proffered by Turner. According to the Warden, the proffered mitigation evidence had further potential for aggravating Turner's sentence over and above the aggravating evidence. In particular, the Warden emphasizes Turner's continued voluntary drug use despite having been told by family members and friends about his acts of violence when under its influence. Similarly, the Warden highlights the futility of raising mental issues at the penalty phase when the jury already had rejected them during the guilt phase. The Supreme Court has held otherwise. In *Eddings*, 455 U.S. at 117, the high Court clearly dictated that "state courts must consider all relevant mitigating evidence and weigh it against the evidence of the aggravating circumstances." In remanding Turner's case, and citing this particular passage from *Eddings*, the Ninth Circuit directed that because *all* relevant mitigating evidence must be considered by the jury, the scope of trial counsel's penalty phase investigation necessarily must be broader than that conducted during the guilt phase. *Turner*, 280 F.3d at 891. As stated in the analysis of Mr. Ellery's performance, Part IV.B.1.c., *supra*, the fact that Turner voluntarily used a dangerous drug that caused him to act aggressively was an issue Mr. Ellery should have been prepared to meet. Evidence of Turner's natural and drug-induced impairments when confronted with Mr. Savage's sexual (or perceived sexual) aggressiveness would have helped the jury understand why Turner acted so impulsively and with unrestrained violence. The strategy Mr. Ellery did present, but did not develop, the improbability of Turner moving tables, statues, stereos, and a whole closet-full of clothes into the Cadillac when, as all the experts agree, he was clearly intoxicated and at least (in Dr. Jones' view) somewhat mentally impaired, would have undermined the notion that he was a calculating thief with grand design to deprive Mr. Savage of substantial property. The post-crime break-in to Mr. Savage's home, evidenced by the broken key in the front door could have been emphasized at the penalty proceedings to give more dimension to the uncertainties Mr. Ellery did catalogue. This evidence, in turn,

---

[116] In contrast, Dr. Terrell was not surprised the tests did not reveal the presence of methamphetamine because it metabolizes at faster rate.

would have supported Mr. Ellery's theory that someone other than Turner cut the telephone cords.  In the alternative, had the PCP abuse been presented fully, Turner's impaired cognitive ability could have been helpful in explaining why he couldn't remember cutting the cords or why he might have cut them after the killing.

The testimony of Dr. Jones about the tranquilizing effects of PCP is remarkable.  First, Dr. Jones was incorrect to say that the DSM-III, which was the diagnostic manual available at the time of Turner's trial, did not include PCP dependence as a diagnosis.  Dr. Terrell had a copy of the relevant excerpt of the DSM-III with him at the evidentiary hearing.  Reciting from the DSM-III, he testified that PCP intoxication produced a sense of feeling good to violent conduct and could induce paranoia.  Dr. Jones' efforts to "take the burden off" PCP and rehabilitate its tarnished popular image as a dangerous drug that can cause the user to become irrationally violent were not persuasive.  The Warden's own argument pointing to the pitfalls of utilizing a PCP intoxication defense demonstrates that criminal law is rife with examples of the nexus between PCP intoxication and violent, irrational behavior.  *See Wade*, 29 F.3d at 1318-19 (not unreasonable for counsel to forego a PCP defense because of potentially negative view among jurors); *Mayfield*, 270 F.3d at 931 (chronic PCP abusers suffer long-term effects including cognitive impairments, depression, mood swings, impaired judgment, decreased impulse control, and violent behavior).

Added to the effects of Turner's PCP intoxication was Mr. Savage's conduct.  A significant material fact to Turner's mitigation case at both trial and on post-conviction proceedings is that Mr. Savage was (or that Turner perceived him to be) authoritatively overbearing and making unwanted sexual advances.  Under Turner's proffered mitigation theory, this circumstance impelled him, in his already PCP-intoxicated state, to overreact by wantonly, unnecessarily, and violently stabbing Mr. Savage to death.  The circumstantial evidence about Mr. Savage's homosexuality Mr. Ellery did present included Mr. Savage's telephone index, his mysterious weekend trips, testimony of the bartender from the gay bar, and the pathologist testimony documenting semen at the tip of Mr. Savage's penis and his looser than normal sphincter, was unpersuasive to the jury. While the Court is not satisfied that Mr. Ellery could have convinced or located the likes of Ms. Means (Tavares) or Ms. Slaton to have testified that Mr. Savage was an intimidating authority figure in the community and a clandestine homosexual,

he (Mr. Ellery) certainly could have corroborated Turner's story with further evidence of Mr. Savage's homosexual lifestyle, including matchbooks and credit card receipts as well as expert testimony about Mr. Savage's solicitous behavior indicating a sexual interest.  No one in the present proceedings disputes the sexual nature of the crime.  Detective Strength's interview statements reveal the view of authorities when the investigation began that it was a "sex crime."  To be sure, developing and eliciting testimony exposing Mr. Savage's homosexual lifestyle in 1984 would not have been easy or popular.  But evidence was available at least to have corroborated Turner's perceptions about Mr. Savage's intentions.  Mr. Ellery's failure to have presented the additional evidence he developed or to have questioned experts about Mr. Savage's behavior was prejudicial.

The Ninth Circuit added an additional point, that is, Mr. Ellery's stated lack of preparation for the penalty phase to the trial court.  This, however, appears not to have happened.  It is true that on Wednesday, November 21, 1984, when the jury returned its first degree murder verdict and found true the robbery-murder special circumstance allegation that Mr. Ellery informed the trial court he was not then prepared to go forward with the penalty proceedings.  The Ninth Circuit described this event as Mr. Ellery's admission to the trial judge that he was not prepared to proceed with the penalty phase.  281 F.3d at 892, 894.  On close re-evaluation of the record, the Court does not find that Mr. Ellery's stated unpreparedness to proceed with the penalty phase on November 21, 1984 was an issue affecting the outcome of the penalty phase.  First, he requested and was granted a continuance.[117]  Second, and more importantly, his penalty phase preparation, or lack of preparation, already had been sealed by that time.[118] He had no intention of presenting evidence regarding Turner's PCP abuse, either anecdotal, to show that Turner was in fact a PCP user, or expert, to explain the effects of PCP intoxication. He also did not develop or present evidence showing Turner's brutal childhood by his unhappy, alcoholic father, even though he (Mr. Ellery) admitted familiarity with the term "thumping."   Nor did he present evidence of Turner's poor academic record to bolster Dr. Hamm's assessment of Turner's borderline intellectual

---

[117] Mr. Ellery reportedly did tell Mrs. Turner after the penalty phase that he had not been prepared to try the penalty phase,  EHT-3: 523-24, but did not remember telling her so, EHT-1: 190.

[118] In any event, he testified that although he didn't feel the case should have been a death penalty case, he still prepared for the penalty phase.  EHT-1: 252.

1   functioning.  Finally, although Mr. Ellery commissioned his investigators to search for evidence to

2   corroborate Mr. Savage's homosexual life style, their search came up empty, except for a telephone

3   index, his patronage of a gay bar in Fresno, and some physical attributes of Mr. Savage's body not

4   inconsistent with homosexuality.

5       Because this is a pre-AEDPA case, written findings of the state court are presumed correct.

6   Former 28 U.S.C. § 2254(d).  Accordingly, the Court's analysis is informed by the findings of the

7   California Supreme Court that "[t]he depth and number of wounds, the presence of defensive and back

8   wounds, the position of the body, the bloody disarray throughout the house, and the lack of injury to

9   defendant, all indicate Savage was not a violent aggressor, as defendant claims, but was attempting to

10  fend off and escape defendant's murderous attack."[119]  *People v. Turner*, 50 Cal. 3d at 688.  The state

11  court's factual conclusions, however, are based solely on the four corners of the trial record.  Had the

12  state court permitted Turner the opportunity to develop a record on state habeas which is now before this

13  Court, it is not at all certain that the only characterization of Turner would have been as a violent

14  aggressor.  To be certain, he did violently and brutally stab Mr. Savage 40 or 50 times.  But the evidence

15  presented on federal habeas (and not presented at trial for jury determination) also shows that Turner's

16  mental state at the time of the crime was affected by his natural low intelligence, his conflicted deference

17  to authority occasioned by childhood abuse, and his PCP intoxication.  It appears clear that with Turner

18  in the compromised mental state, Mr. Savage's sexual overtures, both verbal and physical, overcame

19  Turner's limited impulse control which triggered his violent rage.  The omission of relevant evidence

20  about Turner's childhood abuse, dysfunctional family dynamics, borderline intellectual capabilities, drug

21  abuse, drug abuse history, and Mr. Savage's sexual practices undermine the jury's decision that

22  mitigating factors did not outweigh aggravating factors.

23      It is neither the intent nor the function of this Court, or any court, to substitute itself for the right

24  of both the Government and a criminal defendant to a jury's decision.  While many areas of discussion

25  and findings in this lengthy opinion considered alone, would not result in the granting of a writ of habeas

26  _____

27  [119] This finding was made in connection with Turner's appellate guilt phase claim that the
    evidence was insufficient to support his robbery conviction. The court found that the evidence supported
    the inference that Turner went to Mr. Savage's house with the intent to steal from him and that the
28  killing was for purposes of the robbery.  50 Cal. 3d at 688.

1   corpus, the cumulative failings of the defense at trial are synergistic in effect, leading to only one

2   possible and legal result. *See Silva*, 279 F.3d at 836 (holding that where individual deficiencies may not

3   by themselves meet the *Strickland* prejudice standard, they may when considered cumulatively constitute

4   sufficient prejudice to grant the writ).

5   **V.      Order**

6           Having considered all the pleadings, records, submitted evidence, and arguments of the parties,

7   the Court grants Turner's petition for a writ of habeas corpus as to Claim 5 alleging ineffective

8   assistance of counsel at the penalty phase of his trial.  A writ of habeas corpus shall issue directing the

9   State of California to vacate and set aside the death sentence in *People v. Thaddaeus Louis Turner*,

10  Merced County Superior Court Case No. 11945, unless within 90 days of the entry of judgment herein,

11  the State of California initiates proceedings to retry Turner's sentence.  In the alternative, the State of

12  California shall  re-sentence Turner to life without the possibility of parole.

13          The Clerk is directed to enter judgment forthwith.

14          IT IS SO ORDERED.

15

16  Dated:___August 4,  2009_____                            _/s/ Lawrence J. O'Neill__

17                                                                         Lawrence J. O'Neill
                                                                           United States District Judge
18

19

20

21

22

23

24

25

26

27

28

Appendix

Comparison of documents and information reviewed by Dr. Howard Terrell in preparation for his March 3, 2003 report in comparison with his July 18, 2003 report.

| March 3, 2003 Report Documents | July 18, 2003 Report Documents[120] |
|---|---|
| summary of telephone conversation with Ms. Hart February 6, 2003 | June 13, 2003 deposition of Phillip M. Hamm, Jr., Ph.D. |
| previous report on Turner dated March 1, 1993 based on February 10, 1993 evaluation | documentation from the file of Dr. Hamm |
| prior July 19, 1993 declaration of Dr. Terrell | documentation from Ms. Hart |
| letter from Ms. Hart dated January 31, 2003 | Turner's release of medical and psychological information for Dr. Terrell and Dr. Hamm |
| June 20, 1993 declaration of Ruth Turner | testimony of Dr. Hamm[121] |
| July 1993 declaration of Pam Butler | trial testimony of prosecution witness Lee Stewart Coleman, M.D. |
| August 1994 declaration of Ruth Turner | the Warden's proffered exhibits for the evidentiary hearing |
| June 15, 1994 declaration of Thaddaeus Jefferson Turner (Turner's father) | documentation from Trevor Glenn, M.D. (psychiatrist) |
| June 15, 1994 declaration of Evelyn Turner | September 30, 1982 probation report |
| August 22, 1994 declaration of Lisa Haynes | September 18, 1992 interview transcript of Ruth Turner by Turner's investigator |
| August 20, 1994 declaration of Yvonne Turner Haynes | documentation of John Ellery (letter to the Warden's counsel during state habeas proceedings) |
| November 10, 1994 declaration of Lewis Goodman | notice of lodging the Warden's exhibits |
| August 26, 1994 declaration of Phillips Haynes | additional documentation of Mr. Ellery |
| November 27, 1994 declaration of Elizabeth Turner | Turner's school records from the Fresno Unified School District |

---

[120] The first entry on documents reviewed recorded in the July 18, 2003 report was "documentation from Fredrich Newton, M.D." During this testimony at the evidentiary hearing, Dr. Terrell explained that this entry was a mistake. He did not look at this. EHT-2: 415-16.

[121] Dr. Terrell clarified that this testimony was from the actual trial during cross examination at the evidentiary hearing. EHT-2: 369.

| | |
|---|---|
| November 27, 1994 declaration of Oweida Turner | December 13, 1984 probation report |
| December 13, 1984 probation report | CV of Warden's expert Reese T. Jones, M.D. |
| September 30, 1982 probation report | January 24, 2003 report of Dr. Jones |
| RT from March 26, 1980 regarding a prior felony | documentation from the Merced County Sheriff's Department |
| February 8, 1980 probation report | interview transcript of Ruth Turner by Detective Strength (presumably from April 18, 1984) |
| RT from February 27, 1980 regarding a prior felony | interview transcript of Oweida Turner from April 18, 1984 by Detective Strength |
| March 14, 1980 probation report[122] | interview transcript of Kathryn Carter from April 18, 1984 by Detective Strength |
| Turner's school records from the Fresno Unified School District | interview transcript of Lewis Coleman by Detective Mayer |
| various letters appended to probation reports | (telephonic) interview transcript o f Sandra Goodman from April 24, 1984 by Detective Strength |
| | documentation from PSYCH SYSTEMS |
| | drug abuse and alcoholism newsletter from Vista Hill Foundation |
| | documentation from an October 14, 1998 presentation by Vista Sandia Hospital and Vista Hill Foundation |
| | declaration of Warden's expert Dean Warden |
| | CV of Dean Warden |
| | declaration of Ronald Kinchlowe |
| | Exhibit 1 to declaration of Ronald Kinchlowe |
| | documentation from law offices of Dennis Fischer |
| | documentation from attorney John M. Bishop |
| | Turner's Petition (operative federal) |
| | this Court's May 23, 1993 order |
| | July 21, 1993 declaration of Mr. Taylor |
| | July 21, 1993 declaration of Ms. Hart |

---

[122] The March 14, 1980 probation report was filed in the Fresno Superior Court on March 31, 1980 and summarized as EHT Exhibit 18.  *See* Part IV.A.4.a.(11), *infra.*

| | |
|---|---|
| 1 | declaration of Ernest D. Lykissa, Ph.D. |
| 2 | CV of Dr. Lykissa |
| 3 | documentation from California Toxicology Services |
| 4 5 | July 20, 1993 declaration of Stephen Pittel, Ph.D. |
| 6 | Dr. Terrell's prior July 19, 1993 declaration |
| | Dr. Terrell's CV |
| 7 | July 20, 1993 declaration of Ruth Turner |
| 8 | July 2, 1993 declaration of Pam Butler |
| 9 | July 22, 1933 declaration of Turner |
| 10 | July 16, 1994 declaration of Betty Means (Tavares) |
| 11 | July 3, 1994 declaration of Joyce Slaton |
| 12 | August 1994 declaration of Ruth Turner |
| 13 14 | August 22, 1994 declaration of Thaddaeus Jefferson Turner (Turner's father) |
| 15 | August 21, 1994 declaration of Thelma Alexander (Turner's maternal grandmother) |
| 16 | November 27, 1994 declaration of Elizabeth Turner |
| 17 18 | November 27, 1994 declaration of Oweida Turner |
| 19 20 | March 14, 1980 probation report (filed March 31, 1980 with the Fresno County Superior Court) |
| 21 | letter from Edison High School principal |
| | additional letter of Turner acquaintances |
| 22 23 | portions of Turner's capital trial for the present offense |
| 24 | May 19, 2003 declaration of attorney Dennis A. Fischer |
| 25 | Dr. Terrell's March 3, 2003 report |
| 26 | Dr. Terrell's March 1, 1993 report |
| 27 | |
| 28 | |